UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------x
SAFECO INSURANCE COMPANY OF AMERICA,

                Plaintiff,

        - against -

M.E.S., INC., M.C.E.S., INC., HIRANI ENGINEERING &
LAND SURVEYING, P.C., HIRANI/MES, JV, GEORGE
MAKHOUL, JITENDRA S. HIRANI, SARITA HIRANI,

                Defendants.
-------------------------------------------------------x
M.E.S., INC., M.C.E.S., INC., GEORGE MAKHOUL,

                Plaintiffs,

        - against -

SAFECO INSURANCE COMPANY OF AMERICA,
HIRANI/MES, JV, S.A. COMUNALE CO. INC., LIBERTY
MUTUAL INSURANCE COMPANY, RONALD GOETSCH,
DAVID PIKULIN, CARYN MOHAN-MAXFIELD,

                Defendants.
-------------------------------------------------------x

**MEMORANDUM & ORDER**
09-CV-3312 (PKC) (VMS)

**MEMORANDUM & ORDER**
10-CV-2798 (PKC) (VMS)

PAMELA K. CHEN, United States District Judge:

Before the Court are: (1) Plaintiff Safeco Insurance Company of America's ("Safeco's")
motion for summary judgment against Defendants M.E.S., Inc. ("MES"), M.C.E.S., Inc.
("MCES"), and George Makhoul ("Makhoul") (collectively, "the MES Defendants"), and
Defendants Jitendra S. Hirani ("J. Hirani"), Sarita Hirani ("S. Hirani"), Hirani Engineering &
Land Surveying, P.C. ("Engineering"), and Hirani/MES, JV ("the JV") (collectively, "the Hirani
Defendants") in Case No. 09-CV-3312 ("the Safeco Action"); (2) the MES Defendants' cross-
motion for dismissal of the Safeco action, and motion for partial summary judgment in Case No.
10-CV-2798 ("the MES Action"); and (3) motions for summary judgment filed by Defendants
Safeco, Liberty Mutual Insurance Company ("LMIC"), and S.A. Comunale Co. Inc.
("Comunale") in the MES Action. In addition, the Court addresses the pending motions

regarding the appropriate sanctions to levy against the MES Defendants and the Hirani Defendants.

For the reasons stated below: (1) Safeco's motion for summary judgment, filed in both the Safeco and MES Actions, is GRANTED; (2) the MES Defendants' motions in both actions are DENIED; (3) LMIC's motion for summary judgment in the MES Action is GRANTED; and (4) Comunale's motion for summary judgment in the MES Action is GRANTED. The MES Defendants are jointly and severally liable to Safeco for all losses incurred by Safeco in connection with the PRTF and ERDLF projects, and all Defendants are jointly and severally liable to Safeco for all losses incurred by Safeco in connection with the HEPFF project. An evidentiary hearing will be held to determine the quantum of damages. In addition, although the Court does not impose any sanctions on the M.E.S and Hirani Defendants beyond the full amount of indemnification that they are liable for under the judgment in the Safeco Action, Safeco may move for a restraint of the MES and Hirani Defendants' assets pursuant to N.Y. C.P.L.R. § 5229 pending the evidentiary hearing and the issuance of a final judgement in this matter.

# BACKGROUND

## I. FACTUAL BACKGROUND[1]

Under two indemnity agreements, Safeco provided performance and payment surety

bonds for three construction projects undertaken by the MES and Hirani Defendants. MES sub-

---

[1] Both actions presently before the Court arise out of the same core set of facts, with which the parties' familiarity is presumed. The facts herein are taken from the Court's previous Orders in the Safeco Action (Safeco Action Dkts. 50, 80), as well as the parties' voluminous submissions in connection with the summary judgment motions under consideration here, including the various parties' Rule 56.1 Statements, which are referred to herein by docket number and consist of the following:

| Action | Dkt. | Document Description |
|--------|------|----------------------|
| Safeco | 410-1 | Safeco's Statement of Undisputed Material Facts in Support of Its Motion for Summary Judgment |
| Safeco | 423-2 | The MES Defendants' Response to Dkt. 410-1 and Additional Statement of Disputed Material Facts in Opposition to Safeco's Motion for Summary Judgment, and Additional Statement of Undisputed Facts in Support of Their Motion for Summary Judgment |
| Safeco | 412-1 | Safeco's Response to Dkt. 423-2 |
| Safeco | 399-2 | The Hirani Defendants' Statement of Undisputed Facts in Support of Its Opposition to Safeco's Motion for Summary Judgment |
| Safeco | 411-1 | Safeco's Response to Dkt. 399-2 |
| MES | 213-9 | LMIC's Statement of Material Facts in Support of Its Motion for Summary Judgment |
| MES | 217-2 | The MES Defendants' Response to Dkt. 213-9 and Additional Statement of Disputed Facts in Opposition to LMIC's Motion for Summary Judgment |
| MES | 215-2 | Comunale's Statement of Undisputed Material Facts in support of its motion for summary judgment |
| MES | 218-1 | The MES Defendants' Response to Dkt. 215-2 and Additional Statement of Disputed Facts in Opposition to Comunale's Motion for Summary Judgment |

Where a party's Rule 56.1 Statement is cited and there is no contrary evidence in the record, the Court deems that fact to be undisputed and admitted. *Compare Holtz v. Rockefeller & Co.*, 258 F.3d 62, 73–74 (2d Cir. 2001) ("[W]here there are no[] citations or where the cited materials do not support the factual assertions in the [56.1] Statements, the Court is free to disregard the assertion" and review the record independently.), *with Amnesty Am. v. Town of W. Hartford*, 288 F.3d 467, 470 (2d Cir. 2002) (Rule 56 "does not impose an obligation on a district court to perform an independent review of the record to find proof of a factual dispute."), *and Monahan v. N.Y.C. Dep't of Corrections*, 214 F.3d 275, 292 (2d Cir. 2000) ("While the trial court has discretion to conduct an assiduous review of the record in an effort to weigh the propriety of granting a summary judgment motion, it is not required to consider what the parties fail to point out.") (quotation marks omitted). Any citation to a party's Rule 56.1 Statement incorporates by reference the documents cited therein unless otherwise noted.

contracted with Comunale to perform fire protection work on two of the three projects, and LMIC[2] provided performance and payment bonds to MES on behalf of Comunale for that work.

### A. The Parties' Indemnity Agreements

The first indemnity agreement was signed on February 3, 2003 by Makhoul individually and as the "President, Sole & Only Officer" on behalf of MES and MCES. (Safeco Action Dkt. 64-5 ("the MES Agreement"); *see also* Dkt. 80 at 2; Dkt. 410-1 ¶ 8.) The second indemnity agreement was signed on June 23, 2003 by Makhoul individually and on behalf of MES as both an entity and as part of the JV, by S. Hirani individually, and by J. Hirani individually and on behalf of Engineering as both an entity and as part of the JV. (Safeco Action Dkt. 64-6 ("the Hirani Agreement"); *see also* Dkt. 80 at 2–3; Dkt. 410-1 ¶ 11.)

MES and MCES were listed as the "Principals" for which Safeco acted as surety in the MES Agreement, and the JV was listed as the Principal for which Safeco acted as surety in the Hirani Agreement. (Dkts. 64-5 at 1, 64-6 at 1.) The Principals were defined in both Agreements as "Contractors." (*Id.* (defining "Contractor" as "[a]ny one, combination of, or all of the . . . firms . . . set forth above," which were MES and MCES in the MES Agreement and the JV in the Hirani Agreement).) The Agreements contemplated that MES, MCES, and the JV, as Contractors, would enter into contracts with third parties, "the performance of which is guaranteed by any Bond for which [Safeco] is surety." (*Id.*)

_____

[2] Safeco and LMIC are related entities, by virtue of LMIC's acquisition of Safeco in early September 2008. (Dkt. 217-1, ¶ 1; Dkt. 217-3 at ECF 155.)

All "ECF" citations refer to page numbers generated by the court's Electronic Court Filing ("ECF") system, and not the document's internal pagination.

For ease of reference, the Court shall refer herein to these agreements collectively as "the Indemnity Agreements" or "the Agreements," and shall refer to the signatories thereof as the MES and/or Hirani Defendants.[3]

1.     Purpose

Other than the date of execution, the identities of the indemnitors, and the signatories thereto, the Indemnity Agreements are identical.  (Dkt. 410-1 ¶ 14.)   At the outset, the Agreements state that they are made "in favor of [Safeco] for the purpose of indemnifying them from all loss and expense in connection with any Bonds for which any [Safeco] Company now is or hereafter becomes Surety" for either MES, MCES, or the JV as Principal.  (Safeco Action Dkts. 64-5 at 1, 64-6 at 1.)  The Agreements also state that the MES and Hirani Defendants, as signatories to the Agreements, "jointly and severally[] agree" to the terms set forth therein, "[i]n consideration of the execution of any such Bonds . . . and *as an inducement to such execution by Surety*."  (*Id*. (emphasis added).)

2.     Indemnity to Surety

The Agreements provide that the MES and Hirani Defendants "agree to pay to Surety upon demand . . . [a]ll loss, costs and expenses of whatsoever kind and nature, including court costs, reasonable attorney fees . . . , consultant fees, investigative costs and any other losses, costs or expenses incurred by Surety by reason of having executed any Bond, or incurred by it on account of any Default under this agreement by any of the [MES or Hirani Defendants]," as well

---

[3] The MES Defendants dispute many of Safeco's proffered undisputed facts on the basis that the Indemnity Agreements did not represent "complete copies" of the MES and Hirani Indemnity Agreements, alleging that those Agreements had been revised pursuant to an oral agreement allegedly memorialized, at Safeco's request, in a letter from Makhoul to Safeco.  (*See, e.g.*, Safeco Action Dkt. 423-2 at 2–7 ¶¶ 8–29; *see also id*. at 34–35 ¶¶ 2–7.)  The Court has not considered these allegations, as they directly contradict the Court's prior holding that "the parol evidence rule bars admission of the alleged oral agreement to modify the terms of the written indemnity agreements."  (*See* Dkt. 80 at 14–17.)

as, *inter alia*, "interest on all disbursements made by Surety in connection with such loss, costs and expenses . . . at the maximum rate permitted by law calculated from the date of each disbursement" and "[a]n amount sufficient to discharge any claim made against Surety on any Bond," either to "pay such claim or [to] be held by Surety as collateral security against loss on any bond." (*Id.*)

With respect to claims against Safeco, the Agreements provide that Safeco "shall have the exclusive right for itself and [the MES and Hirani Defendants] to determine in good faith whether any claim or suit upon any Bond shall, on the basis of belief of liability, expediency or otherwise, be paid, compromised, defended or appealed," and "Safeco's determination in good faith . . . shall be final and conclusive" upon the MES and Hirani Defendants. (Safeco Action Dkts. 64-5 at 1, 64-6 at 1.) Safeco is also empowered to "incur such expenses, including reasonable attorneys' fees, as deemed necessary or advisable in the investigation, defense and payment of such claims." (*Id.*) "An itemized statement of loss and expense incurred by [Safeco], sworn to by an officer of [Safeco], shall be prima facie evidence of the fact and extent of the liability of [the MES and Hirani Defendants] to [Safeco] in any claim or suit by [Safeco] against [the MES and Hirani Defendants]." (*Id.*)

3.    Definition of Default

The Agreements provide that MES, MCES, and the JV would be "deemed to be in default under [the Indemnity Agreements]" if they were "declared to be in default by the Obligee of any Bond; [a]ctually breache[d] or abandon[ed] any Contract [between them and any third party for which Safeco acted as surety]; [f]ail[ed] to pay, to the extent due in whole or in part, claims, bills or other indebtedness incurred in connection with the performance of any [such]

Contract;" or, *inter alia*, "[b]reache[d], fail[ed] to perform, or comply with, any provision of [the Indemnity Agreements]." (Safeco Action Dkts. 64-5 at 1, 64-6 at 1.)

    4.    <u>Surety's Remedies in Event of Default</u>

In the event that MES, MCES, or the JV defaulted, the Agreements permitted Safeco, "at its sole discretion," to "[t]ake possession of the work under any and all Contracts and to arrange for its completion by others or by the Obligee of any Bond," "[t]ake possession of [the MES and Hirani Defendants'] equipment, materials and supplies at the site of the work, or elsewhere, if needed for prosecution of the work, as well as [their] office equipment, books and records, and utilize the same in completion of the work under the Contract without payment of any rental for such use," and, *inter alia*, "[t]ake such other action as [Safeco] shall deem necessary to fulfill its obligations under any Bond." (Dkts. 64-5 at 1, 64-6 at 1.) The MES and Hirani Defendants, as signatories to the Agreements, "waive[d] all notice of such default [and] of the payment of any claim." (*Id*. at 1–2.)

    5.    <u>Security to Surety</u>

As "collateral security" to Safeco, the MES and Hirani Defendants assigned to Safeco, "as of the date of execution of any Bond, all rights . . . in, or in any manner growing out of," *inter alia*, "[a]ny Contract or modification thereof; [a]ny subcontract or purchase order and against any legal entity and its surety who has contracted with [MES, MCES, or the JV] to furnish labor, materials, equipment and supplies in connection with any Contract; [m]onies due or to become due [to MES, MCES, or the JV] on any Contract, including all monies earned or unearned which are unpaid at the time of notification by [Safeco] to the Obligee [of the bond on that contract] of [Safeco's] rights . . . ; [a]ny actions, causes of action, claims or demands whatsoever which [MES, MCES, or the JV] may have or acquire against any party to the

Contract, or arising out of or in connection with any Contract[;] . . . and [Safeco] shall have the full and exclusive right, in its name or in the name of [MES, MCES, or the JV], but not the obligation, to prosecute, compromise, release or otherwise resolve such actions, causes of action, claims or demands." (Dkts. 64-5 at 2, 64-6 at 2.) Safeco agreed to forbear exercising these rights "until there is a Default under this agreement," as previously defined. (*Id.*)

The parties also agreed, as additional collateral security for Safeco, that "all monies earned by [MES, MCES, or the JV] under any Contract are trust funds, whether in the possession of [MES, MCES, or the JV] or otherwise, for the benefit of, and for payment of [their] obligations for, labor, material, and supplies furnished to [them] in performance of such Contract for which [Safeco] would be liable under any Bond on such Contract." (*Id.*)

6.     General Provisions

In addition to these specific terms, the Indemnity Agreements contain a number of general provisions that affect the rights of the parties. Specifically, among other things, the parties agreed that Safeco agreeing, or failing to agree, to changes in any contract or bond "shall not release or affect the obligations of [the MES and Hirani Defendants] to Safeco even though any such assent by [Safeco] does or might increase the liability of the [MES and Hirani Defendants]." (*Id.*) The Agreements provided that "[t]he rights and remedies afforded to [Safeco] by the terms of [the Agreements] and the terms themselves may not be waived or modified orally and no written change or modification shall be effective until signed by an employee of [Safeco]." (*Id.*) Finally, the Agreements provide that they are to be "liberally construed so as to protect, exonerate and indemnify [Safeco]." (*Id.*)

## B. Three Construction Projects

The MES and Hirani Defendants entered into three construction contracts with the U.S. Army Corps of Engineers ("Corps") for projects in New Jersey—the Pyrotechnics Research Technology Facility ("PRTF") and the Explosives Research and Development Loading Facility ("ERDLF"), undertaken by the MES Defendants, and the High Energy Propellant Formulation Facility ("HEPFF"), undertaken by the MES and Hirani Defendants through the JV.[4]  Safeco issued performance and payment bonds for all three contracts, in an amount of $10,628,832.00 for PRTF, $8,253,975.00 for ERDLF, and $16,549,000.00 for HEPFF.  (Dkt. 410-1 ¶¶ 30, 33; *see also* Makhoul Aff.[5] ¶ 72.)

### 1. PRTF

On January 16, 2008, the Corps issued a Cure Notice in which it threatened to terminate the MES Defendants for default unless the specific deficiencies cited in the notice were promptly cured.  (Dkt. 410-1 ¶ 35.)  In the PRTF Cure Notice, the Corps also demanded a meeting with the MES Defendants and Safeco to discuss the issues addressed in the notice.  (*Id.*)  MES informed Safeco that it did not want Safeco to attend the meeting because it believed that Safeco's presence and participation would weaken MES's position with the Corps.  (Makhoul Aff. ¶ 14.)

The Notice to Cure meeting took place on January 31, 2008.  (Makhoul Aff. ¶ 15.)  Safeco attended the meeting over MES's objections.  (Makhoul Aff. ¶¶ 15, 17.)  Safeco's

---

[4] The MES Defendants object to many of Safeco's proffered undisputed facts regarding these contracts and related bonds on the basis of clerical errors in attaching the supporting materials, *i.e.*, Safeco cited the wrong exhibits in support of the enumerated facts.  (*See, e.g.*, Dkt. 423-2 ¶¶ 30–41.)  While the MES Defendants appear correct with respect to the mislabeling or mistaken citing of these exhibits, the MES Defendants do not challenge, nor is there any evidence in the record to call into question, the veracity of these underlying facts, and therefore the Court has treated them as undisputed for purposes of resolving the instant motions.

[5] All citations to "Makhoul Aff." refer to the Affidavit of George Makhoul in Opposition to Safeco's Motion for Summary Judgment.  (Safeco Action Dkt. 423-1.)

representative stated in the presence of representatives of MES and the Corps that Safeco would "honor its commitment, the bond commitment to the Corps" and affirmed that Safeco would complete the project if it was terminated and Safeco was asked to complete it.  (Dkt, 410-5 at 139:2-5, 14–16; Makhoul Aff. ¶ 17.)  The MES Defendants allege that at the meeting, the Corps asked MES's employees to leave the room so the Corps representatives could have a private conversation with Safeco's representative.  (Dkt. 441-3, at ECF 3.)

On March 5, 2008, the Corps terminated the MES Defendants for default from the PRTF project, and 12 days later, on March 17, 2008, the Corps made a bond demand on Safeco to complete the remaining work on the PRTF contract.    (Dkt. 410-1 ¶¶ 36–37.)

Safeco entered into a Takeover Agreement ("the PRTF Takeover Agreement") with the Corps, dated June 3, 2008, under which Safeco agreed to undertake the completion of the MES Defendants' work under the PRTF contract.  (Dkt. 410-1 ¶ 42.)  This agreement contained Safeco's full reservation of rights, including but not limited to the right to contest the propriety of the default termination.  (*Id*.)  Pursuant to the PRTF Takeover Agreement, Safeco hired Perini Management Services, Inc. ("Perini") as a completion contractor, tasked with, *inter alia*, completing the work, providing construction management services, and providing technical expertise to Safeco and its attorneys regarding the PRTF contract.  (Dkt. 410-1 ¶ 43.)  Safeco also hired Cashin, Spinelli & Ferretti, LLC ("Cashin Spinelli")[6] as a consultant on the PRTF project, to assist in responding to the performance bond demand, to oversee completion of the PRTF contract, and to provide additional technical expertise to Safeco and its attorneys regarding the project.  (Dkt. 410-1 ¶ 44.)  Finally, Safeco retained outside counsel, Watt, Tieder, Hoffar & Fitzgerald, L.L.P. ("Watt Tieder"), to provide legal advice and assistance to Safeco in responding

---

[6] On its website, Cashin Spinelli describes itself as a "surety consulting and construction management firm."  https://www.csfllc.com/ (last visited 3/29/17).

to the PRTF bond demand and to provide other legal services in connection with the MES Defendants' default and Safeco's completion of the PRTF contract. (Dkt. 410-1 ¶ 45.)

On August 14 and 17, 2015, respectively, Safeco and the Corps executed a settlement agreement under which Safeco and the Corps agreed upon a mutual release and discharge of all claims and responsibilities under the PRTF bond, including Safeco's withdrawal of any remaining appeals with respect to the PRTF bond and the Corps's release and return of the PRTF bond to Safeco. (*See* Dkt. 410-9; *see also* Dkt. 410-1 ¶ 46.) As part of this settlement, the Corps also agreed to pay $2,000,000 to Safeco, "inclusive of interest, legal fees, consultant fees, and any other similar or related expenses whatsoever, in full and complete settlement of all of the reinstated [PRTF] appeals, and the [PRTF] Surety Claim." (*See* Dkt. 410-9 at ¶ 4.)

## 2. ERDLF

On November 10, 2008, the Corps issued a Cure Notice in which it threatened to terminate the MES and Hirani Defendants for default unless the specific deficiencies cited in the notice were promptly cured. (Dkt. 410-1 ¶ 40.) On December 22, 2008, the Corps terminated the MES Defendants for default from the ERDLF project, and that same day, made a performance bond demand on Safeco to complete the ERDLF contract. (Dkt. 410-1 ¶ 41.)

Safeco did not enter into a Takeover Agreement with respect to the ERDLF project, though Safeco still hired Perini, Cashin Spinelli, and Watt Tieder to assist with, *inter alia*, the investigation and analysis of completion issues with the ERDLF project, and to assist in the development of Safeco's legal strategy with respect to that project. (Dkt. 410-1 ¶¶ 56–58.) Ultimately, Safeco denied liability on the bond and on January 8 and 13, 2015, respectively, Safeco and the Corps executed a settlement agreement under which Safeco and the Corps agreed upon a mutual release and discharge of all claims and responsibilities under the ERDLF bond,

including Safeco's withdrawal of any remaining appeals with respect to the ERDLF bond and the Corps's release and return of that bond to Safeco. (*See* Dkt. 410-12; *see also* Dkt. 410-1 ¶ 59.)

        3.    <u>HEPFF</u>

On September 3, 2008, the Corps issued a Cure Notice in which it threatened to terminate the MES and Hirani Defendants for default unless the specific deficiencies cited in the notice were promptly cured. (Dkt. 410-1 ¶ 38.) In the HEPFF Cure Notice, the Corps also demanded a meeting with the MES and Hirani Defendants and Safeco to discuss the issues addressed in the notice. (*Id.*)

A Notice to Cure meeting was held on September 16, 2008, and as with the PRTF project, Safeco attended over MES's objections. (Makhoul Aff. ¶ 166–68.) MES alleges that at the meeting, the Corps requested that Safeco take over and fund the completion of the project through a memorandum of understanding ("MOU") pursuant to which the Corps would advance funds directly to Safeco. (Makhoul Aff. ¶ 172.) MES and Hirani objected to the new provision that payments to the JV for completed work would go directly to Safeco. (Makhoul Aff. ¶ 173, 180.) After further negotiations, on September 30, 2008, the Corps sent Safeco and the JV a letter with its "final offer" for the MOU, which included a term that Safeco receive the remaining payments, as well as a term that the Corps would reserve its right to continue to assess liquidated damages against the JV and Safeco. (Makhoul Aff. ¶ 185, 423-12, Ex. 177 at ECF 178–80.)

In a letter dated October 31, 2008, the JV sent proposed revisions to the MOU to the Corps. (Dkt. 423-12, Ex. 178 at ECF 182–90.) Among other revisions, the JV included a provision waiving the Corps's right to recover liquidated damages if the JV completed the project in accordance with the terms of the agreement. (Dkt. 432-12, Ex. 177 at ECF 179; Ex. 178 at ECF 188.) Ultimately, no MOU was executed.

The Corps terminated the HEPFF contract on November 4, 2008 for default. (Dkt. 410-1 ¶ 39; Makhoul Aff. ¶ 194; Dkt. 64-13 (Ex. J) ("Termination Letter").) The Termination Letter stated that "the JV [had] provided no credible evidence that it [could] deliver the required project." (Termination Letter at ECF 12.) It listed its concerns as "(1) the JV's failure to prosecute the work, (2) the JV's failure to pay sub-contractors, and (3) the JV's failure to remedy significant work deficiencies." (*Id.*) J. Hirani's deposition testimony confirmed that the project was terminated because of "delaying the job and not putting enough manpower and doing quality work." (Dkt. 412-10, at ECF 7.) Bernard Khadra, MES's Project Engineer and Assistant Project Manager for the each of the bonded projects, testified that the Corps terminated the project because the HEPFF project was "behind schedule" and that the Corps claimed there "were construction and design deficiencies." (Dkt. 412-12, at 59.) On November 4, the Corps also made a performance bond demand on Safeco to complete the contract. (Dkt. 410-1 ¶ 39.)

On December 3, 2009, Safeco and the Corps entered into a Takeover Agreement ("the HEPFF Takeover Agreement"), under which Safeco agreed to undertake the completion of the JV's work under the HEPFF contract. (Dkt. 410-1 ¶ 49.) This agreement contained Safeco's full reservation of rights, including, but not limited to, the right to contest the propriety of the default termination. (*Id.*) Pursuant to the HEPFF Takeover Agreement, Safeco hired Perini and Cashin Spinelli as completion contractor and consultant, respectively, and again retained Watt Tieder as outside counsel. (*Id.* ¶¶ 50–52.)

On October 29 and 30, 2015, Safeco and the Corps, respectively, executed a settlement agreement under which Safeco and the Corps agreed upon a mutual release and discharge of all claims and responsibilities under the HEPFF bond, including Safeco's withdrawal of any remaining appeals with respect to the HEPFF bond and the Corps's release and return of the

HEPFF bond to Safeco. (*See* Dkt. 410-11; *see also* Dkt. 410-1 ¶ 53.) As part of this settlement, the Corps also agreed to pay $6,015,000 to Safeco, "inclusive of interest, legal fees, consultant fees, and any other similar or related expenses whatsoever, in full and complete settlement of all of the reinstated HEPFF appeals, and the HEPFF Surety Claim." (*See* Dkt. 410-11 at 3.)

### C.    Safeco's Losses Under The Three Bonds

According to Safeco, it has incurred substantial losses on all three projects, both from (1) Safeco having to investigate the MES and/or Hirani Defendants' defaults under these projects and, as to the PRTF and HEPFF projects, having to complete them, and (2) Safeco having to investigate and discharge bond payment demands of various subcontractors and suppliers on all three projects, who claimed that the MES and Hirani Defendants had failed to pay them for labor and/or materials. (*See* Dkt. 410-1 ¶¶ 47–48, 54–55, 60–67.) In addition, Safeco alleges losses from having to investigate and discharge the U.S. Department of Labor's claim of wage violations by the MES and Hirani Defendants on all three projects, which Safeco ultimately settled. (*Id.* ¶¶ 68–70.)

At the Court's request, Safeco supplemented its summary judgment papers with a statement of damages on September 2, 2016. (*See* Dkt. 438.) In these supplemental papers, Safeco asserts that its total unreimbursed loss for the three projects is $8,841,027.31. (Dkt. 438 at 9). For the PRTF project, Safeco asserts that it paid $11,629,179.91 to contractors and suppliers,[7] $195,903.26 to consultants,[8] and $29,927.93 in additional administrative expenses, for total expenses, prior to inclusion of legal fees, of $11,855,011.11. (Dkt. 438-1, at ECF 11,

---

[7] As MES points out, Safeco asserted in its March 17, 2014 Contract Dispute Act ("CDA") Certified Claim against the Corps for the PRTF project ("PRTF Certified Claim") that its contractor/supplier costs totaled $11,627,797.01. (Dkt. 423-6, at 24, n.63)

[8] Safeco asserted in its Certified Claim that its consulting services cost was $187,945.26.

13–14.) Safeco received $10,537,739.81 in contract funds from the Corp, and $2,000,000.00 in a settlement in litigation against the Corps. (*Id.* at ECF 16–17.) Therefore, prior to the inclusion of legal expenses, which Safeco appeared to provide to Watt Tieder in a lump sum for all three projects (Dkt. 438-1, at ECF 15), <u>Safeco made a net gain of $682,728.71 from the PRTF project</u>. For the HEPFF project, Safeco paid $10,682,341.34 in contractor and supplier costs,[9] $477,278.80 to consultants,[10] and $16,328.70 in additional administrative expenses, for total expenses, prior to the inclusion of legal fees, of $11,175,948.84. (*Id.* at 11, 13–14.) Safeco received $1,953,367.95 in contract funds from the Corps and $6,015,000.00 from a settlement in the litigation with the Corps. (*Id.* at 16–17.) Therefore, prior to the inclusion of legal expenses, <u>Safeco has an outstanding loss of $3,207,580.85 from the HEPFF project</u>. For the ERDLF project, Safeco paid $706,528.81 in contractor and supplier costs, $132,523.15 to consultants, and $12,482.88 in additional administration expenses, for total expenses, prior to the inclusion of legal fees, of $851,534.84. (*Id.* at ECF 12–14.) For the ERDLF project, Safeco has not received

---

[9] In its Certified Claim against the Corps for the HEPFF project ("HEPFF Certified Claim"), Safeco stated that its completion costs were $9,513,378,79 to contractors. (Dkt. 423-13 at ECF 18, n.19.) MES asserts that the reason for this discrepancy is "double billing" of certain subcontractors. (Dkt. 441 at 11.) MES points to an invoice that Perini sent to Safeco on November 12, 2012, in which Perini billed Safeco for work provided by several of the same subcontractors that Safeco asserts in its supplemental briefing that it paid directly. (Dkt. 441-6 at ECF 4–6.) However, Perini's payments to these subcontractors do not appear to be for the same charges that Safeco asserts it paid directly, because the amounts are so different. For example, the Perini invoice demands reimbursement from Safeco for a payment of $394,305.83 that Perini made to the Oliver Drake Company; at the same time, Safeco lists as an expense a payment of $26,811.28 that Safeco made directly to the Oliver Drake Company. (Dkt. 441-6 at ECF 5, Dkt 438-1 at ECF 11). The Perini invoice requests reimbursement for a $49,755.70 payment to Stony Brook, and Safeco lists a direct payment of $4,000 to Stony Brook Lightning Rods. (*Id.*) Given the substantial disparity between these payments, there is no basis to conclude that these payments amounted to "double billing." Indeed, MES cannot genuinely dispute the more obvious explanation that Safeco made some payments directly to subcontractors who worked on the HEPFF project, while Perini made others in the first instance.

[10] In its HEPFF Certified Claim, Safeco states that its construction management and consulting services fees were $365,220.04. (Dkt. 423-13 at ECF 18, n.19).

contract payments from the Corps or any payments from settlements. Therefore, prior to the inclusion of legal expenses, <u>Safeco has an outstanding loss of $851,534.84 from the ERLDF project.</u> <u>Safeco's combined total loss before legal fees is $3,376,386.98, and its combined total loss after legal fees (totaling $5,464,640.29[11]) is $8,841,027.27</u>. There is no genuine dispute that Safeco sustained losses on all three projects. The only project on which Safeco came out ahead prior to the inclusion of attorneys' fees was the PRTF project, and there is no question that attorneys' fees for that project are greater than the small "gain" of $682,728.71, given that the total attorneys' fees for all three projects is $5,464,640.29. In fact, as of March 17, 2014, Safeco had already spent $865,047.52 in attorneys' fees on the PRTF project alone, (Dkt. 423-6 at ECF 27), and that number has unquestionably increased during the years of protracted litigation that have followed. And as discussed *infra*, the Indemnity Agreements unequivocally provide that the MES and Hirani Defendants will indemnify Safeco for attorneys' fees.

## II. PROCEDURAL HISTORY: THE SAFECO ACTION

On July 30, 2009, Safeco filed the Safeco Action, alleging various alternative claims for relief, including, *inter alia*, breach of contract and indemnification as to both the MES and Hirani Defendants. (Safeco Action Dkt. 1.)

On March 24, 2010, Safeco filed a motion for partial summary judgment in the Safeco Action, arguing that the MES and Hirani Defendants had breached the parties' indemnity agreements and seeking to enforce Safeco's alleged rights to collateral security, including assignment of Defendants' affirmative claims against third parties, including subcontractors and full access to Defendants' books, records, and accounts. (Safeco Action Dkt. 64.) On May 19,

---

[11] MES objects to the increase of Safeco's reported legal fees from $1,859,593.41 at the time it submitted its Certified Claims in 2014, to $5,464,640.29 by the time of the supplemental briefing. (Dkt. 423-13 at ECF 22; Dkt. 423-6 at ECF 27; Dkt. 438-1, Ex. 5.) The reasonableness of these fees will be addressed at the evidentiary hearing.

2010, the Honorable Allyne R. Ross granted that motion in part and denied it in part. (Safeco Action Dkt. 80.)

Judge Ross held that the Indemnity Agreements were integrated documents, and therefore, under the parol evidence rule, she rejected the MES Defendants' attempts to introduce evidence of any oral agreements or letters sent prior to the execution of those agreements. (*Id*. at 14–17.) Judge Ross also held that the MES Defendants could not use the alleged oral "modifications" to the Indemnity Agreements to claim that they were fraudulently induced to enter into those agreements. (*Id*. at 17 n.5.) With respect to Safeco's motion for specific performance as to collateral security provided for in the Indemnity Agreements, Judge Ross held that, under both New York State law and the agreements themselves, the issue of Safeco collecting collateral security was separate from the ultimate issue of liability for indemnification, and that any alleged bad faith on Safeco's part was relevant only to the latter. (*Id*. at 18–23.) Therefore, Judge Ross found that Safeco's right to collateral security from the MES and Hirani Defendants under the Indemnity Agreements did not foreclose a later assertion of bad faith by those parties against Safeco as to the ultimate issue of liability. (*Id*. at 25.) Judge Ross reserved judgment on the amount of the collateral security, finding that Safeco had not provided sufficient support for the reasonableness of its demand for $13,325,000 from the MES Defendants and $8,800,000 from the Hirani Defendants. (*Id*. at 26–28.)[12] Judge Ross also granted Safeco's motion to exercise its right under the Indemnity Agreements to review the MES and Hirani Defendants' books and records. (*Id*. at 29.)

---

[12] Judge Ross held that, in light of her grant of Safeco's summary judgment motion as to its claim for collateral security, Safeco's request for an assignment of claims and the power-of-attorney to effect the same was unwarranted at that juncture, but provided that, should the MES and Hirani Defendants be unwilling or unable to provide collateral security, Safeco would be permitted to renew its motion. (Safeco Action, Dkt. 80 at 27–28 & n.6.)

The MES Defendants appealed Judge Ross's May 19, 2010 summary judgment order to the Court of Appeals for the Second Circuit. (Safeco Action Dkt. 84.) The appeal was ultimately dismissed for lack of jurisdiction (Safeco Action Dkt. 101), but while the appeal was pending, the MES Defendants also sought reconsideration of the May 19, 2010 order, allegedly on the basis of evidence that Safeco had produced only after the order was issued. (*See* Safeco Action Dkt. 91.) On October 4, 2010, Judge Ross issued an order on the reconsideration motion, as well as on Plaintiff's motion renewing its collateral security demand in which Plaintiff sought an order establishing the amount of the collateral, setting a deadline for the MES and Hirani Defendants to pay it, and providing for a formal assignment of Defendants' claims against third parties in the event Defendants failed to post collateral by the set deadline. (*See* Safeco Action Dkt. 107.)

Judge Ross held that the Indemnity Agreements clearly distinguished between Safeco's actual losses, which triggered Safeco's indemnification right, and claims yet to be paid or anticipated, which were included in the collateral security provisions. (*Id*. at 2–3.) In light of that distinction, Judge Ross held that the actually-paid claims were to be subtracted from Safeco's collateral security demand of $13,325,000 as to the MES Defendants and $8,800,000 as to the Hirani Defendants, and directed Safeco to refile the demand with the Court, with Defendants to respond within 14 days thereafter. (*Id*. at 3, 10–11. *See also id.* at 9 ("[W]here claims have actually been paid, Safeco has an adequate remedy at law in the enforcement of the indemnification clause of the agreement and is not entitled to the equitable remedy of specific performance.").) Safeco's motion for a formal assignment of Defendants' claims against third parties was again denied. (*Id*. at 11.)

Safeco then filed with the Court its renewed demand for collateral, which Judge Ross took up in an order issued on November 22, 2010. Safeco's modified collateral security demand sought $7,712,170.91 from the MES Defendants and $6,932.603.94 from the Hirani Defendants. (Safeco Action Dkt. 121.) Judge Ross ultimately held that Safeco was entitled to collateral security of $6,614,634.41 from the MES Defendants for anticipated losses and projected legal and consulting fees related to the HEPFF and PRTF projects, and $4,960,067.44 from the Hirani Defendants (though the MES Defendants were jointly and severally liable for this amount), to cover anticipated losses on the HEPFF project, with both sets of losses accruing from August 24, 2010. (*Id*. at 7, 16.) Judge Ross ordered that the MES and Hirani Defendants provide Safeco with that collateral by December 1, 2010. (*Id*. at 27.) The MES Defendants sought reconsideration of that order, a request in which the Hirani Defendants joined, but that request was denied. (*See* Safeco Action Dkt. 125.)

Between 2010 and the present, there have been extensive and protracted disputes over the payment of collateral, and Defendants have failed to rebut Safeco's contention that as of March 11, 2016, "no Defendant has provided Safeco with even one dollar's worth of collateral security." (Dkt. 419, at 2.)[13] There have also been extensive disputes regarding Defendants' failure to turn over all required discovery. On July 23, 2014, the Court adopted the Report and Recommendations of the Honorable Vera M. Scanlon recommending that the Court hold the MES and Hirani Defendants in civil contempt for failing to pay the Court's collateral security

---

[13] MES responds by arguing that Safeco has collected substantial amounts in pledged security and cash held by the Court for Safeco's benefit, (Dkt. 420), citing the funds Safeco collected from the Corps in settlements and money withheld from MES by Safeco and the Court. Yet, the fact that Safeco has been able to extract certain funds, with the Court's intervention, does not rebut its assertion that no Defendant has complied with the collateral security order.

order and for failing to meet their obligations to produce relevant books and records regarding their finances.

On September 3, 2015, the Court granted the parties leave to file cross summary-judgment motions, and the motions were fully briefed on April 17, 2016. The Court held oral argument on July 11, 2016, and requested supplemental filings from the parties as to the extent of Safeco's loss. On September 2, 2016, Safeco submitted supplemental briefing, (Dkt. 438), and on September 30, 2016, Defendants filed a response, (Dkt. 441).

## III.  PROCEDURAL HISTORY: THE MES ACTION

The MES Defendants filed the MES Action on August 24, 2009 in federal court in New Jersey, and filed an amended complaint on December 4, 2009. (MES Action Dkts. 1, 22.) The case was transferred to this Court on June 18, 2010. (MES Action Dkt. 54.) The MES Defendants filed a Second Amended Complaint—the operative complaint in that action—on January 7, 2014. (MES Action Dkt. 111.) On June 16, 2015, the Court granted in part and denied in part a motion to dismiss the MES Defendants' claims in the MES Action, as discussed in note 16, *infra*. As with the Safeco action, the Court granted the parties leave to file summary-judgment motions on September 3, 2015, the motions were fully briefed on April 17, 2016, and oral argument was held on July 11, 2016.

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate where the submissions of the parties, taken together, "show[] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. Proc. 56(a); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986) (summary judgment inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law"). In ruling upon a summary judgment motion, the court

must resolve all ambiguities and draw all reasonable inferences against the moving party, construing any disputed facts in the nonmoving party's favor. *See Zalaski v. City of Bridgeport Police Dep't*, 613 F.3d 336, 340 (2d Cir. 2010); *Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 309 (2d Cir. 2008). The same standard of review applies when the Court is faced with cross-motions for summary judgment, as here. *See Lauria v. Heffernan,* 607 F. Supp. 2d 403, 407 (E.D.N.Y. 2009). When evaluating cross-motions for summary judgment, the Court reviews each party's motion on its own merits, and draws all reasonable inferences against the party whose motion is under consideration. *Morales v. Quintel Entm't, Inc.,* 249 F.3d 115, 121 (2d Cir. 2001).

The initial burden of "establishing the absence of any genuine issue of material fact" rests with the moving party. *Zalaski*, 613 F.3d at 340. Once this burden is met, however, the burden shifts to the nonmoving party to put forward some evidence establishing the existence of a question of fact that must be resolved at trial. *Spinelli v. City of N.Y.*, 579 F.3d 160, 166–67 (2d Cir. 2009); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). The nonmoving party cannot avoid summary judgment simply by relying on "conclusory allegations or unsubstantiated speculation," but must instead "offer some hard evidence showing that its version of the events is not wholly fanciful." *Jeffreys v. City of N.Y.*, 426 F.3d 549, 554 (2d Cir. 2005) (quotation marks omitted). Nor is a mere "scintilla of evidence" in support of the nonmoving party sufficient; rather, "there must be evidence on which the jury could reasonably find for the [non-movant]." *Hayut v. State Univ. of N.Y.*, 352 F.3d 733, 743 (2d Cir. 2003) (quotation marks omitted) (alteration in original); *see also Anderson*, 477 U.S. at 248 (a dispute of fact must be "genuine"—that is, "the [record] evidence [must be] such that a reasonable jury could return a verdict for the nonmoving party."); *Miner v. Clinton Cty.*, 541 F.3d 464, 471 (2d

Cir. 2008) (nonmoving party must offer "some hard evidence showing that its version of the events is not wholly fanciful" (quotation marks omitted)).  In other words, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment . . . ."  *Anderson*, 477 U.S. at 247–48 (emphasis in original).

## DISCUSSION

## I.    SAFECO'S AND THE MES DEFENDANTS' CROSS-MOTIONS FOR SUMMARY JUDGMENT

In the Safeco Action, Safeco asserts claims for declaratory relief, specific performance, breach of contract, and injunctive relief as to both the MES and Hirani Indemnity Agreements, as well as claims for exoneration, *quia timet*[14], and indemnity against the MES Defendants on the PRTF and ERDLF projects, and against all Defendants as to the HEPFF project.  (*See* Dkt. 1.)  As a practical matter, however, Safeco treats all of its claims as essentially coterminous, acknowledging that "[u]pon a judgment of entitlement to full indemnity, the remainder of the relief requested in Safeco's various Counts would likely be rendered moot."  (*See* Safeco Mot.[15] at 12 n.6.)

In the MES Action, the MES Defendants have asserted claims for breach of the duty of good faith and fair dealing, tortious interference with contract, tortious interference with prospective economic advantage, breach of verbal contract for extra work, *quantum meruit*, violations of the Miller Act, 40 U.S.C. § 3131 *et seq*., fraud in the inducement, and fraudulent

---

[14] *Quia Timet* is a legal doctrine that allows a person to seek equitable relief from future probable harm to a specific right or interest.  BLACK'S LAW DICTIONARY (10th ed. 2014).

[15] All citations to "Safeco Mot." refer to Safeco's Memorandum in Support of its Motion for Summary Judgment, filed in both the Safeco and MES Actions.  (*See* Safeco Action Dkt. 410-2; MES Action Dkt. 208-2.)

misrepresentation and concealment against Safeco.[16] (MES Action Dkt. 111 (Second Amended Complaint ("SAC")).) The MES Defendants assert the fraudulent misrepresentation and concealment claim against individual Defendants Mohan-Maxfield and Pikulin[17], and assert a claim for breach of contract/performance bond against LMIC and Comunale. (*Id.*)[18]

## A. Indemnity and Bad Faith

Safeco has moved for summary judgment both as to liability on its claim for full indemnity in the Safeco Action and as to all of the MES Defendants' claims in the MES Action. (*See* Safeco Mot. at 1–3.) Safeco argues that there is no genuine issue of material fact regarding the MES and Hirani Defendants' failure to comply with the Indemnity Agreements, and therefore it is "entitled, as a matter of law, to judgment regarding its entitlement to indemnity, and to recover its resulting damages." (Safeco Mot. at 12.)

The MES Defendants oppose this motion, and move both to dismiss the Safeco Action and for partial summary judgment in the MES Action on their claim for the breach of the duty of

---

[16] The MES Defendants had also asserted a breach of contract claim against Safeco, a claim of bad faith against Safeco and LMIC, and a claim of civil conspiracy to defraud against Safeco, Caryn Mohan-Maxfield, David Pikulin, and an individual named Ronald Goetsch, but these claims were previously dismissed by the Court. (*See* 6/16/15 Minute Entry; Dkt. 182, 6/18/15 Dkt. Order.) In addition, the Court held that the MES Defendants lacked standing to assert their remaining claims, other than the Miller Act claim, as to the HEPFF contract. (*See* 6/16/15 Minute Entry.)

[17] During the time frame relevant to this action, Mohan-Maxfield served at times as Safeco's Home Office Counsel and as a Senior Claims Representative, and beginning in early 2008 handled claims on behalf of Safeco against the Bonds issued in the three bonded projects. (Safeco Action Dkt. 438-2, at ¶ 3.) Pikulin was LMIC's Regional Claims Manager. (MES Action Dkt. 161-2 at ¶ 7.)

[18] As in the order on partial summary judgment issued by Judge Ross, the Court applies New York law to both parties' claims, as Safeco has asserted that New York law applies and no defendant has addressed which jurisdiction's law governs. (*See* Dkt. 80 at 14 n.3; *see also* Safeco Mot. at 13 n.7.) The exception is MES's Miller Act claim in the MES Action, which is governed by federal law.

good faith and fair dealing ("breach of good faith claim"). (MES Safeco Opp.[19] at 35.) The Hirani Defendants also oppose Safeco's summary judgment motion on Safeco's indemnity claim in the Safeco Action, arguing that the issue of Safeco's bad faith must be determined at trial. (Dkt. 399.)

### 1. Affirmative Claim in MES Action Versus Defense in Safeco Action

The MES Defendants assert, as an affirmative claim in the MES Action, that Safeco breached the duty of good faith and fair dealing. This "implied duty of good faith and fair dealing prevents any party to a contract from depriving another party of the benefits of the agreement." *Banque Nationale de Paris S.A.*, 896 F. Supp. at 164–65 (S.D.N.Y. 1995). But "New York law will not recognize a separate cause of action for breach of the implied covenant of good faith and fair dealing when it arises from the same allegations as a breach of contract claim." *Mendez v. Bank of Am. Home Loans Servicing, LP*, 840 F. Supp. 2d 639, 652 (E.D.N.Y. 2012) (collecting cases). As the MES Defendants themselves recognize, their affirmative breach of good faith claim "is mostly based on Safeco's breach of its express agreement to determine in good faith whether the [Corps'] claims were valid." (MES Safeco Opp. at 25.) Moreover, the MES Defendants treat this affirmative breach of good faith claim as wholly coterminous with their defense of bad faith to Safeco's claim for indemnification.[20] (*See id.* at 1 ("Safeco . . . acted

---

[19] All citations to "MES Safeco Opp." refer to the MES Defendants' Brief in Support of their Motion for Partial Summary Judgment and in Opposition to Safeco's Motion for Summary Judgment, filed in the Safeco Action. (Dkt. 423-3.)

[20] The MES Defendants frame their affirmative breach of good faith claim as implicating "the obligation to act in good faith – or the prohibition against acting in bad faith," which is precisely the basis for the MES Defendants' defense to Safeco's summary judgment motion on its indemnity claim. (*See* MES Safeco Opp. at 25–26 (citing, as support for the proposition that "[e]ach of the specific allegations of lack of good faith is supported by the factual record," to the portion of the MES Defendants' brief discussing its bad faith defense to Safeco's summary judgment motion on indemnity).) To the extent MES's affirmative breach of good faith claim is

in *bad faith* and MES moves for summary judgment on [the breach of good faith claim in the MES Action] and to dismiss entirely [the Safeco Action]. Safeco's *lack of good faith* is also a defense to Safeco's motion for summary judgment [in the Safeco Action].") (emphases added).) Therefore, the Court treats the MES Defendants' bad faith/lack of good faith defense in the Safeco Action and the affirmative breach of good faith claim in the MES Action as coterminous, and for ease of reference, will refer to it as Defendants' "bad faith" claim throughout this Order.

### 2. Burden of Proving Bad Faith

As recognized in the case law cited by the MES Defendants, "New York courts have held that pursuant to an indemnity agreement such as that signed by the defendants, 'the surety is entitled to indemnification upon proof of payment, unless payment was made in bad faith or was unreasonable in amount, and this rule applies regardless of whether the principal was actually in default or liable under its contract with the obligee.'" *Lee v. T.F. DeMilo Corp.*, 815 N.Y.S.2d 700, 702 (N.Y. App. Div. 2006) (citations omitted); *see also Berkley Reg'l Ins. Co. v. Weird Bros.*, 13-CV-3227, 2013 WL 6020785, at *7 (S.D.N.Y. Nov. 6, 2013) (quoting *Prestige Decorating & Wallcovering, Inc. v. U.S. Fire Ins. Co.*, 858 N.Y.S.2d 1, 2 (N.Y. App. Div. 2008)) (same); *Joseph R. Wunderlich, Inc.*, 358 F. Supp. 2d 44, 52 (N.D.N.Y. 2004) (holding that the indemnity agreement "unequivocally state[d] that . . . determinations [by the surety regarding whether to settle claims or complete the work] shall be prima facie evidence of the facts" and that "[n]othing that the Defendants have asserted rise to the level of bad faith, fraud or extravagance;" thus plaintiff surety was entitled to summary judgment), *aff'd*, 144 Fed. App'x 125 (2d Cir. 2005).

---

premised on theories underlying its other affirmative claims in the MES Action—*i.e.*, bad faith based on fraudulent inducement or fraudulent misrepresentation and concealment (*id*. at 25–26 & n.12)—it fails for the same reasons as those other affirmative claims fail, as discussed, *infra*.

Nevertheless, the MES Defendants dispute who bears the burden of proof on bad faith, and in fact, whether the standard is bad faith rather than an affirmative showing of good faith, or as they argue, "honest belief" that it was liable on the bonds. First, to support their proposition that Safeco, rather than the MES Defendants, bears the burden of showing good faith, the MES Defendants cite two New York cases that refer to a plaintiff surety's "initial burden" to establish that payments were made in good faith and were reasonable in amount. (MES Safeco Opp. at 3.) (citing *Hartford Fire Ins. Co., Inc. v. Edgewater Constr. Co., Inc.*, 801 N.Y.S.2d 875, 21 A.D.3d 1312 (N.Y. App. Div. 2005) and *North Am. Specialty Ins. Co. v. Schuler*, 737 N.Y.S.2d 741, 291 A.D.2d 924 (N.Y. App. Div. 2002)). Further examination of this line of cases, however, reveals that they are fully consistent with a finding that a plaintiff surety satisfies any "initial burden" with proof of payment, and that the burden then shifts to defendant contractors to show bad faith (which, as discussed further below, equates to a showing of fraud or collusion). *Hartford Fire Ins. Co.* cites *Schuler* for the "initial burden" language, which in turn cites *Peerless Ins. Co. v. Talia Constr. Co.*, 708 N.Y.S.2d 223, 272 A.D.2d 919 (N.Y. App. Div. 2000). *Peerless* itself states that, "Plaintiff met its initial burden [without any explanation of what this burden consists of] [and] Defendants submitted no evidence that plaintiff acted in bad faith, i.e., that plaintiff engaged in fraud or collusion;" therefore concluding that the plaintiff surety was entitled to summary judgment. *Peerless*, 272 A.D.2d at 919. Furthermore, the two cases cited by *Peerless* clearly state that proof of payment satisfies this initial burden on the surety, where indemnification agreements have such a provision,[21] thus shifting the burden to defendants. *See*

---

[21] In *Acstar* and *Spadafina*, the indemnity agreements stated that evidence of payments by the surety were prima facie evidence of the propriety thereof, and of the indemnitor's liability to the surety. *Acstar Ins. Co. v. Teton Enters.*, 670 N.Y.S.2d 588, 248 A.D.2d 654, 654 (N.Y. App. Div. 1998); *Int'l Fid. Ins. Co. v. Spadafina*, 596 N.Y.S.2d 453, 192 A.D.2d 637, 639 (N.Y. App. Div. 1993). The Court considers such provisions equivalent to the provision in the Indemnity

*Acstar Ins. Co. v. Teton Enters.*, 670 N.Y.S.2d 588, 248 A.D.2d 654, 654–55 (N.Y. App. Div. 1998) (explaining that "[t]here is no evidence . . . of bad faith by the plaintiff, and the plaintiff's payment . . . is prima facie evidence of the propriety of such payment."); *Int'l Fid. Ins. Co. v. Spadafina*, 596 N.Y.S.2d 453, 454–55, 192 A.D.2d 637, 639 (N.Y. App. Div. 1993) ("Here, [plaintiff surety] has stated a prima facie case under the contract by submitting proper documentation of payment of the settlement . . . as well as the fees and costs incurred. . . and, as [defendant's] conclusory affidavits are insufficient to raise a triable issue as to either the bona fides of the settlement or as to the reasonableness of its amount[,]. . . summary judgment is granted in favor of [plaintiff surety]." (internal quotations omitted)). *See also Frontier Ins. Co. v. Renewal Arts Contracting Corp.*, 784 N.Y.S.2d 698, 700 (N.Y. App. Div. 2004) ("Plaintiff met its initial burden on the motion by establishing that the underlying claims for defendants' admitted failure to complete the work were paid pursuant to the surety bonds, thus invoking the presumption of propriety contained in the indemnification agreement."). In light of the clear precedent cited above that "the surety is entitled to indemnification upon proof of payment, unless payment was made in bad faith or was unreasonable in amount," *Lee*, 815 N.Y.S.2d at 702, and the principles articulated in *General Accident Insurance Co. of America v. Merritt-Meridian Construction Corp.* ("*Merritt-Meridian*"), discussed at length below, the Court finds that any initial burden upon Plaintiff is simply a burden to submit proof of payments, after which the burden shifts to Defendants to show bad faith.

---

Agreements that "[a]n itemized statement of loss and expense incurred by [Safeco], sworn to by an officer of [Safeco], shall be prima facie evidence of the fact and extent of . . .liability." (Dkts. 64-5 at 1, 64-6 at 1.) Although the MES Defendants have disputed whether Safeco has provided such an itemized statement at various stages in the litigation, there is no question that Safeco has done so in its supplemental briefing, even assuming it had not done so sooner. (Dkt. 438-1.)

Secondly, the MES Defendants assert that not only does a surety have the burden of proving good faith, but that good faith equates to an honest belief that it was liable on the Bonds. (MES Safeco Opp. at 3–6.)  In support of this proposition, the MES Defendants rely entirely on a 1944 New York State case, *Maryland Casualty Corp. v. Grace*, 54 N.E.2d 362 (N.Y. 1944). (MES Safeco Opp. at 3–6.)  But that case is inapposite in terms of establishing a *standard* for purported good faith and is wholly inapplicable here, as the New York Court of Appeals there dealt with an indemnification agreement whose terms required proof that a surety had an honest belief in their liability on the performance bond at issue—which the Indemnity Agreements here plainly do not.

Rather, the case before the Court is on all fours with a 1997 case adjudicated in the Southern District, *Merritt-Meridian*.  In that case, as here, the defendant construction company served as general contractor for several projects on which the plaintiff acted as surety and issued payment bonds, protecting subcontractors in the event of the defendant's default, and performance bonds, protecting owners in the event of the defendant's default.  *Merritt-Meridian*, 975 F. Supp. 511, 513 (S.D.N.Y. 1997).  The plaintiff brought suit under the parties' indemnity agreement for payments made under bonds issued to subcontractors and suppliers, and for costs incurred in completing three construction projects where the defendant was terminated for default by the owners.  *Id*. at 513–14.  The indemnity agreement provided, in relevant part, that "the Surety shall be entitled to charge for any and all disbursements made by it in good faith in and about the matters herein contemplated by this Agreement under the belief that it is or was liable for the sums and amounts so disbursed, or that it was necessary or expedient to make such disbursements, whether or not such liability, necessity or expediency existed . . . ."  *Id*. at 514. The agreement provided further that "the Surety shall have the right to adjust, settle or

compromise any claim, demand, suit or judgment upon the Bonds, unless the Principals and the Indemnitors shall request the Surety to litigate such claim . . . and shall deposit with the Surety, at the time of such request, cash or collateral satisfactory to the Surety in kind and amount . . . ." *Id*. After being informed of the defendant's failure to pay subcontractors, the plaintiff forwarded copies of the claims to the defendant and requested that the defendant either pay or inform the plaintiff of the basis for disputing the claim. *Id*. at 515. In addition, the plaintiff also requested that the owners not make payments to the defendant without the plaintiff's consent. *Id*. While the defendant claimed that there were a number of defects in the claims, at no time did defendant request that the plaintiff defend or litigate any claims, nor did the defendant deposit any collateral with the plaintiff, despite the plaintiff requesting collateral. *Id*.

The *Merritt-Meridian* court noted that "[i]ndemnity agreements such as those at issue in this case are valid and enforceable under New York law," and "[w]here, as here, the general contractor has expressly agreed to indemnify the surety for losses arising from claims made on surety bonds, the indemnity agreement governs the relationship between the surety and the contractor." *Id*. at 515–16. The court held that, under the terms of the indemnity agreement, the plaintiff surety had the right to make payments and settle all claims unless the defendant requested that the plaintiff litigate them and posted collateral, a right "limited only by [the plaintiff's] obligation to settle claims in good faith." *Id*. at 516. The court found that it was "irrelevant whether [the defendant] was actually liable for the payments claimed by the subcontractors or actually defaulted on their contracts with the owners, so long as [the plaintiff] acted in good faith in making the payments and completing the performance under the construction contracts." *Id*. The court concluded that, "[i]n the absence of an indication of fraud or collusion between [the plaintiff] and the claimants, the subcontractor's and owners' claims of

default invoked the Indemnification Agreement and its settlements clause." *Id*. (emphasis added). Notably, the court reasoned that "[s]ureties enjoy such discretion to settle claims because of the important function they serve in the construction industry, and because the economic incentives motivating them are a sufficient safeguard against payment of invalid claims." *Id*. Thus, the court held that the plaintiff surety was entitled to summary judgment unless the defendant could demonstrate bad faith and that "[c]onclusory allegations of bad faith are insufficient to defeat a motion for summary judgment in favor of a surety seeking to enforce an indemnification agreement." *Id*. at 518.

The MES Defendants attempt to shift the burden to Safeco as the surety to show, in the first instance, that it acted in good faith, defined as [or based on] an "honest belief in the surety's liability." They argue that *Merritt-Meridian*'s conclusion that the defendant must first show bad faith, defined as [or based on] "fraud or collusion", on the part of the surety is incorrect, because it rests on a case that misapplied an earlier New York State court case which, according to the MES Defendants, held that a suretor must first demonstrate good faith, *i.e.*, an "honest belief that [the surety] was liable for such claims." (*See* MES Opp. (Dkt. 423-3) at 5–6 (citing *Maryland Cas. Co. v. Grace*, 292 N.Y. 194 (1944)).) These arguments are contradicted by the plain language of the Indemnity Agreements.

As discussed, the Indemnity Agreements expressly provide Safeco with exclusive authority "to determine in *good faith* whether any claim or suit upon any Bond shall, on the basis of *belief of liability, expediency or otherwise*, be paid, compromised, defended or appealed." (Safeco Action Dkts. 64-5 at 1, 64-6 at 1) (emphases added).) By their very terms, the Agreements rebut the MES Defendants' arguments that good faith be defined as having an "*honest* belief in liability" or that Safeco bears the burden initially to show good faith, defined as

such, in the event of a contract dispute. Rather, the Indemnity Agreements not only allow Safeco to settle claims made against the bond without an "*honest*" belief in liability, it grants Safeco this right where Safeco has *no* belief in liability and simply acts out of "*expediency or otherwise*". It is clear then that "good faith," as defined under the Indemnity Agreements, cannot be equated with, or limited to, having a belief in liability, no less an "honest" one, and that the broad discretion accorded Safeco under the Agreements, in effect, creates a presumption of good faith with respect to any decision it makes pursuant to the Agreements' terms, such that, in challenging those decisions, Defendants must first make an affirmative showing that Safeco acted in bad faith, *i.e.*, engaged in "fraud or collusion".

The New York Court of Appeals decision relied upon by the MES Defendants, *Maryland Casualty Co. v. Grace*, is not to the contrary, as the court there had before it contractual language that expressly conditioned indemnification solely on the surety's "belief that it or [indemnitors] were liable" for the claim, suit, or judgment on the bond at issue. *See Maryland Cas. Co. v. Grace*, 292 N.Y. at 197. (*See also* Safeco Reply (Dkt. 412) at 2–3.) Furthermore, to the extent that, as the MES Defendants argue, "the requirement of good faith is implicit in all New York contracts" (MES Opp. (Dkt. 423-3) at 3), this is equally true of the contract at issue in *Merritt-Meridian*, such that the court's analysis in that case is no less relevant to the contracts at issue here. *See also Hanover Ins. Co. v. D'Angelo*, 13-CV-4301, 2016 WL 4402251, at *7 (E.D.N.Y. July 18, 2016) ("New York courts have equated 'bad faith' with fraud or collusion." (quoting *Amaya v. Garden City Irrigation, Inc.*, 03-CV-2814, 2011 WL 564721, at *3 (E.D.N.Y. Feb. 15, 2011))), *report and recommendation adopted*, 13-CV-4301, 2016 WL 4402018 (Aug. 17, 2016).

The Court therefore finds that Defendants have the burden of demonstrating Safeco's bad faith in order to defeat Safeco's entitlement to indemnification.

3. <u>Evidence of Bad Faith</u>

Beyond its burden analysis, *Merritt-Meridian*'s conclusions regarding the merits of the defendant's bad faith arguments in that case are also directly applicable here, and provide a useful preamble to the Court's discussion of Defendants' bad faith arguments.

In *Merritt-Meridian*, the court rejected the defendant's attempted showing of bad faith. First, the court rejected the defendant's suggestion that the plaintiff's "decision to settle the claims despite [the defendant's] objection that it could not determine whether the claims were due until the owner made final payment evidences bad faith," because "[a] decision to proceed with claims despite possible defenses . . . is not evidence of bad faith." 975 F. Supp. at 518 (citing *Banque Nationale* 896 F. Supp. at 165). Second, the court rejected the defendant's argument that the plaintiff's decision to pay the owners on the performance bonds, despite the plaintiff's awareness that the defendant considered two of those owners to have been in default, demonstrated bad faith. *Id.* at 519. The court reasoned that this contention essentially would mean that the plaintiff was required to protect the defendant's interests as vigorously as it protected the interests of the owners, which was not the point of the performance bonds. Indeed, "under the assignments clause and attorney in fact clause of the indemnity agreement, [the plaintiff] had the right to settle not only claims against [the defendant], but [the defendant's] affirmative claims against the owners as well," and "[t]he exercise of these rights after [the defendant] declined to post collateral or indemnify [the plaintiff] is not evidence of bad faith." *Id.* Third, the court rejected the defendant's argument that the plaintiff's "interfer[ence]" with its contracts "by requesting that the owners not make payments to [the defendant] without [the plaintiff's] consent" constituted bad faith. *Id.* The court reasoned that the plaintiff "made these requests only in response [to] the owners' claims of default and after [the defendant] declined to

post collateral or indemnify [the plaintiff] for claims on the bonds," and "[u]nder the assignments clause and attorney in fact clause of the indemnity agreement, [the plaintiff] had the right to payments due to [the defendant] upon [the defendant's] failure to indemnify [the plaintiff] on demand or to deposit collateral security." *Id.* Again, the court found that "[t]he exercise of such contractual rights is not evidence of bad faith." *Id.* For these reasons, the court granted the plaintiff summary judgment, and directed the magistrate judge to hold an inquest to determine the surety's reasonable expenses. *Id.* at 519–20.

4. The MES Defendants' Allegations of Bad Faith

The MES Defendants attempt to establish Safeco's bad faith on seven bases,[22] but as discussed below, none suffices to meet Defendants' burden to establish the existence of a genuine dispute of fact as to Safeco's bad faith under the Indemnity Agreements.

a) *Safeco's Alleged Interference in Contracts Before Default*

The MES Defendants allege that Safeco acted in bad faith with respect to all three construction contracts because Safeco purportedly interfered with their execution prior to any default-triggering event, as defined by the Indemnity Agreements. However, the Court finds that the record evidence is insufficient to create a dispute of fact as to this claim of bad faith.

First, as to the PRTF contract, the MES Defendants claim that it was bad faith for Safeco to attend the January 31, 2008 Notice to Cure meeting with the Corps, because the MES Defendants had told Safeco they opposed Safeco's attendance and because, at the meeting, Safeco allegedly "told the Corps that it would complete the project if MES were defaulted,"

_____

[22] The MES Defendants actually list eight bases for their claim that Safeco lacked good faith in its conduct with respect to the three construction projects at issue, but two—that Safeco did not have an honest belief that it was liable for the Corps's claims and that Safeco's lack of an honest belief in its liability can be demonstrated by its failure to establish loss reserves—are duplicative, and the Court has discussed them as one consolidated theory, *infra*. (*See* MES Safeco Opp. at 11, 21.)

which the MES Defendants characterize as "a clear overstepping of Safeco's rights since there had been no default declaration or actual contract breach as defined by the indemnity agreement." (MES Safeco Opp. at 8–9.) The Court need not spend much time on this allegation, as the MES Defendants have not challenged Safeco's assertion that the Corps required Safeco's presence at the January 31, 2008 meeting, and the sum total of this evidence, even if fully credited, consists of nothing more than Safeco assuring the obligee of its bonds that Safeco would fulfill its obligations under the bond agreement. Nor does the Court infer bad faith by Safeco on the basis of MES's allegation that the Corps and Safeco asked MES's employees to leave the room at the meeting for a private discussion. Even assuming MES was asked to leave the room, and even assuming that Safeco and the Corps discussed Safeco's potential completion of the project, MES does not point to any evidence demonstrating that this private conversation constituted, or resulted in, "fraud and collusion" by Safeco.

Second, as to the ERDLF contract, the MES Defendants claim that the project was not declared in default until December 23, 2008, but Safeco began discussions with the Corps about the project without the MES Defendants' knowledge or approval beginning in September 2008. (MES Safeco Opp. at 9 (citing 423-2 at ¶ 246).) Again, even if credited, that a surety and a bond obligee discussed the progress of a project, and potential performance deficiencies relating to the project, is insufficient to establish bad faith. Indeed, if anything, Safeco was contractually *obligated* under both the Indemnity Agreement and its bond for the ERDLF project to try to address and resolve any performance deficiencies asserted by the bond obligee.

Third, as to the HEPFF contract, the MES Defendants claim that although they stopped being paid on the project in June 2008, Safeco insisted that they keep working on it. The MES Defendants further claim that on August 27, 2008, Safeco began direct communications with the

Corps, and that within a week—two months before the November 4, 2008 declaration of default—Safeco had committed to fund and complete the project. (MES Safeco Opp. at 9 (citing Dkt. 423-2 at ¶¶ 159, 163, 187).) These actions, the MES Defendants assert, amounted to bad faith. However, as with the MES Defendants' contentions regarding the PRTF project, that Safeco reiterated its contractual commitment to the Corps to stand by its bond obligations, in advance of later doing so, is insufficient to create a factual dispute as Safeco's bad faith. Even crediting the MES Defendants' additional claim that Safeco required them to work after they were no longer being paid on the HEPFF project, the MES Defendants have not explained how or why this would evidence bad faith rather than action to minimize losses and perform its obligations under the bond.

Finally, in discussing the foregoing evidence of "collusion," as to one or more of the projects, the MES Defendants themselves have characterized Safeco's behavior as merely negligent. Makhoul testified that "as of August 4, 2008," the MES Defendants believed that Safeco was "[m]aybe unwilling[ly], but negligently, if not willing[ly]," in collusion with the Corps. (Dkt. 410-5, at 255:10–24.). *See also* July 11 Hearing Transcript, at 25:24–25 (MES Defendants' attorney arguing that "[Safeco's representatives] went into [the January 31, 2008 Notice to Cure] meeting knowing that [the Corps was using Safeco to put pressure on MES] and they just fell into the trap.").) Yet as discussed, "'bad faith' requires more than mere negligence." *The Travelers Indem. Co. v. Harrison Constr. Grp. Corp.*, 06-CV-4011, 2008 WL 4725970, at *5 (E.D.N.Y. Oct. 22, 2008) (quoting *Peerless Ins. Co. v. Talia Constr. Co., Inc.*, 708 N.Y.S.2d 223, 224 (N.Y. App. Div. 2000)).

In sum, the MES Defendants have failed to raise a triable issue of fact with respect to its claim that Safeco acted in bad faith by interfering with the MES Defendants' contracts with the Corps for the three projects at issue prior to a default-triggering event.

> b) *Safeco's Alleged Failure to Conduct Reasonable Investigation with respect to the PRTF and HEPFF Projects*

The MES Defendants claim that Safeco exhibited bad faith under the Indemnity Agreements by failing to conduct a reasonable investigation with respect to the PRTF and HEPFF projects. (MES Safeco Opp. at 9–10 (citing Dkt. 423-2 at ¶¶ 26–33, 59, 154, 156).) According to the MES Defendants, after the declaration of default in the PRTF contract, but prior to Safeco entering into the PRTF Takeover Agreement, MES documented for Safeco that the Corps did not have adequate funds to pay for the design corrections and necessary extra work required thereby, in violation of the Anti-Deficiency Act, but Safeco ignored this warning with "little or no independent investigation," and instead entered into the Takeover Agreement on June 3, 2008. (MES Safeco Opp. at 9.)

In support of this allegation, the MES Defendants cite a March 14, 2014 claim from Safeco to the Corps, in which Safeco wrote that "the Corps ran afoul of the Anti-Deficiency Act prior to its termination of MES'[s] Contract for default," and therefore "MES'[s] Contract should have been terminated for convenience once the Corps encountered a potential Anti-Deficiency Act violation," such that it was "improper for the Corps to have subsequently proceeded to terminate MES'[s] Contract for default." (*Id.* at 10 (citing Dkt. 423-2 at ¶ 31, Dkt. 423-6, at ECF 22.)) However, to place this statement in context, the March 14, 2014 letter repeatedly stated that Safeco relied on the Corps's representations that it had adequate funding at the time Safeco entered into the Takeover Agreement, even though the letter acknowledged that MES had told Safeco about its suspicions regarding the funding deficiencies. (*e.g.*, Dkt. 423-6, at ECF 5.)

The MES Defendants also allege that they met with Safeco regarding the HEPFF project on December 17, 2008 and that the parties "agreed that the termination was wrongful (even though . . . the termination was caused by Safeco)," but that "before completing its investigation, Safeco wrote to the Corps on January 15, 2009, informing it that it intended to 'take over this Contract'." (MES Safeco Opp. at 10.) The MES Defendants argue that "[t]he clear contrast between Safeco's treatment of the [PRTF] and HEPFF projects, which it agreed to take over, and the ERDLF project which it refused to complete [based on an investigation that the MES Defendants characterize as 'reasonable'], all of which suffered from the same fundamental problem of lack of funding, highlights [Safeco's] lack of an honest belief that it was liable [] to the Corps for the [PRTF] and HEPFF projects." (MES Safeco Opp. at 10.)

The MES Defendants' arguments are unavailing for two reasons. First, as discussed, *supra*, a surety need not have an "honest belief" that it is liable for the claims on the bond at issue; rather, absent a showing of bad faith, *i.e.*, fraud or collusion, a surety is entitled to indemnification from a contractor pursuant to the terms of the parties' indemnity agreement. Second, and more fundamentally, the MES Defendants' argument, taken to its logical conclusion, would undermine the entire surety industry, forcing sureties to engage in protracted and often costly investigations into the minutia of each claim under a bond and as to every potential defense asserted by a defaulting contractor, on the threat that, should they fail to do so, the contractor could avoid its indemnification responsibilities. This cannot be, nor is it, the law. Rather, as stated on the face of the Indemnity Agreements themselves, Safeco had complete discretion, in the interests of "expediency or otherwise," to determine how to dispose of the Corps's claims. (Safeco Action Dkts. 64-5 at 1, 64-6 at 1.) The Takeover Agreements in both the PRTF and HEPFF projects contained a full reservation of rights with respect to any and all

potential defenses Safeco might later assert against the default termination—as Safeco, in fact, did in the 2014 Certified Claims referenced by the MES Defendants—and any payments made by the Corps upon such defenses would be directly offset against any amounts owed by the MES Defendants as indemnification.

As Safeco correctly notes, "a decision to proceed with claims despite possible defenses . . . is not evidence of bad faith." *Merritt-Meridian*, 975 F. Supp. at 518. "It is irrelevant whether [the contractor] was actually liable for the payments claimed by the subcontractors or actually defaulted on their contracts with the owners, so long as [the surety] acted in good faith in making the payments and completing the performance under the construction contracts." *Id.* at 518.

New York courts routinely reject failure-to-investigate challenges to the enforcement of indemnification agreements. *See D'Angelo*, 2016 WL 4402251, at *7–8 (explaining that "failure to investigate the claim fully or pursue a viable defense does not constitute bad faith" and rejecting defendant's argument that surety acted in bad faith by "voluntarily" paying a settlement); *Berkley Regional Ins. Co.*, 2013 WL 6020785, at 9–10 (rejecting contractor's argument that the surety failed to investigate the contractor's rights and needlessly settled a claim, because "New York courts have routinely held that the rule that the surety is entitled to indemnification upon proof of payment, unless payment was made in bad faith or was unreasonable . . . *applies regardless of whether the principal was actually in default or liable under its contract with the obligee*." (emphasis in original) (internal quotations omitted)); *First Indemnity of Am. Ins. Co. v. Shinas*, 03-Civ.-6634, 2009 WL 3154282, at *6 (S.D.N.Y. Sept. 30, 2009) ("The Surety's actual liability or necessity in making the surety payments is irrelevant under the contract."); *Wunderlich, Inc.*, 358 F. Supp. 2d at 52 (explaining that "sureties are provided discretion and latitude to take whatever action necessary to settle claims and to

complete the work at hand" and that "[a]s long as the surety acts in good faith . . . whether the contractor actually defaulted will neither affect the surety's right to be indemnified for expenses paid nor defeat the surety's motion for summary judgment."), *aff'd*, 144 Fed. App'x 125 (2d Cir. 2005); *North Am. Specialty Ins. Co. v. Montco Constr. Co.*, 01-CV-0246E, 2003 WL 21383231, at *6 (W.D.N.Y. May 9, 2003) (rejecting argument that surety's failure to assert contractor's defenses constituted bad faith, because "[a] surety's decision to proceed with claims despite possible defenses is not credible evidence of bad faith, because, if anything, it was in [the surety's] best interests to assert such defenses considering the fact that its own funds were at risk due to [the contractor's] failure to post collateral").

c)    *Safeco's Alleged Lack of Honest Belief in Liability as*
       *Reflected in Delay in Establishing Loss Reserves*

Related to the prior theory of bad faith, the MES Defendants also argue that "Safeco was not acting out of an "honest belief" that MES had defaulted, since it knew at the beginning essentially what caused it to assert later that [] MES was wrongfully terminated." (MES Safeco Opp. at 11.)  This alleged bad faith "first occurred at the initial pre-termination meeting on January 30, 2008, when a Safeco representative agreed that Safeco would complete the project without having undertaken any investigation whatsoever," and then continued on April 10, 2008, when the MES Defendants allege that the Corps "cowed Safeco with a claim that the [PRTF] project was a 'national security mission' . . . only to admit . . . a few months later that the problems originated with the government." (*Id.*)  In other words, the MES Defendants allege that "[t]he Corps' complicity [in the failed project] was obvious to Safeco from the information and documentation given to it by MES beforehand." (*Id.*)

According to the MES Defendants, this bad faith is underscored by Safeco's failure to establish loss reserves until October 28, 2009, though the three construction contracts at issue

39

were defaulted on March 5, 2008, November 4, 2008, and December 22, 2008. (MES Safeco Opp. at 21.) The MES Defendants argue that "Safeco's failure to set any loss reserves until nearly a year after the defaults had been declared demonstrates that it knew it did not have an honest belief that MES or [the JV] were liable to the Corps." (*Id.*)[23]

As an initial matter, the Court notes that the case cited by the MES Defendants in support of their argument, *Fireman's Fund Ins. Co. v. Great American Ins. Co.* (*Fireman's*), 284 F.R.D. 132 (S.D.N.Y. 2012), has little relevance here. In that case, which dealt with the sinking and salvage of a dry dock, and several related insurance and reinsurance policies, the court concluded that discovery regarding an insurer's loss reserves was relevant and permissible as potentially probative of the insurer's "own beliefs about coverage and [] liability." *Fireman's Fund Ins. Co.*, 284 F.R.D. at 138–39. The MES Defendants rely on *Fireman's* in support of its argument that the Court can infer Safeco's lack of "honest belief" in its liability from its alleged delay in establishing loss reserves. However, even accepting that *Fireman's Fund Ins. Co.* stands for the proposition that an insurer's or surety's beliefs about its liability under a contract can be inferred from its handling of loss reserves, no reasonable inference can be drawn from Safeco's alleged delay in establishing loss reserves in this case. Under the Indemnity Agreements, Safeco was entitled to full indemnification from the MES and Hirani Defendants; establishing loss reserves, therefore, would only have provided double coverage for Safeco with respect to the losses at issue. Thus, the fact that Safeco did not establish loss reserves sooner says nothing about its belief about its liability for the three defaults declared by the Corps. Indeed, Safeco only

---

[23] The Court has difficulty understanding the logic of this argument, since it makes no sense that Safeco did not believe that it was liable in light of the three defaults that had occurred a year earlier; if Safeco can be faulted for anything, it would be for not adequately protecting its indemnification interest by establishing the loss reserves sooner.

established the loss reserves after the MES and Hirani Defendants refused Safeco's request for indemnification and after the filing of this lawsuit in July 2009.

In any event, this loss-reserves argument fails for the same reason as the MES Defendants' reasonable-investigation argument: that Safeco might have believed that it was not liable to the Corps, or that Safeco might have had defenses to any liability, does not undercut its wide latitude, pursuant to the terms of the Indemnity Agreements, to act upon the bonds "in the interests of expediency or otherwise," (Dkts. 64-5 at 1, 64-6 at 1,) particularly not when, as here, Safeco reserved all potential defenses such that any decrease in its exposure would accrue to the benefit of the MES Defendants in terms of a diminished amount of indemnification ultimately owed.

### d) Safeco's Inducement of The MES Defendants to Abandon Counsel

The MES Defendants argue that Safeco acted in bad faith because it "induce[d] MES [to] stop using [MES's] experienced government counsel for issues relating to the default terminations . . . on March 26, 2008." (MES Safeco Opp. at 11; *see also id.* at 12 ("If Safeco takes the position that [Watt Tieder] did not represent MES, then it must acknowledge that the law firm, as its agent, had an obligation to make sure explicitly that MES understood that it was putting its fate with respect to the default terminations in the hands of lawyers who were not disinterested.").) For the same reasons as stated in the Court's Order in *Makhoul v. Watt, Tieder, Hoffar & Fitzgerald, LLP* ("Watt Tieder Case"), Case No. 11-CV-5108, (Dkt. 124 at 7–13), affirmed by the Second Circuit on October 6, 2016 (*Makhoul v. Watt, Tieder, Hoffar & Fitzgerald*, 662 Fed. App'x 33 (2d Cir. 2016) (summary order)), the Court rejects this argument. As the Court found in the Watt Tieder Case, "[the MES Defendants'] communications with their own attorneys contradict the claim that [they] viewed [Watt Tieder] as their attorneys with

respect to the [Corps's] projects. Furthermore, the correspondence between Safeco and [the MES Defendants] indicate that Safeco repeatedly advised MES that Safeco was represented by [Watt Tieder], and requested that [the MES Defendants] engage their own counsel several times . . . . In fact, there is evidence that [the MES Defendants] acknowledged that [Watt Tieder] represented Safeco, and not MES." (*See* Case No. 11-cv-5108, Dkt. 124 at 10–11.)

> e)      *Safeco's Alleged Responsibility for Causing Default*
>         *of HEPFF Project*

The MES Defendants claim that Safeco colluded with the Corps with respect to the HEPFF project to cause the default on that project. (MES Safeco Opp. at 13–14.) This is also the basis for the Hirani Defendants' opposition to Safeco's motion for summary judgment. (*See* Hirani Opp. at 2 (". . . Safeco must be precluded from enforcing the provisions in [the Hirani Indemnity Agreement] which purportedly are triggered upon a default of the HEPFF Project . . . , a default which Safeco caused.").)

Defendants have failed to point to any evidence to support its argument that Safeco "caused" the default of the HEPFF project. First, they allege that Safeco caused the default by refusing to sign the MOU after having "agreed" to sign it on September 16, 2008. (Hirani Opp. at 3–4.) However, Defendants have not shown that Safeco even had an obligation to sign an MOU with the Corps. As previously discussed, Safeco had broad discretion under the Indemnity Agreements regarding its handling of claims by the Corps on all three projects. (Safeco Action Dkts. 64-5 at 1, 64-6 at 1 (Safeco had "exclusive right" to pay, compromise, defend or appeal any claim or suit on the bonds).) Furthermore, Defendants have failed to demonstrate that Safeco could have agreed to the MOU or any other agreement with the Corps on September 16, 2008. The evidence shows that on *September 30, 2008*, the Corps sent Safeco and the JV a letter with its "final offer," for the MOU, including a term that Safeco receive the remaining payments,

and that the Corps would reserve its right to continue to assess liquidated damages. (Makhoul Aff. ¶ 185, Dkt. 412-1 at ¶ 185, 423-12 at ECF 178–80.) In a letter dated October 31, 2008, the *JV* sent proposed revisions to the Corps. (Dkt. 423-12, Ex. 178 at ECF 182–90.) Among other revisions, the JV included a provision waiving the Corps's right to recover liquidated damages, thus changing an essential term of the "final offer." (Dkt. 423-12, Ex. 177 at ECF 179; Ex. 189 at ECF 188.) Thus, the evidence showing that negotiations over material terms in the MOU were still ongoing as of October 31, 2008—because of the *JV*'s dissatisfaction with the MOU— negates any finding that Safeco could have signed the MOU or any other agreement with the Corps as of September 16, 2008.

Even if Defendants could show that Safeco's refusal to sign the MOU was a cause of the HEPFF project default, they have not come close to demonstrating that such a refusal would qualify as bad faith or constitute "fraud or collusion." Despite the Hirani Defendants' vague and conclusory accusations—*e.g.*, that Safeco "collud[ed] with the Corps," as evidenced by Safeco attending the September 16, 2008 Notice to Cure meeting, and that Safeco "blackmail[ed]" the JV by "threaten[ing]" not to sign the MOU" (Hirani Opp. at 7–9)—they fail to cite any proof. At most, Defendants point to an one-line email from a representative of the Corps to Mohan-Maxfield, dated August 27, 2008, requesting that Mohan-Maxfield return the Corps's representative's call to discuss the project, (Dkt. 399-4, at ECF 2), and an August 29, 2008 email from J. Hirani to Mohan-Maxfield stating that Mohan-Maxfield was not responding to J. Hirani's calls. (Dkt. 399-4, at ECF 4.) These emails clearly do not provide a sufficient basis for a finding of any kind of collusion between Safeco and the Corps.

Furthermore, Defendants' own evidence contradicts a finding that Safeco was the cause of the default. The Termination Letter for the HEPFF project stated that "the JV [had] provided

no credible evidence that it [could] deliver the required project." (Termination Letter at ECF 12.) The Corps listed its concerns as "(1) the JV's failure to prosecute the work, (2) the JV's failure to pay sub-contractors, and (3) the JV's failure to remedy significant work deficiencies." (Termination Letter at ECF 12.) J. Hirani's deposition testimony confirmed that the project was terminated because of "[MES's] inability or unwillingness to complete the work," and MES's "delaying the job and not putting enough manpower [or] doing quality work." (Dkt. 411-9, at ECF 5, 7.) J. Hirani stated that MES "prefer[red] to posture and litigate rather than deliver the facility." (*Id.* at ECF 5.) Bernard Khadra, MES's Project Engineer and Assistant Project Manager for all of the Corps projects, testified that the Corps terminated the HEPFF project because the project was "behind schedule" and that the Corps claimed that there "were construction and design deficiencies." (Dkt. 411-11, at ECF 3.)

Accordingly, Defendants have failed to demonstrate a triable issue of fact on this theory of bad faith.

### f) *Safeco's Desire to Capture Profits*

The MES Defendants argue that Safeco's bad faith in acting upon the bonds on the three construction projects at issue can be demonstrated through its alleged pursuit of profits on each of those contracts. The MES Defendants' argument appears to be that Safeco sought to make the MES Defendants default, so that Safeco could profit from taking over and completing the construction projects. There is no evidence to support this otherwise specious accusation.

As an initial matter, this argument is inherently illogical and unbelievable. For Safeco to engage in this profit scheme concocted by the MES Defendants, Safeco would have to first incur millions of dollars in loss and then count on not only recouping that multi-million dollar loss, but also find a way to make a significant enough profit that would make it worth risking the initial

multi-million dollar loss. It strains credulity to believe that an entity such as Safeco, which regularly provides the kinds of surety services involved here, would risk that kind of loss for the possibility of a small and speculative gain. Indeed, this argument borders on the absurd.

Second, there is simply no evidence to support this fanciful theory, no less create a triable issue of fact as to Safeco's bad faith arising out of any alleged profit motive. The MES Defendants point to a handful of exhibits purporting to show this alleged profit motive, yet none do. Much of the evidence on which the MES Defendants rely establishes only that Safeco was attempting to recoup anticipated losses, which would be credited against any indemnification owed by the MES Defendants. (*See, e.g.*, Makhoul Aff. Exs. 47, 182 (Safeco "exhibited an intense interest" in the Corps owing the MES Defendants approximately $7,500,000 in the HEPFF and ERDLF projects); *see also id*. Exs. 30, 31 (Safeco revised PRTF Takeover Agreement to require the Corps's consent to assign PRTF claims to Safeco upon learning that MES had "substantial pending claims" thereon).) The MES Defendants have failed to demonstrate how these actions, even if successful, would have resulted in any *profit* to Safeco, since any money recovered by Safeco under these claims would have directly offset monies owed by the MES Defendants as indemnification for Safeco's incurred costs under the Takeover Agreement. (*See also id*. Exs. 180, 186 (similar allegations regarding HEPFF contract and Safeco's alleged failure to sign the MOU).)[24]

---

[24] The MES Defendants dispute Safeco's assertion that its deduction of any "profit" from MES's indemnity obligations is relevant, stating that "[v]iolating the takeover agreement . . . by making a profit . . . on work performed by Safeco as surety has nothing to do with any indemnification that MES might or might not owe Safeco in the future." (Dkt. 441, at 7.) This argument is close to nonsensical; obviously, if Safeco deducts any money recovered from the Corps or others from its losses for which it seeks indemnification, then Safeco has not made a profit, but merely has reduced its losses.

The strongest evidence that the MES Defendants bring to bear on this alleged profit motive theory are two emails from the Corps and Perini *to* Safeco, regarding the PRTF project after the MES Defendants' default and referencing a "5% profit for Safeco on all change orders associated with the [PRTF] project." (Makhoul Aff. Ex. 43; *see also* Ex. 42.) In its supplemental submission, Safeco acknowledges that it charged a 7% "administrative markup[]" on the change order work it administered. (Dkt. 438, at 6.) At oral argument, counsel for Safeco explained that it was a "markup for administration of the contract," and that the money went to the costs of administering the contract, such as payments to Cashin Spinelli for overseeing the work. (Dkt. 441-2, Ex. I, at 48.)

The MES Defendants dispute that the 7% markup was an administrative cost, stating, without any citation to the record, that "Safeco's administrative cost is covered by the premium that the principal paid for the bonds." (Dkt. 441 at 7.) The MES Defendants also point to a 1.8% charge for insurance costs on the change orders as evidence of Safeco further "profiting" from them, arguing, again without any citation to the record, that "Safeco did not buy insurance policies for the [three bonded] projects, but rather insisted that MES maintain its insurance policies to protect Safeco, which MES did." (*Id.*) Additionally, the MES Defendants point to a charge for "GL-Umbrella Insurance" in Perini's invoices, apparently implying that Safeco could not have had any other legitimate insurance expenses. (Dkt. 441, at 8.) The reasonableness of Safeco's 1.8% charge for insurance costs and whether it, in fact, went toward valid insurance expenses, can be explored at the evidentiary hearing that will be held on the proper amount of the judgment in this case. However, MES's speculation that this 1.8% charge was not a valid insurance expense, supported by nothing except the fact that Perini imposed its own insurance charge, plainly fails to raise a genuine dispute as to whether Safeco acted in bad faith with

respect to its handling of the PRTF bond out of a desire to make a profit from a default on the project.

The MES Defendants argue that these "profits", *i.e.*, the markups, are "a violation of the law, the [Federal Acquisition Regulations ("FAR")] and the respective takeover agreements that Safeco signed with the [Corps]." (Dkt. 441, at 8.) Once again, this assertion is not supported by a single citation. The Court assumes that the MES Defendants are referring to language in the PRTF Takeover Agreement to the effect that "[p]ursuant to FAR 49.404(e)(4), the Surety shall not be paid any amount in excess of its total expenditures necessarily made in completing the work and discharging its liabilities under the Payment Bond . . . ", and that "unpaid earnings [to the Corps] may be required to permit payment to Surety of its actual costs and expenses incurred in completion of the Contract work, exclusive of its payments and obligations under the Payment Bond given in connection with the Contract . . ." (Dkt. 410-8 (PTRF Takeover Agreement), at ECF 5.)[25] Neither of these provisions provides a basis for finding that charging a markup to pay for administering the change orders constitutes an "amount in excess of [Safeco's] total expenditures", since payments to contractors would be an "expenditure necessarily made in completing the work . . . ." Furthermore, to the extent that the MES Defendants' argument that a profit would be prohibited is premised on a claim akin to breach of fiduciary duty—*i.e.*, that Safeco, as the MES Defendants' fiduciary, was not permitted to profit from the MES Defendants' default (MES Safeco Opp. at 15 & n.8), any such claim is not cognizable under New York law, which does not recognize that sureties owe fiduciary duties to their principals.

---

[25] In its "tabulated list of documents and testimony," the MES Defendants state that Safeco's profiting from the contract violated FAR 49.404(e)(4) and 49.404(c)(4). The latter regulation does not exist. The former regulation states that "[t]he contracting officer must not pay the surety more than the amount it expended completing the work and discharging its liabilities under the defaulting contractor's payment bond."

*See Nat'l Union Fire Ins. Co. v. Turtur* (*Turtur*), 892 F.2d 199, 207 (2d Cir. 1989) ("In general, a surety does not owe a fiduciary duty to its principal.").[26]

The decision relied upon by the MES Defendants in support of their argument, *Safeco Ins. Co. v. Siciliano, Inc.* ("*Siciliano*"), No. 06-3162, 2009 WL 212081 (C.D. Ill. Jan. 29, 2009), is inapposite, and if anything, only serves to point out the type of evidence necessary—but lacking here—to create an issue of fact as to bad faith.[27] (*See* MES Safeco Opp. at 17–18.) In *Siciliano*, based on evidence that Safeco had convinced its principal to pre-sign default letters in exchange for financial assistance, the court denied summary judgment to Safeco on its indemnification claim against the principal. The court reasoned that "a jury could conclude that Safeco convinced [the principal] to . . . pre-sign the default letters in exchange for financial assistance, when it always intended to cut off financial assistance and thereby effect defaults on the bonded projects," and that if the jury found that Safeco had misled the principal "*into providing [Safeco] the means to obtain control of the projects*, then it acted unreasonably." *Siciliano*, 2009 WL 212081, at *15 (emphasis added). By contrast, the MES Defendants have pointed to no evidence that would permit a reasonable jury to conclude that Safeco devised a plan, and then negotiated the Indemnity Agreements pursuant to that plan, to enable Safeco to

---

[26] The MES Defendants attempt to distinguish the Second Circuit's decision in *Turtur*, arguing that "it is not based on New York law." (MES Safeco Opp. at 15 n.8.) This argument, however, ignores two key points: (1) the principle approved of in *Turtur*, that a surety does not owe a fiduciary duty to its principal, was based on consideration of the laws of multiple Circuits, *Turtur*, 892 F.2d at 207; and (2) this proposition from *Turtur* has been adopted as New York law, *see, e.g., Bruce v. Martin*, No. 87 Civ. 7737, 1993 WL 148904, at *6, 11 (S.D.N.Y. April 30, 1993) (applying New York law and citing *Turtur* for the proposition that "a surety does not have a fiduciary relationship with its principal"); *see also Nat'l Union Fire Ins. Co. v. Woodhead*, 917 F.2d 752, 757 (2d Cir. 1990) (quoting and adopting *Turtur*, appearing to apply New York law).

[27] Notably, the MES Defendants cite *Siciliano* expressly for the purpose of showing prior bad faith by Safeco in an unrelated matter, as if it were relevant to deciding the case before this Court. It is not.

obtain control of any of the projects or orchestrate the conditions triggering the MES Defendants' default on the projects, so that Safeco could make a profit from the default. To the extent the MES Defendants are claiming that the provision of the Indemnity Agreements that authorized Safeco to unilaterally decide whether to pay, compromise, or defend claims made by the Corps against Defendants is evidence of such a plan, that argument fails, because this provision did not give Safeco control over the conditions that might, or did, trigger the defaults for the projects, as was the situation in *Siciliano*. Indeed, as previously discussed, the conditions that triggered these defaults were uniquely and virtually exclusively within Defendants' control, and related to their performance on the projects, which the Corps ultimately found deficient. Thus, *Siciliano* does not support a finding that there is a triable issue of fact here as to whether Safeco in any way triggered the MES Defendants' default, such that Safeco's subsequent profit, even if believed, would serve retroactively as evidence of bad faith.[28]

In addition to failing to provide evidence supporting a finding that Safeco sought to profit from the change orders, MES has not provided any evidence that Safeco *did* profit from the projects. At most, *if attorneys' fees are not included*, Safeco came out ahead on one of the three projects, the PRTF project, as noted in Section I(C). Yet, the Indemnity Agreements plainly entitle Safeco to reasonable attorneys' fees, including those incurred in enforcing the Agreements. (Safeco Action Dkts. 64-5 at 1, 64-6 at 1 (providing that the MES and Hirani Defendants "agree to pay to Surety upon demand . . . [a]ll loss, costs and expenses of whatsoever kind and nature, including court costs, reasonable attorney fees . . . , consultant fees,

---

[28] The other cases cited by the MES Defendants are also inapposite, as they involve monies held as collateral security—essentially monies held in trust—as opposed to the post-default transactions of a surety performing its obligations under a bond. *See In re Liquidation of New York Surety Co.*, 188 Misc.2d 406 (N.Y. Sup. Ct. 2001); *People v. Metropolitan Surety Co.*, 148 A.D. 503 (N.Y. App. Div. 1911).

investigative costs and any other losses, costs or expenses incurred by [Safeco] by reason of having executed any Bond, or incurred by it on account of any Default under this agreement by any of the [MES or Hirani Defendants]").  Judge Ross held in her November 22, 2010 order that Safeco was entitled to collateral security from the MES Defendants for its projected legal and consulting fees, because of the provision in the Indemnity Agreements entitling Safeco to collateral security "sufficient to cover all exposure" under the bonds, and reaffirmed her previous order holding that "the term 'exposure' . . . unambiguously refers to the risk of loss or future loss faced by Safeco."  (Dkt. 121 at 25.)  The Second Circuit, in affirming the district court's orders, "conclude[d] that the term 'exposure,' as used in the agreements, [was] sufficiently broad to include attorneys' fees" and thus held that the district court had not abused its discretion in including attorney's fees in the collateral security award.  *Safeco Ins. Co. of Am. v. Hirani/MES, JV*, 480 Fed. App'x 606, 609 (2d Cir. 2012) (summary order).[29]

MES argues that "the legal fees to which Safeco may or may not be entitled under the indemnity agreement, depending on whether MES owes Safeco any indemnification after Safeco

---

[29] Furthermore many other courts have found that attorneys' fees are covered by such language. In *Wunderlich*, 358 F. Supp. 2d 44, the indemnification agreement issued by an affiliate of Safeco contained a very similar clause stating that Defendants would pay the surety "[a]ll loss, costs and expenses . . . including . . . reasonable attorney fees . . ." *Id.* at 48.  The court held that "there does not exist an issue of fact that the Plaintiff cannot collect reasonable attorney fees . . . under the Agreement" and explained that "[t]hese types of costs are expected when a surety exercises its exclusive right to seek indemnification."  *Id.* at 57.  The court awarded the surety "all of the attorney fees, including the fees, to prepare, submit, and defend this Motion."  *Id.  See also Berkley Regional Ins. Co.*, 2013 WL 6020785, at *7, 12 (holding that indemnity agreement "plainly cover[ed] [plaintiff surety's] attorneys' fees" where agreement stated that defendants would indemnity surety "from and against any and all liability arising from any cause of action, claim, cost, damage, debt, demand, expenditure, liability, loss, payment, obligation, or penalty of any kind whatsoever, including without limitation, interest, costs, court costs, costs to compromise or settle any claim, expert fees, investigative costs and the fees and expenses of attorneys . . .").  While the MES Defendants appear to argue that a different result is merited because the FAR controls, according to the PRTF Takeover Agreement, they fail to provide any support for this proposition, or explain why the FAR would dictate a different result.

has acted fraudulently and in bad faith, is not an issue for the FAR or the takeover agreement, and therefore the prohibition of the surety from realizing profits on the construction cost is independent of any legal cost incurred by Safeco." (Dkt. 441, at 9.) At best, this argument is circular, if not nonsensical. If MES seeks to argue that Safeco made a profit, and the only way to demonstrate even an arguable profit is by subtracting the attorneys' fees to which the indemnity agreement entitles Safeco, then the question of whether Safeco is entitled to legal fees is integral to the determination of whether it made a profit, certainly not "independent" of that determination.[30]

Thus, the MES Defendants have utterly failed to demonstrate bad faith on the part of Safeco based on an alleged motive to make a "profit" from the Indemnity Agreements by taking over the three Corps projects.

---

[30] In arguing that Safeco made a profit, the MES Defendants also argue that consultant fees and other administrative expenses should not be included in Safeco's losses. They state, again without any accompanying citations, that "taking into account the rules of the FAR and Safeco's [PRTF] takeover agreement with the [Corps], which . . . do not permit any administrative or surety consultant cost to be counted towards the construction cost of the project . . . Safeco actually realized a profit on the [PRTF] project of $909,942." (Dkt. 441 at 9.) Once again, MES provides no cite to the FAR or any provision of the Takeover Agreement. The Court has not found a provision in the PRTF Takeover Agreement that states that administrative or surety consultant costs may not be counted toward the construction cost of the project. (Dkt. 410-8.) Furthermore, the Indemnity Agreements explicitly list consultant fees as recoverable by Safeco in the event of a default. (Safeco Action Dkts. 64-5 at 1, 64-6 at 1.) Judge Ross's 11/22/10 Order also found that Safeco was entitled to collect collateral security from MES for its projected legal and consulting fees. (Dkt. 121 at 25–26.) Lastly, consultant fees routinely are awarded to sureties under indemnification agreements. *See, e.g.*, *Wunderlich*, 358 F. Supp. 2d at 57 (upholding payment of consultant fees where agreement explicitly provided for them). Because the MES Defendants have failed to identify any provision of the FAR or Takeover Agreement that excludes administrative or surety consultant fees from a project's construction costs and because the MES Defendants have otherwise failed to justify excluding these fees, the Court declines to omit those fees in determining whether Safeco "profited" by taking over the three Corps projects, as alleged by the MES Defendants.

The MES Defendants argue that Safeco "has long sought to gain control of MES'[s] claims [under the ERDLF project] not only as a source of revenue, but . . . to use as a bargaining chip in settlement [presumably with the Corps]. . . ." (MES Safeco Opp. at 19.) They argue that, while Safeco was assigned MES's ERLDF claims in Judge Ross's December 17, 2010 Order, Judge Ross "warned that MES could recover in the indemnity action if Safeco settled meritorious claims in bad faith." They claim that that is precisely what Safeco did by settling the ERDLF project with the Corps on January 8, 2015, dismissing MES's claims and appeals, and leaving in place MES's default termination, "which is fatal to any future prospect MES may have of bidding for federal government contracts." (*Id*.) The MES Defendants argue conclusorily that "it is clear that there was no good faith basis for having abandoned MES'[s] claim in exchange for releasing Safeco from liability, because Safeco had no exposure." (*Id*. at 19.) The Court disagrees.

The MES Defendants' arguments ignore the clear terms of the Indemnity Agreements, which vest Safeco with the discretion to settle claims in the interests of "expediency or otherwise." The fact that Safeco chose to settle the claims despite MES's asserted defenses is not evidence of bad faith. *See Merritt-Meridian*, 975 F. Supp. at 518–19. The ERDLF settlement agreement states that it represents a "compromise of disputed claims." (Dkt. 410-12, at ECF 4.) Here, just as in *Merritt-Meridian*:

> There is not a scintilla of evidence, as distinct from conclusory assertions, that [the surety] acted inappropriately. Indeed, it obviously was in [the surety's] interest to press the alleged defenses for all they were worth, as the third party defendants' failure to post collateral meant that [the surety's] own funds were at risk . . . There is no evidence that [the surety] failed to extract in the settlement whatever value could be derived from the alleged defenses.

*Id.* at 518 (quoting *Banque Nationale de Paris S.A.*, 896 F. Supp. at 165). Indeed, there is absolutely "no evidence that [Safeco] failed to extract in the settlement whatever value could be derived from the alleged defenses." *Id.*

Thus, Defendants have not demonstrated a genuine factual dispute regarding their claim that Safeco acted in bad faith by abandoning its ERLDF claim and leaving the default termination for that project to stand.

*          *          *

In sum, Defendants have failed to raise a triable issue of fact as to any of its bad faith theories with respect to Safeco's conduct pursuant to the Indemnity Agreements. For the same reason, the MES Defendants' motion for partial summary judgment in the MES Action on their claim for the breach of good faith and fair dealing is denied.

## B.  Indemnity and Reasonableness

There also is no genuine dispute as to the reasonableness of Safeco's payments to the Corps and other parties made pursuant to the Indemnity Agreements. As noted above, "New York courts have held that pursuant to an indemnity agreement [such as this one], 'the surety is entitled to indemnification upon proof of payment, unless payment was made in bad faith *or was unreasonable in amount*, and this rule applies regardless of whether the principal was actually in default or liable under its contract with the obligee.'" *Lee*, 815 N.Y.S.2d at 702 (emphasis added). "Where, as here, the general contractor has expressly agreed to indemnify the surety for losses arising from claims made on surety bonds, the indemnity agreement governs the relationship between the surety and the contractor." *Merritt-Meridian*, 975 F. Supp. at 516. "As such, the general contractor is obligated to indemnify the surety against all losses and expenses incurred by the surety, including attorney fees." *Star Ins. Co. v. Champion Constr. Servs. Corp.*,

13-CV-3635, 2014 WL 4065093, at *3 (E.D.N.Y. July 30, 2014), *report and recommendation adopted,* 13-CV-3635, 2014 WL 4065094 (E.D.N.Y. Aug. 15, 2014); *see also Pro-Specialties, Inc. v. Thomas Funding Corp.*, 812 F.2d 797, 799 (2d Cir. 1987) ("The general rule is that a surety is equitably entitled to full indemnity against the consequences of a principal obligor's default" (internal quotation marks omitted)). "Reasonable payments include settling claims made by third parties and the legal fees attached thereto." *Star Ins. Co.*, 2014 WL 4065093, at *4 (citing *Peerless Ins. Co.*, 708 N.Y.S.2d at 224).

Safeco seeks summary judgment on its entitlement to indemnification by Defendants, and requests a separate evidentiary hearing as to the quantum of damages to which Safeco is entitled. (Dkt. 410-2, at 2, n.2.). While the MES Defendants, in their supplemental briefing,[31] have demonstrated some dispute about the exact amounts of Safeco's damages—which will need to be resolved at the upcoming evidentiary hearing on the amount of fees and costs to be awarded—they are plainly unable to show that Safeco's payments were "unreasonable," such that it is not entitled to indemnification. Courts deciding cases such as these often grant summary judgment on liability and leave issues regarding the reasonableness of expenses for a later evidentiary hearing. *See, e.g.*, *D'Angelo*, 2016 WL 4402251, at *9 (rejecting Defendant's argument that "many of the fees sought are unreasonable or excessive" in part because "Plaintiff [did] not seek summary judgment as to damages[,] . . . [but] as to liability only, subject to a hearing, if necessary, on the amount of fees and costs to be awarded"); *see also Merritt-Meridian*, 975 F.

---

[31] The Court notes that MES's supplemental brief, like much of its prior briefing, is rife with completely unsupported allegations of serious wrongdoing by Safeco. The Court is deeply troubled by the MES Defendants' willingness to continually make such serious allegations without proper evidentiary support. Were the Court not finding that the MES Defendants are required to indemnify Safeco for its attorneys' fees, including those spent defending against unsupported and misleading allegations, the Court would consider imposing additional sanctions.

Supp. at 519–20 (granting summary judgment in favor of surety, but deciding that an "inquest to determine [the surety's] reasonable expenses will be held before the . . . magistrate judge").

Defendants assert a number of grounds for finding that Safeco's payments pursuant to the Indemnity Agreements were unreasonable. None, however, has merit.

### 1. Safeco's Mark-Ups on Change Orders

The primary argument advanced in the MES Defendants' supplemental briefing that arguably applies to the reasonableness of Safeco's payments (although it is framed as being relevant to bad faith) is that Safeco sought to profit, and did profit, from the three Corps projects, most specifically, by charging a 5%, 2%, and 1.8% markup on change orders. As discussed above, Safeco has explained that these are routine charges to cover the expense of completing the orders, and that the fees went to Safeco's consultants to complete the projects. The MES Defendants' response, that under the "Law and the FAR," (as incorporated into the PRTF takeover agreement) sureties are not allowed to profit, *and* that consultant and attorneys' fees must be excluded when determining whether a surety has profited, is not based on *any* authority or evidence. (Dkt. 441 at 7, 9.) As noted above, the MES Defendants have pointed to no legal provision to support their argument that charging these fees is unreasonable, so as to strip a surety of its entitlement to indemnification. Furthermore, the MES Defendants' statement that "Safeco's administrative cost is covered by the premium that the principal paid for the bonds," (Dkt. 441, at 7), again, contains no supporting citation and appears to be made up out of whole cloth. In sum, there simply is no basis upon which the Court or a jury could conclude that the above-referenced fees do not constitute completion costs.

## 2. Safeco's Attorneys' Fees

Nor could the Court or a jury find that MES has sufficiently challenged the reasonableness of Safeco's attorneys' fees, which have increased from $1,859,593, at the time of its 2014 Certified Claims, to $5,464,640, at the time of its supplemental submission, to defeat summary judgment on liability. Although Safeco has not provided detailed support for its attorneys' fees,[32] the MES Defendants have not provided any evidence showing that the fees claimed by Safeco are unreasonable, so as to negate Safeco's entitlement to indemnification. *Berkley Regional Ins. Co.*, 2013 WL 6020785, at *13. Indeed, given the protracted settlement and litigation history relating to the three projects—including three separate lawsuits, two of which were initiated by Defendants—the approximately five million dollars being claimed by Safeco in attorneys' fees does not seem out of line. Thus, the Court follows the lead of the *D'Angelo* court in granting Safeco summary judgment on liability, and scheduling an evidentiary hearing for which Plaintiff is directed to submit additional documentation in support of the reasonableness of its damages, including contemporaneously created time records that specify, for each attorney, the date, hours expended, and nature of the work done, and support for the reasonableness of the hourly rate sought and the hours expended. *See D'Angelo*, 2016 WL 4402251, at *10.

## 3. Accounting Discrepancies

As discussed in Section I(C) and the accompanying footnotes, the MES Defendants have pointed to small discrepancies in Safeco's construction and consultant fee costs, ostensibly to demonstrate that Safeco's payments were unreasonable. Because these discrepancies are minor, however, they do not create a genuine dispute as to the reasonableness of Safeco's payments

---

[32] This could be due to the fact Safeco has requested an evidentiary hearing to determine the appropriate amount of fees and costs to be awarded. (Dkt. 410-2, at 2, n.2.)

under the Indemnity Agreements. At the same time, it is not clear why the amounts that Safeco submitted to the Corps in its Certified Claims, regarding completion costs and consultant fees, do not match the amounts submitted to the Court in its supplemental submission. At the evidentiary hearing, Safeco will be required to explain these discrepancies, including whether it is including interest in its calculations, as part of establishing its entitlement to a specific amount of damages.

4.    Miscellaneous Arguments

Consistent with their scattershot approach to this litigation, the MES Defendants make an assortment of other arguments, some of which are hard to understand, in contesting the reasonableness of Safeco's payments to the Corps and third parties. None of these arguments, however, comes close to raising a triable issue of fact on this issue.

The MES Defendants' conclusory argument that Safeco's permissible loss on the HEPFF project should be reduced because Perini charged "exorbitant" and "outrageous" fees fails. The MES Defendants cite no authority for their assertion that "the normal market" fee for an "at no risk" contract is 4% instead of the 9% charged by Perini. (Dkt. 441, at 12.)[33] The MES Defendants provide no evidence as to what a reasonable fee would be for such a contract, and thus have provided no basis upon which the Court or a jury could conclude that Perini's fees were unreasonable.[34]

---

[33] The MES Defendants define an "at no risk" Construction Management contract as one where "there are no liquidated damages imposed for a CM [who has] caused delays and no set maximum price for the construction or any expenses incurred." (Dkt. 441, at 12.)

[34] The MES Defendants argue that they was denied the discovery necessary to determine whether Perini's payments to subcontractors were reasonable, because, although MES was provided with the list of subcontractors that Perini used, "Safeco refused to provide MES with the subcontractors' contract that spells out the scope of the work or the change orders scope that ensued." (Dkt. 441, at 20.) The MES Defendants, however, have provided no support for their claim that "Safeco refused" to provide them with this information, and the Court has no way of determining whether the MES Defendants specifically demanded those subcontractor contracts.

Similarly, the MES Defendants' arguments disputing the exact amounts of the change orders, (Dkt. 441 at 13) are issues for the evidentiary hearing, but do not demonstrate that Safeco's payments were unreasonable. The MES Defendants appear to be disputing Safeco's claim that the 2% and 5% markups it charged for the change orders did not amount to a large sum of money. However, given that the MES Defendants cannot demonstrate that these fees are not completion costs for which Safeco is entitled to reimbursement under the Indemnity Agreements, *i.e.*, that these fees do not represent a "profit" to Safeco, the magnitude of these fees is irrelevant to the reasonableness issue.

Neither is the Court convinced by the MES Defendants' argument that Safeco has "eliminate[ed] its right to be reimbursed for the $301,743 that Safeco alleges to have lost on the ERDLF project" because "Safeco in bad faith compromised and dismissed" some of the MES Defendants' claims against the Corps. (Dkt. 441 at 13.) This argument merely regurgitates an argument that the Court has already rejected, based on Safeco's entitlement under the Indemnity Agreements to settle claims rather than pursue valid defenses.

The MES Defendants further argue that "Safeco . . . failed to deduct from its alleged losses check payments received from Perini" and cite to records that include refunds from Perini to Safeco. (Dkt. 441 at 13.) Yet, as far as the Court can tell, the MES Defendants have not provided any basis for finding that Safeco did not subtract these amounts from its reported total payments to Perini for purposes of its indemnification request to the MES Defendants. (Dkt. 438-1 at ECF 19–20.) For the evidentiary hearing, the Court will request that Safeco provide proof that the specified refunds were deducted from its total reported losses.

In a three-sentence section, the MES Defendants allege that Safeco "pocketed in bad faith MES employees' payroll taxes" rather than paying them to the IRS and the state of New Jersey.

(Dkt. 441, at 20.) According to the MES Defendants, Safeco settled, without MES's knowledge, a dispute concerning hourly wages with the U.S. Department of Labor and collected payments for that work from the Corps, including payroll taxes. In support of this allegation, the MES Defendants submit a letter from the IRS stating that MES owed $13,212.95 in taxes for social security, a bill for $13,212.95 from the IRS, and a breakdown of the tax deductions by employee. (Dkt. 441, Ex. Q.) However, the MES Defendants have not submitted *any* evidence regarding Safeco's settlement with the Department of Labor or of Safeco's withholding of money from the IRS, the State, or anyone else. Safeco submitted the settlement agreement with the Department of Labor, (Dkt. 410-13,) but there is no evidence anywhere in the record that Safeco withheld funds from the government. The Court cannot determine what exactly the MES Defendants are alleging about this transaction, but in any event, whatever allegation is buried in these vague statements, it is neither clarified nor supported by any evidence proffered by the MES Defendants.

In conclusion, while the MES Defendants have been able to point to minor discrepancies in Safeco's accounting, ones that merit an evidentiary hearing, they have failed to provide any basis for a finding that Safeco's payments were unreasonable, such that they are not entitled to indemnification for the millions of dollars they undisputedly have expended under the bonds for the three projects.

\*          \*          \*

Accordingly, the Court finds that Safeco is entitled to summary judgment on liability and that Defendants must indemnify Safeco for its costs and fees arising from the bonds for the PRTF, ERLDF and HEPFF projects. The MES Defendants are jointly and severally liable to Safeco for all losses incurred by Safeco in connection with the PRTF and ERDLF projects, and

all Defendants are jointly and severally liable to Safeco for all losses incurred by Safeco in connection with the HEPFF project. The Court will hold an evidentiary hearing on the quantum of damages to which Safeco is entitled.

**C.  Safeco's Motion as to Remaining Claims in the MES Action**

Safeco has also moved for summary judgment with respect to all of the MES Defendants' remaining claims in the MES Action.

### 1.  Tortious Interference with Contract

Safeco argues that this claim fails because liability for this tort can only attach to a party acting in its economic interest, if it acted with malicious or illegal purpose, and there is no proof of that here, particularly since the Indemnity Agreements permitted Safeco to act to protect its interests in the way it did. (Safeco Mot. at 28–31.) The MES Defendants, on the other hand, argue that tortious interference with a contract may be sustained where a party uses "dishonest, unfair, or improper means," and here Safeco did so when "it wrongfully and in violation of ethical standards induced MES to abandon its counsel and then used that lack of representation to enable it to interfere[] with [the three bonded projects] before declaration of default." (MES Safeco Opp. at 27.)

The sole basis for the MES Defendants' tortious interference with contract claim is that Safeco "induced MES to abandon its counsel and then used that lack of representation to enable it to interfere" in the three construction contracts. However, the MES Defendants are precluded from making this argument in light of the Court's holding in the Watt Tieder Case, as discussed, *supra*. (*See also* Watt Tieder Case, Dkt. 124 at 7–13.) Therefore, summary judgment is granted to Safeco on this claim.

2.    <u>Tortious Interference with Prospective Economic Advantage</u>

The parties make the same arguments as to this claim as they did with respect to the MES Defendants' tortious interference with contract claim. The Court rejects the MES Defendants' argument for the same previously stated reasons.

The MES Defendants assert an additional argument as to this claim, however, that Safeco used "dishonest, unfair and improper means when . . . it settled the ERDLF claims without making any attempt to assert legal defenses with the result that not only were MES'[s] claims abandoned, but Safeco left in place the default termination of MES for which it now has no avenue of redress." (MES Safeco Opp. at 27.) This claim fails for the same reasons that the Court rejected this argument in the context of the MES Defendants' bad faith claim, as discussed *supra*. (SECTION (g) above.)

3.    <u>Breach of Verbal Contract for Extra Work</u>

The MES Defendants allege that Safeco verbally agreed on March 26, 2008 to pay the MES Defendants to perform work following the terminations of the contracts, and that because Safeco breached that agreement, the MES Defendants are entitled to compensatory damages. (Dkt. 111 at 43–44.)

The inherent problem with this argument, even if the MES Defendants could provide sufficient evidence of such an oral agreement, is that the Indemnity Agreements expressly state that the MES Defendants shall indemnify Safeco for all completion costs. Therefore, even if Safeco hired MES to do completion work, and paid them, Safeco would then turn around and seek indemnification for that amount from MES. *See Nelson Const. Co. v. U.S.*, 79 Fed.Cl. 81, 93 (Fed. Ct. Cl. 2007) (explaining that plaintiff was seeking to recover from the government because, as indemnitor, it could not recover its performance costs from the surety because the

surety's "immediate next step would be to demand those same monies be returned by plaintiffs . . . under the [indemnity] agreement"). Therefore, as discussed at oral argument, this claim would only result in a payment to MES in the event that there was a surplus of funds after Safeco was made whole. (Dkt. 441-2, at 165–67.) In light of the Court's finding above that the MES Defendants have not shown that Safeco has made a profit, Safeco is entitled to summary judgment on this claim.

### 4.    Quantum Meruit

In general, "[t]he equitable doctrine[] of quantum meruit . . . is the means by which an unjust enrichment is remedied," and "[b]oth doctrines are quasi-contractual in nature and apply only in the absence of an express agreement." *Alter v. Bogoricin*, No. 97 Civ. 0662, 1997 WL 691332, at *10 (S.D.N.Y. Nov. 6, 1997) (emphasis added). However, at oral argument, counsel for the MES Defendants clarified that they were only applying the *quantum meruit* theory to the post-termination work that the MES Defendants claim that they performed pursuant to an oral agreement. Defense counsel argued that if no oral agreement existed, the MES Defendants should recover for the post-termination work they performed in order to prevent unjust enrichment of Safeco. (Dkt. 441-2, at 168–69.) However, counsel for the MES Defendants also acknowledged that unjust enrichment would only be applicable if Safeco had not suffered a loss. (*Id.*) In light of the Court's finding above that the MES Defendants have not been able to make such a showing, this claim fails for essentially the same reason as the prior claim.

### 5.    Miller Act

Safeco argues that it is entitled to summary judgment on the MES Defendants' claim under the Miller Act because that claim seeks to recover payments for work performed by MES under the bond on the HEPFF project, but MES was a partner in the JV with the payment bond

on that project, and therefore cannot prevail. The MES Defendants argue that MES was not truly a partner in the joint venture for purposes of the Miller Act, because that must be determined by the conduct of the parties, and here MES and the HMES "conducted themselves as though they were subcontractors,"[35] rather than engaging in "the essential hallmark of a joint venture, namely the sharing of profits and losses." (MES Safeco Opp. at 29–30.) Both parties rely on *U.S. ex rel. PCC Constr. v. Star Ins. Co.*, 90 F. Supp. 2d 512, 518–19 (D.N.J. 2000), in which the court held that "[a]lthough a Miller Act bond holds a surety liable for labor and materials furnished by a subcontractor when the general contractor defaults, sureties are not liable for monies expended on the contract by a partner or joint venturer of the general [contractor]," and that in determining whether parties are a joint venture, "[s]ome key factors courts have identified as indicative of such a relationship are a mutuality of control and an agreement to share in the profits (or losses) of the venture." Applying these principles, and for the reasons discussed on the record at the oral argument, the Court finds that, having enjoyed the benefits of partnership in a joint venture for purposes of being approved by government agencies as a joint venture, the MES Defendants cannot now deny that relationship for purpose of recovering on this claim. (441-2, at 80–85.)

Furthermore, despite claiming that MES and HMES did not behave like a JV, the MES Defendants offer no support for this self-serving claim. As discussed, MES is arguing that it was a subcontractor rather than a partner in the JV. In support of this claim, they first argue that because 97% of the work under the contract with the Corps was to be performed "as fixed price subcontract work," there was no sharing of profits and losses.[36] (MES Opp. at 29.) They

---

[35] The Court construes this argument to mean that MES served as a subcontractor to HMES, and thus was not a true partner in the JV.

[36] Although this argument is difficult to understand, the Court interprets it to mean that 97% of the payments that *MES* received for their work were paid at a fixed price, and thus do not reflect profits.

provide no evidentiary support for this claim that 97% of the payments to MES were for fixed amounts. Furthermore, while citing *U.S. ex rel. PCC* for the proposition that sharing in profits and losses is a key feature of a joint venture, their factual assertion that 97% of their payments were fixed does not preclude a finding that they shared in profits. Secondly, the MES Defendants argue that MES and the JV "conducted themselves as though they were subcontractors." (*Id.* at 30.) In support of this assertion, they cite the Makhoul Affidavit, which in turn cites a handful of irrelevant exhibits, the only one of any relevance being a letter from MES to Safeco requesting money for work performed and materials delivered. (Dkt. 423-15, at ECF 36.) This too is insufficient to demonstrate that there was no joint venture. Therefore, Safeco is entitled to summary judgment on the MES Defendants' Miller Act cause of action.

### 6.  Fraud in the Inducement

The MES Defendants argue that they were fraudulently induced into signing the Indemnity Agreements on Safeco's representation that "MES would have the right to handle claims against the bonds." They argue that this claim is not barred by Judge Ross's "*dictum*" holding "that the parol evidence rule bars a claim for fraudulent inducement," since Judge Ross did not have the opportunity to address an exception to that principle, namely, the peculiar knowledge exception: if the allegedly misrepresented facts are peculiarly within the misrepresenting party's knowledge, even a specific disclaimer will not undermine another party's allegation of reasonable reliance on the misrepresentations. (MES Safeco Opp. at 30–32.)

The Court concludes that Safeco is entitled to summary judgment on this claim in light of Judge Ross's earlier holding. (*See* Dkt. 80.) Judge Ross was presented with the MES Defendants' argument that "Safeco fraudulently induced the Indemnity Agreements" and that

this issue "must be resolved" prior to any grant of summary judgment in Safeco's favor. (*See* Safeco Action Dkt. 66 at 4.) Judge Ross explicitly rejected that argument, and the MES Defendants may not now seek to resurrect that argument, or improperly urge this Court to disregard or reconsider Judge Ross's holding. To the extent the MES Defendants now seek to make a new argument regarding this claim, the time to do so has passed.

7.      Fraudulent Misrepresentation and Concealment

This claim is premised on the MES Defendants' assertion that "Safeco convinced MES to rely on [Watt Tieder] to represent its interests in dealings with the Corps vis-à-vis the default termination for the [PRTF] project," and that, "in reliance on Safeco's representation, MES asked its attorneys to stand down in lieu of [Watt Tieder]." (MES Safeco Opp. at 33.) The MES Defendants expressly acknowledge that this claim depends on "the representation that [Watt Tieder would represent MES'[s] interests in dealings with the Corps," a representation which "MES reasonably believed" and on that basis "asked its experienced government attorneys to stand down." (*Id*. at 34.) But, as previously discussed, the MES Defendants are precluded from making this claim in light of the Court's Order in the Watt Tieder Case. *See also* Watt Tieder Case, Dkt. 124 at 15 n.17 ("[T]he clear evidence establish[es] that [MES] had an adversarial relationship with Safeco and [Watt Tieder], [MES's] interactions with [Watt Tieder] were in furtherance of duties that [MES] owed Safeco under the indemnity agreement, and [MES] were advised to use their own legal counsel.").

Accordingly, the Court grants summary judgment to Safeco on this claim.

## II.     LMIC'S MOTION FOR SUMMARY JUDGMENT IN THE MES ACTION

In the MES Action, the MES Defendants/Plaintiffs in the MES Action assert a claim for breach of contract on LMIC's bond in connection with the ERDLF and HEPFF projects.[37]  The claim is based on MES having engaged the services of Comunale to perform fire protection work on the ERDLF and HEPFF projects, and Comunale having obtained performance and payment bonds from LMIC for that work.  (MES Action SAC ¶¶ 179, 225.)  Comunale's bonds with LMIC stated that LMIC would be required to complete or arrange for the completion of the project "[w]henever the Principal shall be, and be declared by the Obligee to be in default under the Subcontract. . . ."  (Dkt. 213-7, at ECF 2–3.)  MES alleges that LMIC acted in bad faith in handling MES's claims against Comunale's bonds by not performing under the bond agreement after MES declared Comunale to be in default.  (Dkt. 217-2 at 15, 17, ¶¶ 33, 48.)

The primary dispute between the parties is whether MES notified LMIC of Comunale's default at a time when LMIC could have performed its obligations under the bonds.  The evidence establishes the following timeline:

By letters dated February 17, 2009, MES advised LMIC that the Corps had terminated the HEPFF and ERDLF projects and that the letter constituted "MES'[s] notice of claim against the [subcontract bonds] to [LMIC] for all damages suffered by MES on the [projects]."  (Dkt. 213-6, at ¶¶ 14, 15; Dkt. 213-7 at ECF 12–13.)  LMIC asserts that the February 17th letter was the first time MES provided any notice to LMIC of potential claims under the subcontractor bonds.  (Dkt. 213-9 at ¶ 19, 21.)  On February 26, 2009, Pikulin advised Kim Mcnaughton, the LMIC claim representative assigned to review MES's claims, that "[t]o the extent [her] office

---

[37] MES originally brought another count against LMIC for tortious interference with contract (MES Action SAC, at 46), but this claim was dismissed as moot in a minute entry dated June 18, 2015.

determine[d] that any amount [was] owed to MES under either bond[,] . . . [Pikulin] request[ed] that [they] not release any funds to MES or any other party without first obtaining [his] written consent." (MES Action Dkt. 217-3 at ECF 146.)

LMIC responded to MES on March 12, 2009, stating that nothing in MES's letters indicated that Comunale was in default of its obligations under the Subcontracts. (Dkt. 213-7, at ECF 15.) LMIC wrote that if it was MES's intention to proceed with its claim against Comunale's bond, MES should "forward [LMIC] all documentation that [it] believe[d] may validate [its] allegations." (*Id.*) MES responded on May 8, 2009, stating that it was in the process of assembling data and was engaged in discussions with the Corps to settle the matters, and that it would keep LMIC and Comunale apprised of the outcome. (Dkt. 213-6 ¶ 19; 213-7 at ECF 20.) On November 16, 2009, MES wrote to Comunale advising Comunale that since it had been unable to reach a settlement with the Corps, it was declaring Comunale to be in default. (Dkt. 213-5, at ECF 6.) The next day, MES wrote to LMIC advising it of the same facts and demanding payment of the full amounts of the Comunale Bonds. (Dkt. 213-6 ¶ 22, 213-7 at ECF 24).

In contrast, the MES Defendants allege, relying solely on Makhoul's affidavit, that they informed Comunale and LMIC of Comunale's default several months prior to February 2009, while LMIC still had the opportunity to intervene and cure the problems. The MES Defendants allege that in September 2008, they had a series of conversations and meetings with Mohan-Maxfield and Pikulin, as well as with the Cashin Spinelli consultants, at which time the MES Defendants informed LMIC "through its agents" that Comunale was in default and that LMIC was responsible for the consequences. (Dkt. 217-2, at 11–12, 17 ¶¶ 16–21, 42–45). According to the MES Defendants, Comunale failed to remedy the default and LMIC failed to replace

Comunale's work and remedy its default, thus breaching its obligation under the bonds. (*Id.* at ¶¶ 28, 46.) The MES Defendants assert that these failures caused the Corps to terminate the ERDLF and HEPFF projects. (*Id.*)

As a preliminary matter, the Court rejects LMIC's argument that the MES Defendants do not have standing to assert their claim for breach of contract against LMIC. LMIC argues that MES does not have standing because in the MES Indemnity Agreement, MES agreed to assign to Safeco all rights growing out of "[a]ny subcontract or purchase order and against any legal entity and its surety who has contracted with Contractor to furnish labor, materials, equipment and supplies in connection with any Contract" in the event of a default. (Dkt. 213-8, at 23 (quoting the Indemnity Agreements, at 2).) However, the case LMIC cites for the proposition that an assignment extinguishes the assignor's rights explicitly provides an exception where the assignment is "more in the nature of an assignment as security for an antecedent debt owed to the assignee" and explains that in such situations the assignor maintains the right to sue the obligor "in order to enforce its rights and ensure that the assignee prosecutes the cause vigorously." *Aaron Ferer & Sons Ltd. v. Chase Manhattan Bank, Nat'l Ass'n*, 731 F.2d 112, 125 (2d Cir. 1984). The MES Indemnity Agreement's assignment provision appears in a section titled, "SECURITY TO SURETY: As collateral security to [Safeco] for the agreement of [the MES Defendants] to repay all loss and expense to [Safeco], [the MES Defendants] . . . assign[] to [Safeco]…all rights of [the MES Defendants] . . . in . . . any subcontract . . . ." Thus, because the assignment in the Indemnity Agreement is not only "more in the nature of an assignment as security for an antecedent debt" owed to Safeco, but is explicitly an assignment as security, the

Court finds that the MES Defendants have standing to sue LMIC to enforce the MES Defendants' rights as the obligee under Comunale's bonds with LMIC. [38]

Nevertheless, LMIC is entitled to summary judgment, because the MES Defendants are unable to point to evidence from which a jury could find that the MES Defendants satisfied the conditions precedent for triggering LMIC's obligations under the subcontractor bonds—*i.e.*, that Comunale was in default and was declared to be in default—at a time when LMIC had an opportunity to complete the project.

First, the only evidence that the MES Defendants allegedly informed LMIC that Comunale was in default in September 2008 is Makhoul's affidavit stating that he had conversations with Mohan-Maxfield, Pikulin, and representatives of Cashin-Spinelli to that effect. (Dkt. 217-2 at ¶¶16–19, 21, 25, 42.) No documents put forth by the MES Defendants confirm or corroborate in any substantive way that MES told any of these people that Comunale was in default. At most, they demonstrate that there were disputes between the Corps and LMIC about the design of the deluge system, and that the Corps listed dissatisfaction with the deluge system as a reason for the Corps's ultimate termination of the projects. (Dkt. 217-3 at ECF 125–26, 130.)

The Court does not find that Makhoul's self-serving affidavit is sufficient evidence to defeat summary judgment. While it is not the Court's role to assess the credibility of parties or witnesses at the summary judgment stage, *see*, *e.g.*, *McClellan v. Smith*, 439 F.3d 137, 144 (2d Cir. 2006), "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt

---

[38] The Court is particularly reluctant to find that the MES Defendants assigned away their right to sue LMIC in light of the fact that Safeco and LMIC are related entities, and Safeco has no incentive to sue LMIC to assert the MES Defendants' rights.

that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007). "[W]here the plaintiff relies almost exclusively on his own testimony, much of which is contradictory and incomplete, it will be impossible for a district court to determine whether the jury could reasonably find for the plaintiff, and thus whether there are any 'genuine' issues of material fact, without making some assessment of the plaintiff's account." *Jeffreys v. City of N.Y.*, 426 F.3d 549, 554 (2d Cir. 2005) (internal quotation omitted).[39]

The other, unimpeachable evidence in the record contradicts Makhoul's assertion. On February 17, 2009, MES sent a letter to LMIC advising it that the Corps had terminated the HEPFF and ERDLF projects and that MES was going to make a claim for damages against the Comunale bonds; but the letter did not reference any earlier declaration by MES that Comunale was in default. (Dkt. 213-9 at ¶ 19, 21.) On March 12, 2009, LMIC responded by letter to MES, specifically stating that nothing in MES's letters indicated that Comunale was in default of its obligations and that if MES intended to proceed with its claim against Comunale's bond, MES should provide LMIC all supporting documentation. (Dkt. 213-7, at ECF 15.) MES responded by letter, dated May 8, 2009, stating that it was in the process of assembling data and was engaged in discussions with the Corps to settle the matters and that it would keep LMIC and Comunale apprised of the outcome. (Dkt. 213-6 ¶ 19; 213-7 at ECF 20.) Finally, on November 16, 2009, MES wrote to Comunale advising Comunale that since it had been unable to reach a settlement with the Corps, it was declaring Comunale to be in default. (Dkt. 213-5, at ECF 6.)

---

[39] In their supplemental briefing, the MES Defendants include a letter from Mohan-Maxfield to Comunale, dated November 15, 2010, in which Mohan-Maxfield refers to the fact that MES had claimed in the instant action that Comunale breached its contract with MES. (Dkt. 441-10.) Nothing in this letter supports a finding that the MES Defendants informed LMIC in September 2008 that Comunale was in default.

The next day, MES wrote to LMIC advising it of the same. (Dkt. 213-6 ¶ 22, Ex. F; 217-2 ¶ 30.) As with its February 17, 2009 letter, in neither of MES's letters to Comunale and LMIC on November 16, 2009—in which MES declared Comunale to be in default—did MES reference any *prior* declaration of default and certainly did not indicate that such a declaration had occurred in September 2008.

Even more damning are the MES Defendants' own discovery responses in this case. In the MES Defendants' responses to LMIC's First Set of Interrogatories, they were asked if MES had defaulted or terminated Comunale on the Projects, to which they answered, "MES defaulted SA Comunale [on] November 7, 2008 and November 16, 2009." (213-3 at ECF 122.) Even if the earlier of these two dates is relied upon, November 7, 2008 is *after* the HEPFF project was terminated on November 4, 2008, and thus after LMIC could have performed its obligations under the bond as to that project. More tellingly, when asked the exact dates that MES *first provided notice to LMIC* of its "claims against . . . the Comunale Bonds," MES responded February 17, 2009. (*Id.*)

Thus, the Court is unable to find that there is any credible or competent evidence of a "clear, direct, and unequivocal" declaration of default at a time when LMIC could have intervened. *See Elm Haven Const. Ltd. P'ship v. Neri Const. LLC*, 376 F.3d 96, 100 (2d Cir. 2004)[40]

Accordingly, LMIC is entitled to summary judgment on the MES Defendants' breach of contract claim.

---

[40] Even if there had been sufficient evidence to support a finding that Makhoul told Mohan-Maxfield and/or Pikulin in September of 2008 that Comunale was in default, the Court questions whether there would be sufficient evidence to support a finding that they were acting as agents of LMIC instead of agents of Safeco. The Court need not resolve this issue.

**III. COMUNALE'S MOTION FOR SUMMARY JUDGMENT IN THE MES ACTION**

The MES Defendants have asserted one claim against Comunale in Count Seven of the MES Action, stating that Comunale "has breached its subcontracts with MES to the extent that its work failed to comply with the specifications for the HEPFF and ERDLF projects." (Dkt. 111 at ¶ 279.) The MES Defendants assert that this claim encompasses both a breach of contract claim against Comunale and a claim against the LMIC payment bond because Comunale and LMIC are jointly and severally liable.

Comunale is entitled to summary judgment on these claims. As Comunale notes, it is clearly established that "to state a breach of contract claim, the pleadings 'must allege the provisions of the contract upon which the claim is based", as well as the acts or omissions constituting the breach. *Dilworth v. Goldberg*, 914 F. Supp. 2d 433, 457 (S.D.N.Y. 2012) (quoting *Atkinson v. Mobil Oil Corp.*, 614 N.Y.S.2d 36 (N.Y. App. Div. 1994))). The MES Defendants did not provide any details about this alleged breach until January 29, 2016—after Comunale served its summary judgment papers upon MES—when the MES Defendants submitted a new affidavit by Makhoul detailing for the first time specific ways in which Comunale breached its contractual obligations. As with the claim against LMIC, MES's assertion that Comunale breached its contract is based solely on Makhoul's affidavit, which does not rest on any evidentiary support for its claims regarding Comunale's breach. Although at the July oral argument, counsel for the MES Defendants referred to a "paper . . . trail" documenting Comunale's refusal to redesign the deluge system to the Corps's satisfaction, and emails between Comunale and MES, and MES and the Corps, regarding Comunale's default, (Dkt. 441-2 at 135–36), no paper trail or emails have been produced or cited in the MES Defendants' motion papers. As discussed above in relation to the MES Defendants' breach of contract claim against LMIC, the lack of reference to a default by Comunale prior to November 2009, when Comunale was

told to stop working because MES had been terminated by the Corps, contradicts a finding that Comunale breached its contract. Evidence of the Corps's dissatisfaction with the deluge system at the time of termination, (Dkt. 217-3 at ECF 125–26, 130), is insufficient to support a finding that Comunale breached its contractual obligations, without further evidence regarding what actions Comunale specifically took, or failed to take, with respect to the deluge system, and what specific contractual provisions those actions or omissions breached. Furthermore, the MES Defendants' November 7, 2008 letter to Comunale after the HEPFF project was terminated, telling Comunale to stop working on the project, made no mention of a breach (MES Action, Dkt. 213-5, at ECF 2.) The MES Defendants' allegation of breach by Comunale is further undercut by the fact that Comunale was brought on the ERLDF project to finish the project after MES's contract was terminated. (MES Action, Dkt. 213-5, at ECF 9–13.)

Finally, to the extent that the MES Defendants have argued that Comunale is jointly and severally liable for any breach by LMIC on its bond, any such claim is disposed of by the Court's finding that there is insufficient evidence of a breach by LMIC.

## IV.  CONTEMPT SANCTIONS AGAINST THE MES AND HIRANI DEFENDANTS IN THE SAFECO ACTION

As noted, on July 23, 2014, the Court adopted the Report and Recommendations of the Honorable Vera M. Scanlon recommending that the Court hold the MES and Hirani Defendants in civil contempt for failing to comply with the Court's collateral security order and for failing to meet their obligations to produce relevant books and records regarding their finances.

The Court adopted Judge Scanlon's findings that Plaintiff had established a *prima facie* case of contempt sanctions, which Defendants had not rebutted, and that Defendants had failed to prove a total defense to contempt by establishing that they clearly, plainly, and unmistakably were unable to comply with the contempt order. (*See* Dkt. 321.) The Court requested that the

parties submit briefing regarding the amount of the sanction the Court should impose. (*Id.*) The parties filed their respective opening briefs on October 6, 2014 (*see* Dkts. 325–28), and their responses to one another's briefs on October 24, 2014 (*see* Dkts. 331–34). On September 3, 2015, the Court granted Safeco's motion to supplement its contempt briefing, and on March 11, 2016, Safeco filed its supplemental brief regarding contempt sanctions (Dkt. 419), to which MES Defendants replied that same day (Dkt. 420).

The sanctions sought by Safeco are:

1) entry of a final default judgment against the MES and Hirani Defendants on each of Safeco's claims, with damages to be established at a subsequent hearing;

2) an order striking all of the defenses of the MES and Hirani Defendants;

3) an order striking all claims and counterclaims that the MES Defendants brought or could have brought in the Safeco Action, which would include all those set forth in the MES Action;

4) imposition of a fine to be immediately enforceable as a final judgment under Local Rule 83.6, covering both the full amount of the court-ordered collateral security obligation of $6,614,634.41 and $547,291 in legal costs and fees incurred over the years in attempting to obtain the MES and Hirani Defendants' compliance;

5) an order requiring the MES and Hirani Defendants, under penalty of imprisonment, to immediately transfer specific assets and information to Safeco; and

6) any other relief determined by the Court to be just and proper.

(Dkt. 327, at ECF 4; Dkt.328, at 4).

The Court finds that most of the relief that Safeco has requested in its sanctions briefing is moot in light of the other findings in this Order, especially the finding that Safeco is entitled to indemnification for attorneys' fees for the litigation in the instant actions, including the contempt proceedings. The requested relief that is now moot includes: (1) entry of a final default judgment against the MES and Hirani Defendants; (2) an order striking all of the MES and Hirani Defendants' defenses; and (3) an order striking all of the MES Defendants' claims and

counterclaims in both actions. The Court denies the relief requested in (4) and (5), above, because the Court has ordered the MES and Hirani Defendants to indemnify Safeco for the full extent of their losses and attorneys' fees, and the Court is further prepared to grant a restraint of the MES and Hirani Defendants' assets pursuant to New York CPLR § 5229 in lieu of the immediate transfer of assets requested by Safeco.

Given Defendants' demonstrated willingness to disregard the orders of this Court, withhold payments, and dissipate assets to avoid paying their debts, and the apparent danger that Defendants will continue to dispose of their remaining assets prior to the entry of damages, the Court will, upon Safeco's motion, grant a restraint of Defendants' assets pursuant to New York CPLR § 5229 ("In any court, before a judgment is entered, upon motion of the party in whose favor a verdict or decision has been rendered, the trial judge may order examination of the adverse party and order him restrained with the same effect as if a restraining notice had been served upon him after judgment").[41] *See, e.g.*, *Sequa Capital Corp. v. Nave*, 921 F. Supp. 1072 (S.D.N.Y. 1996) (restraining the defendant's assets between the entry of summary judgment in the plaintiffs' favor on liability, and the subsequent calculation of damages). If Safeco intends to move for a restraint of the MES and Hirani Defendants' assets under CPLR § 5229, it shall make a motion and submit the proposed order within thirty (30) days of the issuance of this Order. Thereafter, the Court will schedule an examination of the MES and Hirani Defendants,

---

[41] FRCP 64(a) permits federal courts to grant certain provisional remedies in accordance with State law. CPLR § 5229 provides one such remedy. *See Leser v. U.S. Bank Nat'l Ass'n*, 09-CV-2362, 2013 WL 867151, at *1 (E.D.N.Y. March 7, 2013); *Sequa Capital Corp. v. Nave*, 921 F. Supp. 1072, 1076 (S.D.N.Y. 1996); *see also Shamrock Power Sales, LLC*, 2016 WL 6102370, at *8 (listing CPLR § 5229 as a "prejudgment remed[y] that may be available to Plaintiff" under FRCP 64(a)").

which may include further inquiry into whether they have complied with the order to allow Safeco access to all of their books and records.

## CONCLUSION

For the reasons stated above:  (1) Safeco's motion for summary judgment, filed in both the Safeco and MES Actions, is GRANTED in its entirety; (2) the MES Defendants' motions in both actions are DENIED; (3) LMIC's motion for summary judgment is GRANTED; and (4) Comunale's motion for summary judgment is GRANTED.  All arguments not explicitly addressed in this opinion have been considered and deemed meritless or irrelevant.  The Court does not impose any sanctions on the M.E.S and Hirani Defendants beyond the judgment that they are liable to Safeco for the full amount of indemnification, including attorneys' fees.  An evidentiary hearing will be scheduled for calculation of damages.  In the meantime, Safeco may move for restraint of the MES and Hirani Defendants' assets pursuant to N.Y. C.P.L.R. § 5229 pending the evidentiary hearing and the issuance of a final judgment in this matter.


SO ORDERED.


*/s/ Pamela K. Chen*
Pamela K. Chen
United States District Judge

Dated: March 30, 2017
　　　Brooklyn, New York