# EXHIBIT "2"

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SAFECO INSURANCE COMPANY OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>M.E.S., Inc., M.C.E.S., INC. and GEORGE MAKHOUL, et al.<br><br>Defendants. | Case No. 09-cv-3312 (PKC)(VMS) |
| M.E.S., Inc., M.C.E.S., INC. and GEORGE MAKHOUL<br><br>Plaintiffs,<br><br>v.<br><br>SAFECO INSURANCE COMPANY OF AMERICA, et al.,<br><br>Defendants. | Case No. 10-cv-2798 (PKC)(VMS)<br><br><br>**STEVEN A. TASHER EXPERT REPORT** |

**INTRODUCTION AND SCOPE OF EXPERT REVIEW/ANALYSIS**

I have been retained by MES, Inc., MCES, Inc., and George Makhoul (collectively, the "MES Defendants") to provide an expert opinion with respect to certain fees/expenses sought by Safeco in its May 31, 2017 Application for Attorneys' Fees and Expenses and Supplement Regarding Additional Loss (the "Fee Application"). I have prepared this Report pursuant to Rule 26 of the Federal Rules of Civil Procedure.

The scope of my retention is to provide an opinion regarding whether Safeco has demonstrated that the fees and expenses incurred in connection with certain Underlying Action(s) complied with the general standards and customs governing the reasonableness of attorneys' fees (including all applicable Rules of Professional Conduct), as well as a directive to Safeco from the Court in its March 30, 2017 Order regarding Safeco's Fee Application to assist the Court with its determination of the quantum of damages. To the extent it is my opinion that portions of such fees and expenses do not comply and/or require additional information in order to render a meaningful evaluation, I shall provide a description of such fees/expenses below, as well as any

1

respective amounts in connection with same.  All of my opinions stated herein are to a reasonable degree of certainty.

I have reviewed background information and the respective generated legal fees pursuant to applicable principles regarding the reasonableness of legal fees, applicable rules of professional conduct, ethics, custom, the practice of law, as well as my more than forty years of experience as a litigator and in-house attorney responsible for evaluating and assessing the reasonableness of fees and expenses billed by outside counsel.

I have neither been asked nor do I offer an opinion or quantification as to the appropriate allocation of fees/expenses between the Hirani Defendants and the MES Defendants.  That is a legal issue which is beyond the scope of my retention and role as an expert.  I will, however, offer my expert opinion as to whether the format and substance of Safeco's Fee Application compromises my ability to conduct a meaningful evaluation regarding this issue.

## LITIGATION AND EXPERT WITNESS BACKGROUND

I have spent my entire legal career handling or supervising litigation and, as outlined below, have become an expert in the field of assessing and evaluating the reasonableness of attorneys' fees. My current CV is attached hereto as Exhibit A.

As Deputy Attorney General for the State of New Jersey, I personally tried and supervised numerous cases in state and federal court involving, *inter alia*, tort and contract claims brought against the State, election fraud, eminent domain and transportation issues, debarment of state contractors and environmental matters.

While a partner at Donovan, Leisure, Newton & Irvine and Willkie, Farr & Gallagher (in their New York and Washington offices), I litigated several complex, multiple party environmental matters throughout the United States.  I was national coordinating counsel for NL Industries in federal and state court proceedings associated with environmental and tort claims regarding NL's lead smelting operations.  In addition, I served as national coordinating counsel for Chemical Leaman Tank Lines, a nationwide common carrier transporter, defending environmental and tort claims involving the transportation of hazardous materials and environmental remediation claims arising out of the operation of terminal facilities throughout the United States.  I also served as liaison counsel in numerous multiple party actions brought by the United States Department of Justice throughout the country under the Comprehensive Environmental Response Compensation Liability Act (CERCLA) and the Resource Conservation Recovery Act (RCRA) on behalf of companies such as AT&T, Ashland Chemical, Arco, E. I. du Pont de Nemours, Texas Instruments, and IBM.

While Vice President and Associate General Counsel at Wyeth and Senior Vice President at its pharmaceutical division, I supervised outside counsel on many of the company's most complex and critical domestic and international litigation.  One such matter involved Wyeth's diet drug (Fen-Phen) litigation, one of the largest mass tort cases in U.S. history.  In that litigation, 63,000 lawsuits were filed in virtually every state by plaintiffs who claimed that their use of the product

2

led to moderate to severe pulmonary and cardiac issues. Wyeth had reserved over $20 billion dollars for these claims.

Since 2009, I have been Co-Chief Executive Officer (and, since mid-2013, Chief Executive Officer) and Managing Director of Wyatt Partners, a consulting firm which, among other things, provides expert analysis on the reasonableness of attorneys' fees and expenses in complex litigation. As a consultant on the issue of legal fees and expenses, I have advised companies and law firms with respect to billing guidelines used in complex litigation. I have also been retained by a number of national and international law firms to assist them in their analysis of legal fees and expenses in ongoing litigation. Examples of such companies include Chicago Title Insurance Company, Motorola Mobility, Inc., Plantronics, Inc., GN Netcom, A/S., Philadelphia Indemnity Insurance Company, Plexus Cotton, Ltd., AGI-Shorewood, LLC, and Honeywell International, Inc.

As an expert in attorneys' fees cases, I have been involved in the trial, resolution and evaluation of legal fees and expenses in many jurisdictions throughout the United States and Europe, including California, Colorado, Delaware, the District of Columbia, Florida, New Jersey, New York, North Carolina, Pennsylvania, Tennessee, Texas, Virginia, and the Commonwealth of Puerto Rico. These cases, several of which were coverage related disputes, have varied in nature, covering legal disciplines such as breach of contract/fiduciary duty, criminal law, intellectual property, securities fraud, bankruptcy, construction disputes (both defect and delay), environmental torts and remediation, employment disputes, real estate, and unfair business practices/false advertising. My testifying history has been attached hereto as Exhibit B.

## STATEMENT OF COMPENSATION

My rate of compensation is $450.00 per hour.

## MATERIALS REVIEWED

My opinion is based on a review and analysis of the following information and materials:

- The May 31, 2017 Safeco Fee Application (and all respective attached Exhibits);
- Relevant Pleadings of the multiple matters referenced in the Safeco Fee Application, including the March 30, 2017 Order Granting Safeco Summary Judgment;
- June 18, 2017 Letter from Hirani's counsel to Judge Chen;
- July 14, 2017 Letter from George Makhoul to Judge Chen;
- July 19, 2017 Scheduling Order from Judge Chen;
- July 26, 2017 Letter from Hirani's counsel to Judge Chen;
- August 1, 2017 Letter from Safeco's counsel to Judge Chen;
- August 2, 2017 Letter from Hirani's counsel to Judge Chen;
- August 7, 2017 Court Order
- August 9, 2017 Letter from Safeco's counsel to Judge Chen; and
- August 10, 2017 Corrective Order from the Court re: Safeco's Rebuttal Deadline.

## STATEMENT OF THE CASE

This matter arises from an action brought by Safeco Insurance Company of America ("Safeco") to recover its legal fees and expenses pertaining to performance and payment bonds issued by Safeco associated with three construction projects with the United States Corps of Engineers (the "Corps") for projects in New Jersey-the Pyrotechnics Research Technology Facility ("PRTF" or "Pyro") and the Explosives Research and Development Loading Facility ("ERDLF") undertaken by M.E.S., and the High Energy Propellant Formulation Facility ("HEPFF") undertaken by M.E.S and Hirani through a joint venture. Safeco issued performance and payment bonds for all three contracts, in an amount of $10,628,832.00 for PRTF, $8,253,975.00 for ERDLF, and $16,549,000.00 for HEPFF. Each bond was issued pursuant to indemnity agreements in favor of Safeco in the event of a default by M.E.S. or Hirani. The indemnity was intended to cover Safeco's loss and expense, in the event of a default, (including reasonable attorneys' fees) arising out of the investigation of, defense against, and payment of claims for the bonded projects.

In its Fee Application, Safeco seeks reimbursement for fees/expenses generated by three law firms who incurred a combined total of $5,689,807.59[1] in legal fees/expenses. These three firms were as follows:

- Watt, Tieder, Hoffar & Fitzgerald, LLP          $5,338,165.64
- Farber, Brocks & Zane, LLP                      $258,958.59
- Torre, Lentz, Gamell, Gary & Rittmaster         $92,683.36

### Safeco's Legal Fees and Expenses Incurred in Conjunction with Investigation, Defense, and Analysis Of Claims With Respect to the Three Bonded Projects.

Of the overall fees Safeco alleges that it incurred in legal fees and expenses for all categories of matters for which they seek reimbursement, Safeco contends in its Fee Application that it expended $839,847.00 in legal fees and expenses in connection with its efforts to provide legal assistance to investigate, defend, and analyze claims on the three Bonded Projects, and complete two of them for the Corps.

### *The Pyro Project Bond*

This project involved the construction of a Pyrotechnics Research and Technology Facility. In mid-January, the Corps sent Safeco a copy of its Formal Cure Notice documenting its concerns with M.E.S.'s performance of the work. On or about March 5, 2008, the Corps terminated M.E.S. on the Pyro Project and made a demand on Safeco to complete the remaining work on the PRTF contract. Safeco entered into a Takeover Agreement with the Corps on June 3, 2008, under which Safeco agreed to undertake completion of the work pursuant to the PRTF contract. In August of 2015, Safeco and the Corps executed a Settlement Agreement regarding Safeco's

---

[1] It is my understanding that Safeco has made certain "discretionary billing adjustments" in connection with $119,199.97 of fees/expenses incurred by Watt Tieder and Farber Brocks. For purposes of this Report, however, my analysis (and corresponding quantifications) shall be based on fees/expenses actually incurred by both firms, as this allows for a more thorough/accurate evaluation of what work was performed, how much, and by whom.

4

responsibilities and obligations under the Bond, and as a condition of the Settlement Agreement, the Corps paid $2,000,000 to Safeco to reimburse Safeco for, *inter alia*, "its legal fees...in full settlement" of its obligations under the Bond. Safeco retained the law firm of Watt Tieder to provide legal advice and assistance to Safeco in responding to the Corps' bond demand, as well as to advise and protect and preserve Safeco's rights vis a vis the Corps and M.E.S.

According to the Safeco Fee Application, the Watt Tieder services in connection with the Pyro Bond matter included the following:
- Analyzing and evaluating project records;
- Providing legal analysis of alternate takeover options;
- Preparation of a Takeover Agreement and negotiation of its terms with the Corps;
- Drafting and negotiating a contract;
- Researching and developing potential claims against the Corps;
- Communicating with in-house Safeco attorneys;
- Analyzing change order claims; and
- Researching alleged Davis-Bacon Act wage violations asserted against M.E.S by the Department of Labor.

Watt Tieder alleges that it incurred a total of $282,757.50 in legal fees with respect to the Pyro Bond matter.

## The HEPFF Bond

On September 3, 2008, during Safeco's completion efforts of the Pyro Project, the Corps sent Safeco a copy of its Cure Notice stating that the Joint Venture work on the HEPFF Project faced termination. The Corps terminated this contract on November 4, 2008. On December 3, 2009, Safeco and the Corps entered into a Takeover Agreement under which Safeco agreed to complete the work and executed a Settlement Agreement which included a mutual release and discharge. As part of the settlement, the Corps paid Safeco $6,015,000.00 which, as was the case in the Pyro settlement, included reimbursement of its legal fees. Safeco retained Watt Tieder to provide legal services with respect to this Project. According to its Fee Application, Safeco delineated the work performed, including:

- Analyzing and evaluating project records;
- Developing a legal strategy for negotiating a takeover agreement with the Corps;
- Retaining experts to prepare an analysis of the status of the project completion;
- Drafting and negotiating agreements;
- Analysis and defense of claims asserted by subcontractors and suppliers;
- Communication with Safeco's in-house attorneys;
- Retaining and working with experts to evaluate the design of the deluge system; and
- Researching alleged Davis-Bacon Act wage violations asserted against M.E.S by the Department of Labor.

Watt Tieder alleges that it incurred a total of $315,748.50 in fees in connection with the HEPFF Bond matter.

*The ERDLF Bond*

On November 10, 2008, the Corps issued a Cure Notice for the ERDLF Project in which it threatened to terminate M.E.S. On December 22, 2008, the Corps terminated the ERDLF Project and made a demand on Safeco's performance Bond for that project. Safeco did not enter into a Takeover Agreement in connection with this project, ultimately entering into a Settlement Agreement with the Corps with respect to this project. According to the Safeco Fee Application, Watt Tieder performed a number of tasks in connection with this Bond project. This work included the following:

- Assessing Safeco's contractual obligations and liability to the Corps under the Performance Bond and applicable surety law;
- Conducting an analysis of Safeco's rights and obligations;
- Preparing an analysis of Safeco's obligations under the Performance Bond;
- Communications with Safeco;
- Communications with the Corps;
- Reviewing and analyzing documents;
- Coding documents;
- Analysis of M.E.S claims; and
- Drafting and negotiating a settlement with the Corps;

Watt Tieder alleges that it incurred a total of $241,341.00 in fees in connection with the ERDLF Bond matter.

In sum, Safeco alleges that it incurred a total of $839,847.00 in legal fees with respect to Watt Tieder's work pertaining to the three Bond Projects.

**Safeco's Fees and Expenses in connection with numerous legal matters separate and distinct from work performed on the three Bond Projects**

In addition to the legal services Safeco alleges were performed on its behalf analyzing and dealing with the legal issues associated with its obligations for the three Bond Projects, Safeco alleges that it incurred an additional quantum of legal fees and expenses on numerous other separate and distinct legal matters which are detailed in its Fee Application.

These legal actions are as follows:

1. A July 30, 2009 federal court action brought by Safeco against M.E.S. and Hirani in the United States District Court, Eastern District of New York, alleging various alternative claims for relief, including, inter alia, actions for breach of contract and indemnity; and
2. An August 4, 2009 federal court action brought by M.E.S. against Safeco and several of its officers and employees in the United States District Court for the District of New Jersey seeking a broad spectrum of relief, including but not limited to claims for breach of the duty of good faith and fair dealing, tortious interference with contractual relations and prospective economic advantage, quantum meruit and breach of contract; and

3. A federal court action brought by M.E.S. in the United States District Court, Eastern District of New York, which involved a dispute between M.E.S. and one of its subcontractors (M.J. Favorito Electric, Inc.); and

4. A federal court action (Power With Prestige *vs.* M.E.S) brought in the United States District Court for the District of New Jersey.

In its Fee Application, Safeco has broken down the legal fees for these additional actions as follows:

1. Matter Number 4, which is broken down into nine categories of work and for which Safeco alleges it incurred $3,460,000.00 in legal fees;

2. Matter Number 5, which is described as litigation against a subcontractor and for which Safeco alleges it incurred $34,230.00 in legal fees;

3. Matter Number 6, which Safeco describes as development and pursuit of the Indemnitor's Assigned Claims, and for which Safeco alleges it incurred $277,216.00 in legal fees;

4. Matter Number 7, involving Safeco's claims against the Corps, and for which Safeco alleges it incurred $255,968.50 in legal fees; and

5. A matter brought by M.E.S against Safeco's corporate executives alleging conspiracy and bad faith, and for which Safeco alleges that it incurred $36,697.50 in legal fees

On March 30, 2017, the court found that Safeco was entitled to summary judgment on liability and that M.E.S. and Hirani must indemnify Safeco for its fees and costs arising from the Bonds issued for the PRTF, ERDLF and HEPFF projects. Accordingly, the court made the following determination with respect to Safeco's potential entitlement to its legal fees and expenses:

1. It ruled that M.E.S and its indemnitors were jointly and severally liable to Safeco for losses incurred by Safeco in connection with the Pyro and ERDLF projects;

2. It ruled that M.E.S, Hirani and their indemnitors, were jointly and severally liable to Safeco for losses incurred by Safeco in connection with the HEPFF project; and

3. It ordered that an evidentiary hearing be held to determine the quantum of damages to which Safeco is entitled.

In order to assist the court with its determination of the quantum of damages, the court directed Safeco to "submit additional documentation and support of the reasonableness of its damages, including contemporaneously created time records that specify for each attorney, the date, hours expended and the nature of the work done, and support for the reasonableness of the hourly rate and the hours expended." Order at Page 56.

## STANDARDS GOVERNING MY REVIEW AND BURDEN OF PROOF

My analysis will be informed and guided by my experience as an attorney, in-house counsel, and fee expert, as well as the standards contained within the New York Rules of Professional Conduct. I am guided by the requirement of Rule 1.5 that an attorney has a duty to bill reasonably, and shall evaluate the list of factors affecting reasonableness contained within Rule

1.5(a), particularly in light of my experience as a former litigator and consumer of legal spend as an in-house attorney.

The NYRPC explicitly prohibit an attorney from <u>charging or collecting</u> a fee that is excessive. NYRPC 1.5(a) (emphasis added). In addition to the factors in Rule 1.5(a), there are several other significant factors affecting and governing my evaluation of whether the fees/expenses Plaintiffs are seeking are reasonable. They are:

- The case management of Plaintiffs and counsel during the Underlying Action(s), including: (1) whether someone at Safeco reviewed the invoices for reasonableness; (2) whether Safeco provided counsel with billing guidelines and counsel's adherence thereto; (3) whether budgets were provided by Safeco and counsel's adherence thereto; and other factors indicating whether Safeco conducted the Underlying Action(s) in a reasonable and cost-effective manner.
- The format and substance of the time records and invoices, including: (1) whether contemporaneous time entries permit a meaningful evaluation of the tasks performed and whether such tasks were reasonable; (2) billing practices such as block/vague billing that interfere with the meaningful evaluation of the time entries; and (3) sufficient documentation for all expenses to permit an evaluation of the reasonableness of such expenses; and (4) whether Safeco has provided adequate support for their apparently arbitrary allocation of certain fees/expenses between the Hirani Defendants and the MES Defendants.

As a fee expert, my opinions are based upon two fundamental principles. The first is the principle that a "fee applicant bears the burden of establishing an entitlement to an award and documenting the appropriate hours expended and hourly rates. *Hensley v. Eckerhart*, 461 US 424, 437 (1983). Toward this end, "The party seeking an award of fees should submit evidence supporting the hours worked and rates claimed. Where the documentation of hours is inadequate, the district court may reduce the award accordingly." *Id.* at 424. As a fee expert, I agree with the fundamental principle that the party seeking to recover its legal fees has the burden to demonstrate their reasonableness, and this principle will guide and govern my analysis of the Safeco Fee Application.

A second fundamental principle which will guide and govern my analysis is the principle that "absent statute or enforceable contract, litigants pay their own attorneys' fees." *Alyeska Pipeline Service Co. v Wilderness Society*, 421 U.S. 240, 257 (1975). An important component of my opinion will focus on whether Safeco has met its burden to demonstrate that all or a portion of the fees/expenses it is seeking are derived from either a statutory or contractual obligation.

I will therefore focus my analysis of the Safeco Fee Application within the context of these two fundamental principles: 1) has Safeco met its burden that the fees and expenses they allege to have incurred are derived from an obligation pursuant to a statutory or contractual obligation, and, if so, 2) has Safeco met its burden of demonstrating the appropriateness of the fees and expenses they allege to have incurred?

**SUMMARY OF MY ANALYSIS/REPORT ROADMAP**

As a provider and consumer of legal services, and now as a fee expert, it is my belief that the foremost element of seeking payment of one's legal fees is providing the "reviewer" with a meaningful opportunity to evaluate 1) a clear articulation and allocation of the quantity of fees/expenses sought; 2) the nature of the work performed in connection with total amount sought; and 3) the basis of entitlement in connection with same (either via a statute, a contract, an order, or other basis).

Safeco has, in my expert opinion, presented a fee application that provides none of this. Despite a lengthy series of declarations to which it has attached hundreds of invoices, exhibits, and charts, Safeco's fee application is so fundamentally flawed (both in format and in substance) that it is my expert opinion that a significant reduction should be applied to the excess of $5 million they seek.

It is important to note that there are a few elements of Safeco's Fee Application that I am not disputing in my Report. They are as follows:

- I am not challenging the hourly rates of Safeco's counsel; and
- I am not disputing Safeco's entitlement (as per the Indemnity Agreements and the Court's March 30, 2017 Order) to reasonable legal fees/expenses in connection with efforts to secure its payments of legal fees to investigate, defend, and analyze all claims against Safeco's Performance and Payment Bonds).

My analysis will set forth in detail all of the reasons why Safeco's fee application (both in format and substance) fails to provide me with the information required to conduct a meaningful analysis of the reasonableness of its fees/expenses, and therefore fails to satisfy its burden to demonstrate the appropriateness of its legal fees/expenses as well as the requirements of the Rules of Professional Conduct and the Court's Order.

I shall do this via three separate sections:

1. In the General Observations section, I describe several significant problems with the format and substance of Safeco's invoices – all of which demonstrate Safeco's failure to follow the directive issued by the Court in its March 30, 2017 Order, and therefore its failure to demonstrate that the fees/expenses sought comply with NYRPC 1.5(a).

2. The section entitled Analysis will address certain multiple and overlapping unreasonable billing practices I observed by Safeco's counsel that are further exacerbated by the issues I raise in the General Observations section.

3. In my Conclusion, I will provide my opinion with respect to a fair and reasonable reduction based on all of the information described in the General Observations and Analysis sections.

## GENERAL OBSERVATIONS

The scope of my retention was to evaluate whether Safeco has demonstrated that its fees/expenses complied with the general standards and customs governing the reasonableness of attorneys' fees (including all applicable Rules of Professional Conduct), as well as the directive of the Court in its March 30, 2017 Order regarding the documentation it required Safeco to provide in order to evaluate an appropriate quantum of damages. My opinions for this report have particularly been informed by my independent review of Safeco's invoices as well as the materials reviewed. The invoices and materials have yielded several key observations – ranging from issues with Safeco's invoice review process, case management, format/substance of counsel's invoices, billing practices of counsel, and, most importantly, Safeco's refusal to provide certain vital information required to conduct a thorough and accurate analysis of its fees/expenses.

In my opinion, as I will enumerate below, Safeco has failed to demonstrate that its fees are in compliance with both the Rules of Professional Conduct as well as certain instructions/guidance provided by the Court in its March 30, 2017 Order regarding Safeco's Fee Application.

I.    General Observations Regarding Safeco's Invoice Review Process/Case Management

Based on the information provided in Safeco's Fee Application, Safeco has not provided documentation that it was supervising, coordinating and/or managing counsel's activities in any organized or concerted fashion over the course of the Underlying Action(s).

The only information provided with regard to Safeco's case management and bill review process over the course of the Underlying Action(s) appears to be boiled down to two identical paragraphs (Paragraph 35) that appeared in both Supplemental Affidavits of John O'Donnell and Stacy Hipsak Goetz that accompanied Safeco's Fee Application:

"In addition to automated billing review software, Safeco in-house attorneys have reviewed each of the above outside counsel's invoices for the reasonableness of time billed for the services provided in connection with each of the legal matters on which indemnity is sought, and, where Safeco has occasionally determined it to be appropriate, it has paid less than the full amount of such invoices."

This paragraph (as well as the remaining substance of Mr. O'Donnell's and Ms. Goetz's Affidavits) suggests several things. First, neither one of these individuals asserted personal responsibility or expressed first-hand knowledge over the supervision and/or case management of the Underlying Action(s) – specifically, the communication with and supervision of counsel, day-to-day strategy operations of the matters involved, and, most importantly, review of counsel's invoices for reasonableness. In fact, these Affidavits provide no information whatsoever on whether and to what extent Safeco participated in the bill review, supervision and management of the Underlying Action(s) or who at Safeco performed any such tasks.

Second, a computerized bill review process, combined with an unspecified method of review by multiple attorneys at Safeco does not suggest an organized, focused process for reviewing and

10

supervising the work performed or reviewing counsel's invoices. In fact, this apparent failure to supervise and review the invoices for reasonableness allowed counsel to operate in an essentially unsupervised and unfettered manner with no objective watchful eye monitoring their work or their bills. In my opinion, had someone at Safeco been doing this, he/she would have observed certain readily apparent unreasonable billing practices on counsel's part – including a top-heavy administration of the workload, overstaffing, charges for clerical/administrative work, duplication of efforts between primary and local counsel, block and vague billing, and other practices (all of which I will describe in detail in my Analysis and Conclusions section).

Third, had Safeco followed these types of case management guidelines, they would have managed the entire set of matters appropriately, with budgets for specific sets of tasks, careful attention to and adherence to the budgets, and supervision of all aspects of the work, which would have included task-appropriate staffing and an appropriate mix of attorneys and staff working on the matter.

In my opinion, the usual best practice for corporate and governmental law departments supervising outside law firms working on litigation consists of the development, implementation and compliance with a set of guidelines which govern the overall management and conduct of litigation. Such guidelines set forth the requirements and expectations of the client and establish a clear set of "rules of the road" by which outside counsel is required to operate in the conduct of the litigation. The essential elements of such guidelines call for the performance of legal work in accordance with a specified set of requirements, including requirements regarding staffing and the conduct of the case and management of experts, budgets prepared in advance of performing any legal work, review and approval of the budgets by the client, the generation of legal bills that comply with the specified requirements and budgets, and review of the legal bills by the client to confirm compliance with the requirements.

In this respect, Safeco has failed to demonstrate that it has engaged in meaningful supervision and management of the work performed in these matters, and thus has failed to demonstrate that compliance with the Rules of Professional Conduct.

II.    General Observations Regarding The Format and Substance of Plaintiffs' Invoices

A. Issue re: Redactions

In its March 30, 2017 Order, the Court directed Safeco to "submit additional documentation and support of the reasonableness of its damages, including contemporaneously created time records that specify, for each attorney, the date, hours expended, and *nature of the work done*, and support for the reasonableness of the hourly rate and the hours expended." Page 56 (emphasis added).

Safeco's extensive redactions fail to meet two vitally important criteria: 1) the directive of the Court, which required that Safeco provide information about the *hours expended* and *nature of the work done* performed by counsel for Safeco; and 2) satisfaction of its burden to demonstrate that its time incurred was appropriate under the Rules of Professional Conduct (particularly with

11

regard to permitting a review in light of the Rule 1.5 factors, including actual time and labor required in the case). See Rule 1.5(a)(1).

It is my understanding that the Court recently ruled that Safeco need not produce unredacted versions of its invoices to support its Fee Application. *See* August 7, 2017 Order. I wish to express my concerns about the operative effect of this ruling.

First, it is my understanding that certain *ex parte* exchanges regarding these redactions took place between Safeco's counsel and the Court's clerk prior to the filing of Safeco's Fee Application. August 1, 2017 Letter from Safeco's counsel to Judge Chen.[2] Safeco's counsel indicated that, during such *ex parte* discussions, Safeco expressed the "intent to supply the Court with an unredacted version of its legal invoices for *in camera* inspection." *Id.* The ultimate result (after several additional follow up letters on the issue) was the Court's finding that, in the event the Court needed unredacted invoices to assist in deciding Safeco's fee application, it would, in fact, review them *in camera*. August 7, 2017 Order. It is also my understanding that neither the MES nor the Hirani Defendants were aware of any such intent on Safeco's part to request this *in camera* inspection as a substitute for the review of the unredacted invoices by M.E.S. or Hirani until this August 1 letter. August 2, 2017 Letter from Hirani's Counsel to Judge Chen.

Second, had the Defendants been privy to any of these *ex parte* discussions, it is also my understanding that they would have raised the exact issue I am raising now – which is that an *in camera* inspection <u>does not resolve the problem</u> for the fee experts who are left in the position of providing an opinion on the reasonableness of fees/expenses without the ability to review the underlying documentation. In essence, asking me to review a set of <u>incomplete information</u>. As an expert whose role it is to <u>assist the Court</u> (and lessen its burden) when evaluating the reasonableness of Safeco's fees, this ruling, in effect, compromises my ability to do so.

Third, it is my expert opinion that, the widespread redactions in Safeco's <u>currently produced</u> invoices significantly interfere with my ability to conduct a thorough and comprehensive analysis of its fees and expenses. The following is a non-exhaustive list of reasons as to why:

- Contrary to Safeco's representation, these redactions do not represent a *de minimis* percentage of Safeco's fees/expenses in question, but rather encompass time entries (and corresponding fees) of approximately <u>$1.5 million dollars</u> (approximately 27% of the total fees/expenses sought in Safeco's fee application).
- To the extent Safeco is seeking its fees and has the burden of demonstrating the reasonableness of same, it is <u>not Defendants' (nor their experts') responsibility to "guess"</u> <u>the nature of this redacted information</u> (nor can they possibly do so).
- Because Safeco bears the burden of demonstrating the reasonableness of its fees in light of the Rule 1.5 factors, I am <u>completely precluded</u> from applying a number of the Rule 1.5 factors, most critically, Rule 1.5(a)(1) (time and labor required, complexity, and the

---

[2] By referencing this *ex parte* discussion, I am neither opining on its appropriateness nor is my argument on this issue based on whether/to what extent this type of *ex parte* discussion with the Court was permitted under the Rules of Court. I defer the making of all such related arguments to the MES Defendants and their Counsel.

"skills required to perform the legal service properly." How can I meaningfully consider the skills required to perform the services properly when I am unable to see what services were being performed?

- Given that all three law firms representing Safeco have engaged in these redactions, I am hindered in my ability to conduct an analysis as to certain apparent overlapping/duplicative work (notably between primary and local counsel).

- Given the nature of certain redactions (notably, for example, the subject topics of Safeco's counsel's legal research), there is no way to determine whether and to what extent a) the total time spent on certain research projects was reasonable; b) the timekeepers engaging in such research were duplicating one another's efforts; or even c) whether the timekeepers performing this particular research were at the appropriate skill level for the tasks. This issue also applies to certain work performed in connection with "reviewing/analyzing" or "preparing" particular pleadings/issues, as well as the evaluation of certain documents during discovery. Regardless of the arguments Safeco is making as to the reasons behind the redactions, it does not change their interference with my ability to evaluate and quantify these types of problems.

- To the extent certain time entries were redacted in their entirety, I have no meaningful way whatsoever to evaluate the fees connected to those particular time entries (or consider them in light of the Rule 1.5 factors, as described *supra*).

- Some of the redactions (notably in the Farber Brocks invoices) not only mask the time entries, but also the timekeeper, the amount of hours, and the total fees in connection with the work – essentially, the entire substance of the entry is missing.

Most importantly, in my Analysis section, I describe certain unreasonable billing practices of Safeco's counsel for which, ordinarily, I would make a recommended reduction for each category based on a thorough review and quantification of the fees/expenses related to same. However, these redactions (and their widespread nature) affect every single category of fees I would ordinarily evaluate and quantify for purposes of recommending reductions. These widespread and pervasive redactions have compromised my ability to provide what would be a thorough, accurate, and reasonable reduction recommendation to assist the Court and the parties regarding Safeco's entitlement to fees/expenses.

Therefore, in this respect, Safeco has failed to meet its burden to demonstrate the reasonableness of those fees/expenses which have been redacted, and has also failed to comply with this Court's directive to provide documentation of the hours incurred and nature of the work performed by each attorney. It also fails to permit proper analysis under the Rules of Professional Conduct. It is therefore my opinion that Safeco should not be entitled to any fees/expenses for which they have failed to provide all relevant information as to the "nature of the work performed" per the Court's instructions. This would encompass an approximate reduction of $1,500,000.00 – the total amount of fees associated with any time entries for which Safeco has redacted information either in whole or in part.

13

B.  Safeco's Arbitrary and Unsupported Allocation of Fees in Connection with Matter No. 4 and Other Matters

In its Fee Application, Safeco has set forth certain arbitrary approximations of fees/expenses incurred by counsel with respect to two separate issues.

First, Safeco has presented in excess of $3 million in fees/expenses in connection with, what Safeco has referred to as "Watt Tieder Matter No. 4" – a billing matter that appears to encompass two actions – the "Safeco Action" and the "MES Action." However, as counsel for the Hirani Defendants correctly points out in its June 18, 2017 letter to the Court, "[i]t seems Watt Tieder never created any sub-matters to contemporaneously track and apply its billing in the Actions to the specific project relating to the litigation task at hand. Neither did Safeco's local counsel . . . "

Safeco has provided what appears to be arbitrary and unsupported approximations of fees in connection with nine categories/projects in connection with Matter No. 4. As Safeco explains, "[b]ecause of the magnitude of these invoices (Matter 4 invoices alone contain approximately 7,000 entries), and recognizing the difficulty for the Court in analyzing this quantity of raw data, Watt Tieder, to the best of its ability, attempted to group the approximately 7,000 time entries into one of the following nine categories." Safeco Fee App., page 26.

The nine categories (and related approximations of fees) are as follows:

- Preparing the Complaint and Complaint-Related Services ($40,000),
- Motion for Summary Judgment regarding Collateral Security ($100,000),
- Enforcement of the Collateral Security Orders ($1,490,000),
- Defense of the Indemnitors' Bad Faith Allegations ($460,000),
- General Discovery Efforts ($960,000),
- Cross-Motions for Summary Judgment ($300,000),
- General Case Management and Strategy ($60,000),
- Settlement Efforts ($35,000), and
- Preparation for the Upcoming Evidentiary Hearing ($15,000).

My problem with Safeco's presentation of these figures is twofold. First, despite Safeco's purported solution to this tremendous quantity of "raw data," they do not provide any supporting documentation and/or corresponding time entries in connection with these figures. As counsel for Hirani accurately pointed out in its June 18, 2017 letter, neither Watt Tieder nor local counsel "created any sub-matters to contemporaneously track and apply its billings . . . to the specific project relating to the litigation task at hand." Furthermore, "Safeco has not even attempted, as part of its fee application, to go back and break down the entries in Watt Tieder's Matter No. 4 or Farber Brocks' invoices on a project-by-project basis now."

Safeco is thus expecting the parties and Court to rely on its "say so" that significant amounts of money are both accurate and appropriate for their work. However, absent a clear representation of which time entries Safeco claims were related to and/or appropriate for the approximately $960,000.00 they allege were incurred for "General Discovery Efforts," I cannot meaningfully evaluate necessary issues such as 1) staffing; 2) time entries indicating potential duplication of

14

efforts; 3) time entries connected to this work that were redacted (either in whole or in part); 4) whether/to what extent these efforts were performed on a task-appropriate level.

Second, over the course of its fee application, Safeco has also attempted to present certain arbitrary approximations of fees/expenses to be allocated between the M.E.S. and the Hirani Defendants. To the extent Safeco has failed to provide proper breakdowns of the time entries connected to certain projects/fees, Safeco cannot expect these arbitrary allocation figures to be taken seriously – either by the Defendants or by the Court. It is my understanding that there is currently a dispute as to allocation of damages between the M.E.S. and Hirani Defendants. This is, in fact, a legal issue for which I offer no opinions and that I appreciate will be addressed at a later juncture. However, Safeco's failure to break down its fees/expenses clearly and with appropriate support (particularly in connection with Matter No. 4) not only makes its allocation approximations unreliable, but is also going to result in unnecessary expenses and resources down the road – both for the Court and for all the parties.

Therefore, in this respect, Safeco has failed 1) to meet its burden to demonstrate the reasonableness of those fees/expenses for which they have not articulated a clear and supported breakdown by project, 2) to comply with this Court's directive to provide documentation of the nature of the work performed by each attorney in connection with each respective matter; and 3) to provide the required information to permit a proper analysis under the Rules of Professional Conduct. While I cannot attach a particular dollar figure to Safeco's failure in this respect, I will take this into account in my section entitled Recommendation re: Additional Percentage Reduction.

>C. Certain Fees/Expenses For Which Safeco 1) Has Failed to Demonstrate its Statutory/Contractual Entitlement to Reimbursement and/or 2) Has Not Demonstrated Its Entitlement Due to Apparent Prior Reimbursement

As a fee expert, my opinions are based on the general principles governing the recovery of attorneys' fees. One such foundational principle is the "American Rule" which states that "absent statute or enforceable contract, litigants pay their own attorneys' fees." *Alyeska Pipeline Service Co. v. Wilderness Society*, 421 U.S. 240, 257 (1975). Pursuant to this principle, Safeco is required to specifically delineate the basis upon which it is seeking recovery of legal fees and expenses it allegedly incurred. While I am not offering a legal opinion on this entitlement, I am nevertheless required to evaluate whether Safeco has met its burden to demonstrate the basis upon which it is entitled to the fees which it seeks, and, to the extent it has failed to meet its burden to demonstrate an appropriate legal basis, the quantum of fees and expenses for which no such legal entitlement has been demonstrated.

**Fees For Which Safeco Has Failed to Demonstrate its Statutory/Contractual Entitlement to Reimbursement**

In its Fee Application, Safeco has indicated that it has incurred $839,847.00 in legal fees and expenses in connection with investigating, defending, and analyzing its rights under the Pyro, ERDLF, and HEPFF Bond projects. In support thereof, Safeco delineated the legal services provided for each of these projects (which are set forth in my Statement of the Case, *supra*)

15

Safeco alleges that it incurred an additional quantum of legal fees on the numerous other matters set forth in its Fee Application, which matters are separate and distinct from work performed to provide advice and counsel with respect to the three bonded projects.

I have carefully reviewed Safeco's Fee Application and related documentation in support thereof. I do not see in that material a specific and precise articulation of the rationale in support of the statutory or contractual basis for its entitlement to the additional quantum of legal fees and expenses sought in its Fee Application. It is my opinion that Safeco is required to provide a specific articulation of the basis in order to meet its burden of documenting the reasonableness and recovery of the quantum of the legal fees and expenses which it seeks. In the absence of meeting such burden, Safeco should not be entitled to recover any such fees and expenses.

## Fees/Expenses For Which Safeco Has Apparently Already Been Reimbursed In Connection with the Bonded Projects

Moreover, Safeco is seeking recovery from M.E.S and Hirani for two sets of legal fees and expenses it allegedly incurred in connection with work performed by counsel with respect to two of the bonded projects for which it appears to have already been reimbursed by the Corps:

- The $282,757.00 Safeco allegedly incurred in connection with the Pyro Project; and
- The $315,748.50 Safeco allegedly incurred in connection with the HEPFF Project.

With respect to both of those projects, Safeco entered into settlement agreements with the Corps which included mutual releases and discharges (August 2015 for the Pyro Project and December 3, 2009 for the HEPFF Project), each of which appears to have contained a reimbursement to Safeco for its legal fees incurred in connection with these specific matters. Safeco does not appear to have factored the reimbursement for its legal fees in connection with this work into its Fee Application.

In my opinion, Safeco has the burden of demonstrating that it has not already received reimbursement of the legal fees and expenses it is now seeking from M.E.S and Hirani. If Safeco has already received a reimbursement of such fees and expenses from the Corps, such fees and expenses should not be included in its Fee Application and should not be part of the requested recovery from M.E.S or Hirani.

III.   General Observations Regarding Plaintiffs' Apparent Unreasonable Billing Practices

Over the course of my review of both sets of invoices, I observed multiple overlapping unreasonable billing practices by all three firms. These billing practices ranged from general overstaffing, block/vague billing; task-inappropriate work performed by partners that should have been delegated to lower-billing attorneys (and, in the case of Watt Tieder, an unreasonably top-heavy administration of the workload); clerical/administrative work performed by support staff that should not be charged to the client; multiple attendance at hearings/other events, and other miscellaneous unreasonable billing practices.

As I will describe in greater detail below, these unreasonable fees/expenses also overlap with fees/expenses that may be unrelated to the Underlying Action(s). Furthermore, based on the declarations from Safeco's representatives and lack of clarification of this practice by Safeco's counsel, it is my opinion that the unreasonable billing practices I observed further reinforce Safeco's apparent failure to supervise and manage these matters in an appropriate, reasonable way.

In this respect, Safeco has also failed to demonstrate compliance with the general standards and customs governing the reasonableness of attorneys' fees (including all applicable Rules of Professional Conduct) as well as certain instructions/guidance provided by the Court in its March 30, 2017 Order regarding Safeco's Fee Application.

IV.    Overlapping/Pervasiveness of These Issues and Affect On My Analysis

Based on my review of the materials and invoices, the aforementioned issues above (the Safeco's clear lack of case management/bill review for reasonableness, the redactions, Watt Tieder's commingling of their invoices in Matter No. 4 as well as their arbitrary allocations and approximations of fees associated with certain projects) cannot be considered independently of one another. It is my expert opinion that these issues are further complicated by the fact that they overlap significantly with one another. Furthermore, they affect my ability to evaluate and quantify the unreasonable billing practices I describe above.

All of these factors, which individually are not numerically quantifiable, collectively further support my opinion that the fees and expenses in the fee application are patently unreasonable, not in compliance with either the Rules of Professional Conduct or the relevant customs governing attorneys' fees, and warrant a further reduction in Safeco's fees. Since they are not numerically quantifiable, yet together unreasonably impacted the fees being sought, it is my opinion that a further percentage reduction in Safeco's recoverable fees is warranted, which will be outlined specifically below in the section entitled Recommendation re: Additional Percentage Reduction.

## ANALYSIS

In this section of my Report, I shall evaluate the fees/expenses sought by Safeco. This section will address all remaining fees/expenses for Safeco's counsel in the context of the Safeco's failure to demonstrate the reasonableness and necessity of the fees/expenses.

I.    Watt Tieder

Over the course of my review of the firm's invoices and related materials, I noted several key observations in connection with the fees/expenses billed by this firm – all of which indicate that Safeco has failed to demonstrate that Watt Tieder's fees/expenses were reasonable and necessary. I shall describe these key observations in detail below.

17

However, I begin by reiterating the significance and pervasiveness of the overlapping issues I delineate in the General Observations section, as all of them affect my ability to evaluate and recommend a reduction for Watt Tieder's fees/expenses (particularly the issue of redactions).

As a fee expert, it is my opinion that these overlapping issues further demonstrate that Safeco has not adequately demonstrated which fees/expenses sought are reasonable and necessary with respect to the Underlying Action(s), nor have they taken the necessary steps to identify, quantify, and remove the fees/expenses that are unrelated and/or unreasonable.

A. Unreasonable Billing Practices

1. Top-Heavy Administration of the Workload

Based on my review of the materials (notably Watt Tieder's own admission), it is my opinion that Watt Tieder's administration of the workload in these matters was top-heavy and inadequately delegated to more junior attorneys who, based on Safeco's Fee Application, were competent to perform certain elements of the required workload.

As Watt Tieder states, "of the $5,023,797.50 that Watt Tieder billed to Safeco, $3,857,832 (or approximately 77% of the total) relates to legal services performed by senior associates (5th year associate or higher) or partners. Further analysis indicates that nearly $3.3 million of the foregoing amount was billed for legal services provided by Vivian Katsantonis (lead counsel in this case), Christopher Harris and Christopher Anzidei." Safeco Fee App., page 10.

Watt Tieder then goes on to explain that "[b]illings by junior associates (1st-4th year attorneys) amount to $950,923, or roughly 19% of the total amount billed by Watt Tieder," *id.*, despite "the specialized nature of Watt Tieder's practice (where an associate literally spends all of his or her time on construction, surety and government contracts matters), these associates had far more surety and government contracts experience than more senior associates at other broad based firms." *Id.*

In other words, the senior-most Watt Tieder attorneys (5th year and above) outbilled the junior attorneys (in fees) by a ratio of 4 to 1. In hours (instead of fees), the senior-most attorneys billed 12,584.6 hours to 3,588.4 hours (a ratio of 3.5 to 1). See Chart entitled Watt Tieder Hoffar & Fitzgerald LLP – Billing Individuals by Matter & Title.

In effect, Watt Tieder boasts the fact that they have talented, capable associates experienced in surety matters but underutilized them. Furthermore, as I will describe below in the section regarding Ancillary Billers, the majority of the time entries of junior associates – particularly those of Erica Marshall and Rachel M. Farrer – contained heavily (or entirely) redacted research, thus preventing my ability to meaningfully evaluate whether/to what extent their contribution involved surety expertise or other more general skills traditionally assigned to junior associates such as document review.

The staffing, delegation of workload, and the overall handling of litigation requires the performance of a myriad of tasks and assignments pertaining to a whole range of disciplines.

These tasks vary in complexity and difficulty and require different levels of skill and experience levels, and an attorney has the obligation under the Rules of Professional Conduct to match up the requirements of the task to the skill sets and experience of the individuals performing the work. Specifically, when staffing/delegating the required workload of a matter, the attorney in charge must consider the novelty and difficulty of the questions involved and the skill sets requisite to perform the legal service properly, NYRPC 1.5(a)(2), as well as the fee customarily charged in the locality for similar legal services. NYRPC 1.5(a)(3). Moreover, it is a fundamental obligation of counsel to consult with the client about the means by which the client's objectives are to be accomplished, NYRPC 1.4(a)(2), and to abide by the client's decisions concerning the objectives of the representation and the means by which they are to be pursued. NYRPC 1.2(b).

Many of the tasks performed could and should have been performed by attorneys at lower billing rates. It is my opinion that this top-heavy administration of the workload was inappropriate and that the failure to delegate certain tasks to attorneys at lower billing rates led to excessive charges in these matters. Specifically, I noted among the senior-most attorneys (Vivian Katsantonis, Christopher Harris, Christopher Anzidei, and Christopher Brasco) significant amounts of legal research for more than 3 hours at a time, and in some cases, more than 10 hours at a time (much of which was redacted), document review, as well as drafting certain discovery requests, Complaints, and Motions to Dismiss – all of which can and should have been delegated properly to lower billing associates (who Watt Tieder admits had the surety experience to perform the work).

In my experience as a fee expert, a percentage reduction is a common practice in the industry to account for top-heavy and task inappropriate work that should have been properly delegated to lower billing attorneys. It is therefore my opinion that a reduction would be warranted to account for such top-heavy administration of the workload.

Ordinarily, I would simply recommend a reduction for the total amount of fees connected to this top-heavy administration of the workload. Specifically, I would traditionally calculate a reduction based on what I would opine to be a more appropriate balance of the work between junior and senior attorneys. In this case, I would calculate a 50% reduction of the 12,584.6 senior attorney hours (5th year associate and higher) times $30/hr in the difference between the senior/junior hourly rates. This would result in a reduction of $188,769.00.

However, given the redacted nature of many of the same entries for which I have already recommended a reduction and cannot "double dip," applying this traditional reduction would neither be fair nor accurate.

Therefore, I will address this issue accordingly in the section below entitled Recommendation re: Additional Percentage Reduction.

2. Clerical/Administrative Work (Approximately $65,000.00)

Administrative and clerical activities are generally considered part of a law firm's overhead expenses, and, as such, are already included within the law firm's pricing in the establishment of

hourly rates for professional services. Clerical activities include tasks that do not require legal acumen and that should be effectively performed, at no charge to the client, by secretaries, file clerks and other non-professional staff of the law firm.

The client should also not be charged for items which are traditionally included in a law firm's overhead, such as secretary salaries, costs of maintaining a library, malpractice insurance, utilities and like kind expenses. Fees billed for office management/clerical work, and hence, attorney overhead, are, in my opinion, not separately compensable from the fees billed by the attorneys. The billing by attorneys and paralegals for the performance of clerical or secretarial tasks is both unreasonable and inappropriate. These tasks could and should be delegated to non-billing staff members or not charged to the client if performed by billing staff members.

In my opinion, it is unreasonable for a law firm to charge a client for overhead expenses generally associated with a law firm's proper administration, staffing and equipment. A number of the billing entries (and related timekeepers) of Watt Tieder which I have reviewed are non-billable clerical or administrative items or tasks which should have been included in the firm's overhead expenses and not separately charged to clients. Accordingly, I traditionally disallow all such entries.

In this case, I observed that the majority of Watt Tieder's paralegals (with the exception of Jeannie K. Blood who worked on a privilege log) and all of the Project Assistants engaged in tasks that were generally clerical/administrative in nature, and that should not be reimbursed, including printing, organizing, uploading, compiling, preparing copies and/or data, and otherwise attending to document-related issues that can and should be billed by a secretary.

Specifically, Paralegals, Najmah Bass, Diana Fordyce, and Catherine Curtis billed a combined total of $22,303.00 in fees to the matters. The particular tasks I reference above appeared in virtually all of their time entries, which happened to include other descriptive tasks in the same entries, such as "review" and/or "analyze" – thus interfering with my ability to provide an exact quantification of the clerical-specific tasks.

Additionally, Project Assistants Wesley Kellogg, Angie Nguyen, Thomas O'Leary, Matthew Albert, and Simona Antonova generated a combined total of $9,518.00 in fees in connection with these matters. Their time entries included tasks such as printing, organizing, "prepare copies" "review and compile," and "review and prepare" exhibits – again, all clerical and administrative work that should not be charged to a client.

Finally, Paralegal Stefanie Castalano incurred $151,632.00 in fees in connection with these matters. In reviewing her time entries, I also noted similar tasks such as organizing, printing, compiling, downloading, and retrieving documents (many of which were contained in block billed time entries). If I had to put an approximate figure on the respective time entries, I would estimate that approximately $35,000.00 of Ms. Castalano's fees were clerical/administrative in nature.

It is also important to note that with the exception of Stefanie Castalano, Jeannie Blood, and Najmah Bass, I would also consider these support staff timekeepers ancillary billers (as

20

described in the section below), given their *de minimis* participation (less than 50 hours) in these matters, as well as Watt Tieder's own admission in calling them "Secondary Billers."

Ordinarily, I would simply recommend a reduction for the total amount of fees connected to clerical/administrative time entries. However, given a) the <u>block billed</u> nature of many of the clerical/administrative entries, combined with b) the <u>redacted</u> nature of many of the same entries for which I have already recommended a reduction and cannot "double dip," applying this traditional reduction would neither be fair nor accurate.

Therefore, I will address these clerical/administrative fees in the section below entitled Recommendation re: Additional Percentage Reduction.

### 3. Overstaffing/Ancillary Billers ($57,765.00)

In Watt Tieder's exhibits, they have provided a document entitled "Biographical Information for Watt, Tieder, Hoffar & Fitzgerald, L.L.P. Billing Individuals, in which they set forth biographical descriptions of each timekeeper for whose fees Safeco seeks reimbursement. The document is divided into two sections: "Primary Timekeers" and "Secondary Timekeepers." I have reviewed the time entries of all such 25 timekeepers identified as "Secondary" by Watt Tieder. In addition to the support staff timekeepers who (in my expert opinion) performed clerical/administrative tasks as described above, the majority of remaining timekeepers in this section billed such a *de minimis* amount of time (less than 50 hours) that I do not believe their associated fees should be reimbursed. These timekeepers are as follows:

- Mark Sgarlata ($9,880.00) (a portion of whose time entries were redacted)
- Arnie Mason ($7,875.00) (assisted with the research/drafting of Safeco's Opposition to Hirani's Motion to Stay Pending Appeal, apparently alongside timekeepers Vivian Katsantonis, Elizabeth Dorfman, Rachel Farrar, and possibly others in April 2011 whose time entries were redacted, thus preventing me from stating this with certainty)
- Robyn Burrows ($7,371.00) (all of whose research was contained in redacted time entries)
- James Ogorzalek ($4,806) (all of whose research/document review was contained in redacted time entries)
- Daniel Broderick ($5,832.00) (conducted "research and analysis relating to collateral security under the respective indemnity agreements," apparently alongside timekeepers Vivian Katsantonis, Erica Marshall, Rachel Farrar, and possibly others in April 2011 whose time entries were redacted, thus preventing me from stating this with certainty.
- Julia Fox ($7,182.00) (all of whose research was contained in redacted time entries)
- Nathan Lambeth ($1,944.00) (all of whose research was contained in redacted time entries)
- Christine J. Lee ($2,538.00) (all of whose research was contained in redacted time entries)
- Kimberly A. Wilson ($3,888.00) (all of whose research was contained in redacted time entries)
- Brian Maxted ($5,855.50) (all of whose research/drafting was contained in redacted time entries)
- Travis L. Mullaney ($594.00) (all of whose work was contained in redacted time entries)

Ordinarily, I would simply recommend a reduction for the total amount of fees connected to these ancillary timekeepers. However, given that many of these timekeepers' fees were connected with the redacted time entries for which I have already recommended a reduction and cannot "double dip," applying this traditional reduction would neither be fair nor accurate.

Therefore, I will address these clerical/administrative fees in the section below entitled Recommendation re: Additional Percentage Reduction.

4. Undocumented Expenses ($318,254.67)[3]

Safeco seeks reimbursement for a significant amount of expenses incurred by their counsel/vendors for which no supporting documentation has been produced. As the party seeking payment of these expenses, Safeco must demonstrate that these expenses were in compliance with any retainer agreements, in compliance with the New York Rules of Professional Conduct, and incurred in connection to the Underlying Action(s). Safeco's failure to produce documentation for expenses precludes any review by myself or the Court to determine whether they have demonstrated that the expenses were reasonable and necessary, in compliance with any engagement agreements (many of which Safeco has failed to produce). As presented, Safeco's fee application fails to provide information to meaningfully evaluate 1) which timekeepers incurred these expenses; 2) the specific nature of such expenses (including appropriate documentation); and 3) the dates on which such expenses were incurred.

Instead, what Safeco has done is provided a summary chart of five[4] "categories" of expenses: 1) Meals and Travel; 2) Document Production; 3) Depositions/Court Reporters; 4) Experts and Consultants; and 5) General Case Management Costs. Safeco Fee App., page 50. However, this chart in no way accurately represents the multitude of categories and types of expenses that were incurred by Watt Tieder in connection with the matters, and for which I have no ability to determine what they were, whether they conformed with/enforced by any Safeco outside counsel billing guidelines with regard to expenses, or whether they were appropriate.

Specifically, there are at least three problems with Safeco's expectations:

1. Safeco expects reimbursement for certain expenses incurred by other individuals/entities for which separate engagement agreements/invoices should have been provided for evaluation, such as "Investigative Service" (Invoice 114149), "Mediation Fees" (Invoice 115178), "Expert/Consultant" (Invoice 128299).
2. Safeco expects reimbursement for certain expenses that should adhere to/be enforced by Safeco's Counsel Billing Guidelines, including any and all travel expenses (Air Travel, Hotels, Lodging, Meals, Ground Transportation, Parking, Telephone); and expenses in connection with Document Productions for which there is no documentation or

---

[3] This figure encompasses the expenses incurred only by Watt Tieder. I will address the expenses for Farber Brocks and Torre Lentz separately in their respective sections.

[4] Watt Tieder is not seeking reimbursement for a sixth category of expenses (Westlaw Charges) based on certain New York case law regarding lack of entitlement to reimbursement for such charges.

breakdown of costs per page or other means of tracking what was reproduced, how much, and by whom ("Reproduction," "Outside Reproduction"); and

3. Safeco expects reimbursement for certain expenses for which they have provided <u>no explanation whatsoever</u> as to the nature of same, including but not limited to charges for "Miscellaneous" on a multitude of invoices (*see, e.g.*, Invoices 93084 and 132959), "Computer Hardware" (Invoice 120947), and "Agency Fees" (Invoice 101906).

While I do appreciate Ms. Katsantonis' representation to the Court regarding her review/approval of all of these expenses, her "say so" is no substitute for the standard to be applied here, nor is it what the Court directed Safeco to provide. This Court's order directed Safeco to provide <u>documentation and support</u> of the reasonableness of its damages. It is therefore my opinion that, absent such documentation and support, none of these $318,254.67 in Watt Tieder's expenses should be reimbursed.

### 5. Other Practices

As I explain above, Safeco (via their own internal representatives and their counsel) has failed to address and clarify their commingled and unclear/inconsistently allocated invoices. Consequently, Safeco has also failed to demonstrate which of the fees/expenses they seek for reimbursement are either reasonable and necessary with respect to the Underlying Action(s). Additionally, I noted another significant issue – multiple <u>overlapping unreasonable billing practices</u>. These billing practices ranged from general overstaffing (both in terms of participation in hearings/events and in connection with certain projects/pleadings), block/vague billing that further exacerbated the commingling/allocation of invoices, excessive amounts of intra-office conferencing, excessive amounts of time spent on particular projects and duplicative efforts in connection with similar work.

The main additional unreasonable billing practices I observed can be highlighted as follows:

- Thousands of block billed time entries;
- Thousands of vaguely billed time entries that make it difficult, if not impossible to determine what, in fact, the timekeepers were actually doing and whether such time/fees were reasonable and necessary with respect to the Underlying Action(s);
- Hundreds of time entries for which multiple attorneys at Watt Tieder engaged in intra-office conferencing;
- Thousands of time entries and hundreds of thousands of dollars in efforts/fees generated by multiple attorneys billing time and apparently identical efforts to particular projects.

Again, these examples were not just isolated issues contained in a handful of invoices, but issues that were pervasive throughout the entirety of the invoices that I reviewed. As I mention above and will explain in further detail below, the overlapping of these unreasonable billing practices with the commingling/allocation issue would make conducting a line-by-line analysis of Watt Tieder's unreasonably billed fees/expenses incomplete and potentially inaccurate. Regardless, my observations of these unreasonable billing practices reinforce my conclusion that Plaintiffs have failed to demonstrate that the fees/expenses incurred in connection with the Underlying Action(s) were reasonable and necessary.

23

Ordinarily, I would recommend a reduction for the total amount of fees connected to these billing practices. However, given that many of these timekeepers' fees were connected with the redacted time entries for which I have already recommended a reduction and cannot "double dip," applying this traditional reduction would neither be fair nor accurate.

II.    Farber Brocks ($258,958.59)

Farber Brocks served as local counsel for Safeco in this Indemnity Action against MES and Hirani, allegedly generating fees/expenses in the amount of $258,958.59 ($232,359.65 in fees, $26,599.94 in expenses). Safeco Fee Application, page 15, *citing* Affidavit of William Brocks ("Brocks Aff."), at ¶¶ 2-3.

I have reviewed both the Affidavit of William Brocks, as well as all such Exhibits attached to same (including the invoices). I have the following observations. First of all, Mr. Brocks stated that, as his firm's invoices were generated, he "reviewed them for *accuracy* prior to being sent to Watt Tieder for payment by Safeco." Brocks Aff., at ¶ 5 (emphasis added). In my opinion, as a fee expert, there is a difference between evaluating an invoice for accuracy (correct math, spelling, representation of what was done and for how long) versus a supervisory partner's obligation under Rule 5.1 of the Rules of Professional Conduct to review the work performed by all attorneys at his/her firm for reasonableness. Mr. Brock has thus conceded that his review of the firm's fees/expenses was not based on the correct standard for review.

Secondly, with the exception of the invoices that were redacted (either in whole or in part), I observed that Farber Brocks' time entries for which Safeco seeks reimbursement suggests that local counsel's fees revolved around one of three repetitive tasks:
- "Receipt and review" of documents (nearly half of the firm's time entries contained this phrase);
- "Teleconferencing" (some of which overlapped with the receipt and review described above); and
- Drafting correspondence with Watt Tieder (also which overlapped in block billed time entries with the tasks described above).

Based on my review of the invoices and affidavits in support of Farber Brocks' fees/expenses, it is my opinion that Safeco has not met its burden in demonstrating several things: 1) what substantive role Farber Brocks' in connection with these matters, aside from "reviewing" documents and correspondence alongside Watt Tieder; 2) the coordination and case management between primary and local counsel and attempts to avoid overlapping/duplication of work (an issue on which both Watt Tieder and Farber Brocks' affidavits are silent); 3) to the extent Farber Brocks attended court hearings/conferences alongside Watt Tieder, Safeco's fee application has not articulated what Farber Brocks' specific role was in connection with same; and 4) to the extent I might have been able to identify certain duplicative work between primary and local

24

counsel, the pervasiveness of <u>Watt Tieder's redacted time entries</u>[5] interferes with my ability to do so thoroughly and accurately.

For all of the above reasons, it is my expert opinion that Safeco was required to demonstrate that the work performed (and related fees/expenses) did not duplicate the work of primary counsel and that a supervising partner of the firm reviewed all such invoices for reasonableness. Because Farber Brocks has not demonstrated that it did so, Safeco should not be entitled to any of these unredacted remaining fees (as well as Farber Brock's $26,599.94 in expenses).

III.    Torre Lentz (M.J. Favorito Matter) ($92,683.36)

According to Safeco's Fee Application, Torre Lentz served as counsel for Safeco, who was a third-party defendant in the matter of *M.E.S., Inc. v. M.J. Favorito Electric, Inc., et al.*, No. 1:08-cv-183-JG-JMA (E.D.N.Y.) (the "M.J. Favorito Action"). The M.J. Favorito Action involved several of the same parties, contracts, bonds, facts, and allegations as this Indemnity Action, as the M.J. Favorito Action arose from the HEPFF. Safeco Fee App., pages 16-17.

Torre Lentz provided services relating to the M.J. Favorito case in the amount of $92,683.36 in fees/expenses ($92,436.00 in fees, $247.36 in expenses), a dispute with a subcontractor relating to the HEPFF Project. Safeco was drawn into the litigation between M.E.S., the Joint Venture, and the subcontractor through third-party complaints and cross-claims. Since the M.J. Favorito case arose from a dispute from the HEPFF Project, and all the Indemnitors in this action were involved with the HEPFF project, Safeco is allocating 100% of the Torre Lentz fees and costs to the each of the MES and Hirani Indemnitors, jointly and severally. *Id.*, pages 57-58.

I have reviewed the Declaration of Benjamin Lentz and all such attached exhibits (including the invoices of the firm). Safeco has not provided a specific and precise articulation of the rationale in support of its entitlement to the fees incurred by this firm. I have already recommended a reduction above for the $45,457.00 in redacted invoices in connection with this firm's time. Because Safeco has not demonstrated such entitlement, Safeco should not be reimbursed for these unredacted remaining fees (as well as Torre Lentz's $247.36 in expenses).

IV.    Recommendation re: Additional Percentage Reduction of Watt Tieder's Fees

During my review, I observed numerous other unreasonable billing practices and fundamentally flawed billing practices that permeate and influence my opinion of the reasonableness of the overall quantum of fees and expenses sought by Safeco in this matter. All of these factors, which individually are not numerically quantifiable, collectively further support my opinion that the fees and expenses in the Safeco Fee Application are unreasonable and inappropriate, not in compliance with either the New York Rules of Professional Conduct or the relevant customs and practices governing attorneys' fees. Thus, these factors warrant a further reduction in the quantum of fees sought by Safeco. Since they are not numerically quantifiable, yet together unreasonably impacted the fees being sought, it is my opinion that a further percentage reduction in Safeco's recoverable fees is warranted, which I will detail below.

---

[5] Based on my review, the fees connected to Brocks Farber's redacted time entries amount to $6,982.50.

First, as noted previously, Safeco's redaction of approximately $1.5 million of its invoices (representing approximately 27% of the total fees and expenses sought by Safeco) compromised my ability to conduct a thorough, accurate, and meaningful analysis of the reasonableness of the invoices. Additionally, the redactions had other particularly insidious impacts in that they eliminated my ability to conduct the following further analysis critical to my review:

- Evaluation of overlapping and duplicative work performed by timekeepers within each Firm;
- Evaluation of overlapping and duplicative work between primary and local counsel;
- Evaluation of time spent on specific projects;
- Evaluation of whether work performed was done by timekeepers at the appropriate experience and skill level;
- The identity of the timekeepers;
- The amount of hours spent on specific projects and tasks.

A second factor is Safeco's failure to meet its burden of documenting that it was managing and supervising outside counsel's activities in an appropriate manner. Aside from its stated reliance on computer billing software to review the accuracy of outside counsel's invoices, Safeco has provided neither the documentation of the methodology and practice in which it engaged in the supervision of the activities of outside counsel in this matter nor the manner in which it conducted a qualitative review of counsel's fees and expenses. Safeco has provided no information regarding its utilization of Outside Counsel Billing Guidelines to establish benchmark parameters and requirements for the manner in which work was to be performed and billed, no information about the manner in which counsel communicated about the work to be performed, no information about scopes of work or budgets pertaining to the tasks in which counsel was to be engaged (or as a benchmark for review of invoices), and no information about how and to what extent qualitative review of the invoices were to be performed. All of these usual best practices described above, which are implemented by most companies and governmental entities for whom legal work is performed, would have provided the fundamental process and tools to have enabled Safeco's counsel to cost-effectively supervise and manage the matters and to identify many of the unreasonable practices I have observed.

As noted previously, the invoices submitted by Safeco in its Fee Application are replete with a multitude of time entries that appear to be overstaffed, excessive, duplicative and overlapping. I have observed thousands of hours of time on projects and legal tasks to which multiple timekeepers participated in the work and incurred substantial time. On certain of these projects, up to seven or more timekeepers worked on the very same projects, oftentimes setting forth duplicative or identical descriptions of the work. My ability to precisely quantify the time associated with this apparent overstaffing and duplication in order to understand and qualitatively analyze the role of and necessity for each and every one of the multiple timekeepers on projects was compromised by the extensively redacted, block billed and vague time entries. I have previously noted the apparent lack of case management and supervision by Safeco's in-house counsel , who permitted this significant amount of legal spend without billing guidelines or budgets for the work. This failure in supervision provides the explanation of why the law firms in question generated unjustifiable and excessive amounts of time and staff to the work

performed in the matters-there appeared to be no one responsible for the supervision of the work who was carefully and diligently supervising and monitoring the work.

Another factor is the manner in which Safeco has structured its Fee Application. Safeco has provided what appears to be a hodgepodge of arbitrary and unsupported approximations of fees in connection with nine categories of projects that it has characterized as Matter No. 4, the invoices for which contain approximately 7,000 time entries. The manner in which this has been presented provides no supporting documentation or corresponding time entries in connection with these fees and fails to break down the entries on a project by project basis. This failure to provide a clear indication of which time entries were incurred in connection to which matters compromised my ability to properly evaluate necessary issues such as staffing, potential duplication of efforts, time entries related to time entries that have been redacted, and work that may have been performed on and allocated to matters relating to work on M.E.S matters and work relating to Hirani.

A fourth factor is that a substantial amount of the work performed by Watt Tieder was done by timekeepers at the highest hourly billing rate of the firm. This top heavy administration of the workload is evidenced by the fact that 77% of Watt Tieder's total fees were performed by senior attorneys (5th year associates through senior partners). In other words, Watt Tieder's senior attorneys outbilled associates with four years or less experience by a ratio of 4 to 1. This allocation of the work to the most senior timekeepers appears particularly inappropriate for several reasons. Based upon Watt Tieder's own statement in its Fee Application, it employed a cadre of talented, knowledgeable and experienced associates who possessed extensive experience in the subject matter of the litigation. The staffing, delegation of workload and overall handling of litigation requires the performance of a myriad of tasks which require different skill sets and experience levels and Watt Tieder had the obligation to allocate these tasks in an appropriate and cost-effective manner. There is no explanation as to why the allocation of work did not include utilizing these experienced associates who could have performed the work at a lower billing rate. Furthermore, my review of the invoices indicates that many of the tasks performed by senior lawyers could have and should have been performed by the attorneys at lower billing rates.

Yet another factor is the approximately $65,000 incurred by Safeco for clerical/administrative activities. My review of the invoices revealed a number of such tasks that do not require legal acumen and that should be performed, at no charge to the client, by secretaries, file clerks or other non-professional staff of the law firm. These charges are generally considered part of a law firm's overhead expenses and should not be charged items to a client.

I have also considered the number of timekeepers who, in my opinion, had a minimal participation with and familiarity to the matters and performed a *de minimis* amount of work in conjunction with the matter. My review of the invoices reveals that 11 Watt Tieder timekeepers each individually billed less than 50 overall hours to the matter (a total of approximately $57,000) and, in my opinion, it was neither efficient or appropriate to have included their time for reimbursement.

27

The final consideration in my rationale in support of a percentage reduction is that the invoices in the Safeco Fee Application contain an extensive number of time entries that are vaguely billed or block billed. The vaguely billed entries do not provide descriptions of the work performed that clearly or precisely communicate what work was done. They do not provide the reviewer with the opportunity to determine from each time entry the nature and scope of the activity, whether the time entry is appropriately billed and the reasonableness of the time spent by the timekeeper performing that activity. For these reasons, vague billing descriptions are universally prohibited and discounted by courts.

Similarly, the practice of block billing has been universally discouraged by courts and prohibited by nearly every client billing guideline I have reviewed. An extensive number of the Safeco invoices were block billed, which prevents me from meaningfully determining the reasonableness of the time spent on any of the individual tasks listed in the blocked set of time. The extensive quantum of time entries that were vaguely billed and block billing also prevents (as is the case of the redacted time entries) a meaningful and qualitative evaluation of whether and to what extent time entries were duplicative, overlapping, necessary and pertinent to the matter at hand.

For all of the reasons set forth above, it is my opinion that a further percentage reduction in the amount of 20% ($700,000.00) should be applied to Watt Tieder's fees/expenses (less the reductions that I have already applied for redactions ($1,467,679.30) and expenses ($318,254.67)).[6]

## CONCLUSION

At this juncture, my opinions may be summarized as follows:

1. Safeco has failed to meet its burden to precisely and specifically articulate the basis for its statutory or contractual entitlement to any of the fees sought that were not in connection with Matters 1 through 3.

2. Safeco has failed to explain why certain legal fees and expenses for which it has already received reimbursement from the Corps as part of the settlement of the Pyro and HEPFF bond Projects should now be recoverable from M.E.S and Hirani.

Additionally, I hereby opine that Safeco should not be entitled to reimbursement for the following fees/expenses:

1. Reductions for Redactions (**$1,520,119.30**)
   - Watt Tieder: $1,467,679.30
   - Farber Brocks: $6,982.50
   - Torre Lentz: $45,457.50

---

[6] The extent to which these practices pervaded Watt Tieder's invoices and time entries was so substantial that, in my expert opinion, it warranted a much higher percentage. However, given Watt Tieder's "discretionary billing adjustment" of $115,951.97 (*see* page 6 of its Fee Application), I will apply a 20% reduction of the remaining fees.

28

2.  Reductions for Watt Tieder's Undocumented and Potentially Unreasonable Expenses **($318,254.67)**

3.  Reductions for Farber Brocks (Less Redactions) **($251,976.09)**

4.  Reduction for Torre Lentz (Less Redactions) **($47,225.86)**; and

5.  Additional Percentage Reduction in the amount of 20% of Watt Tieder's Fees/Expenses (Less the Reductions Already Applied for Redactions and Expenses) **($700,000.00)**.

I declare, under penalty of perjury under the Laws of the United States, that the foregoing is true and correct. I hereby reserve the right to supplement my opinions should any additional information become available.

Respectfully submitted this 15th day of August, 2017.

Steven A. Tasher

29

# EXHIBIT A

**STEVEN A. TASHER, ESQ.**
**CEO and Managing Director, Wyatt Partners**
**P.O. Box 358, Berkeley Heights, New Jersey 07922**
Telephone: (908) 561-7483   Email: stasher@wyattpartners.com   Website: www.wyattpartners.com

## EXECUTIVE SUMMARY

As one of the nation's leading experts on legal fee matters whose entire legal career has focused around the handling and supervision of major litigation throughout the world, Steven Tasher evaluates the reasonableness of legal spend in complex litigation throughout the United States. He also serves as an advisor to major corporations and law firms on the development and implementation of billing guidelines, litigation budget, and bill review programs.

## INDUSTRY AND LEGAL EXPERIENCE

**WYATT PARTNERS,** Berkeley Heights, NJ

2009-         *Co-Chief Executive Officer and Managing Director*
              *(Chief Executive Officer since mid-2013)*

- Serve as an expert witness, auditor, and mediator with regard to litigation fees and costs of outside counsel;
- Assist corporations with creation and implementation of Litigation Budget & Support Programs and Outside Counsel Billing Guidelines;
- Assist international corporations with familiarization of United States litigation in the area of legal spend;
- Provide advice and counsel to major corporations on development of Environmental Health and Safety (EHS) and Energy Policies and Programs;
- Provide advice and counsel on the preservation of critical company resources by reducing the use of energy, water and waste in company operations and promotion of reuse, recycling and conservation; and
- Conduct environmental due diligence on complex transactions and acquisitions and analysis of the costs of investigation, remediation and disposal.

**WYETH,** Madison, NJ

1992 –2008    *Vice President and*
              *Associate General Counsel*
              *Principal Corporate Officer*
              *Senior Vice President, Pharmaceutical Division*

Strategic worldwide responsibilities for five operating departments of the company as well as Associate General Counsel responsibilities.

*Key responsibilities:*

- Oversee the Environmental and Energy Departments to assure compliance with all applicable laws and regulations regarding environmental, health and safety matters, and to ensure the most efficient use of energy at all company facilities.
- Administer the Global Real Estate Department.
- Supervise the Aviation Department, including aircraft, pilots, ground crew, and hangar facility.
- Manage Facilities Operations and Building Management.
- Serve as Associate General Counsel; supervise major legal issues affecting the corporation, including major litigation, global contract administration, and internal corporate investigations.
- Serve on the Corporate Law/Regulatory Review Committee which provides guidance to the Chairman of the Board on all issues affecting the potential liability of the corporation.
- Provide advice and direction with regard to environmental issues, health and safety compliance and assessment programs, environmental remediation, regulatory matters, legislative issues, corporate acquisitions & divestitures, and supervision and defense of environmental enforcement actions.
- Manage the company's $300 million environmental reserves as well as oversee the $103 million environmental reserves for Cytec, Inc.
- Serve as Counsel to the President of Wyeth Pharmaceuticals on global compliance issues.

*Key accomplishments:*

- Formed a world-class global Environment Health and Safety (EHS) Department in 1992, establishing a comprehensive program and set of policies designed to achieve EHS excellence.
- Guided Wyeth Pharmaceuticals through its compliance with a Consent Decree imposed by the FDA on three key manufacturing facilities and served as counsel to the President on all cGMP compliance issues.
- Served on a three-person senior leadership team which re-engineered and restructured Wyeth's supply chain organization.
- Served as Senior Vice President, Global Compliance Auditing for Wyeth Pharmaceuticals; established and supervised the audit programs for all company operations, including manufacturing and research facilities, clinical trials, medical labeling, and promotional activities.
- Supervised the successful litigation against a Minneapolis company and its individuals who had stolen the company's trade secret process for the extraction and purification of *Premarin*.
- Established a safety program which achieved a substantial reduction in the company's lost time incident rate and total incident rate.
- At the behest of the company's Board of Directors, created animal health and welfare programs for the care and treatment of horses involved in the production of *Premarin*; supervised the ongoing defense of attacks by animal activist organizations on the production and manufacture of the *Premarin* family of products.

- Established a Budget Program for the company's diet drug litigation. This matter required supervision of the legal spend of over 60,000 lawsuits, coordinating counsel, and 120 law firms which defended these matters.
- Supervised environmental international litigation and claims brought against the company and/or its affiliates in Europe, South America, and Asia.

**WILLKIE, FARR & GALLAGHER**, New York, NY and Washington, DC

1988 – 1992  *Partner in charge, Environmental Practice Group*

Provided legal expertise on an international level to a wide range of corporate, banking, insurance, real estate and financial services clients.

**DONOVAN, LEISURE, NEWTON & IRVINE**, New York, NY and Washington, DC

1983 – 1988  *Partner in charge, Environmental Practice Group*

Provided legal expertise on an international level to a wide range of corporate, banking, insurance, real estate and financial services clients.

**BAYH, TABBERT & CAPEHART**, Indianapolis, IN, and Washington, DC

1982  *Partner in charge, Environmental Practice Group*

Provided legal expertise on an international level to a wide range of corporate, banking, insurance, real estate and financial services clients.

**E.I. duPont de Nemours and Company**, Wilmington, DE

1980 – 1982  *Staff Attorney*

Served as an attorney within the Law Department, providing litigation and regulatory counsel on a wide range of issues affecting the corporation.

**STATE OF NEW JERSEY**, Trenton, NJ

1973 – 1980  *Deputy Attorney General*
*Chief Counsel to the Commissioner of the New Jersey Department of Environmental Protection and Commissioner of Agriculture*

Supervised all environmental litigation and counseling for the State of New Jersey. Prosecuted several of the nation's landmark environmental matters. Tried and supervised numerous cases in state and federal court involving workers' compensation, tort and contract claims, transportation and eminent domain, and debarment of state contractors.

## EDUCATION

1973    **GEORGE WASHINGTON UNIVERSITY, NATIONAL LAW CENTER,**
Washington, DC
Juris Doctor, with honors

1970    **RUTGERS UNIVERSITY,** Newark, NJ
BA, Political Science/Pre-law, with honors

## BOARD POSITIONS
- The George Washington University Law School – Member, Board of Advisors
- The Cancer Hope Network – Member, Board of Trustees (Past President)
- Visiting Nurse Association of Northern NJ – Member, Board of Trustees

## AWARDS AND HONORS
- Jacob Burns Award for Extraordinary Service to The George Washington University Law School – 2008
- Philanthropic Leadership Award, 2003 – Cancer Hope Network
- Corporate Leadership Award, 2003 – Visiting Nurse Association of Northern NJ
- Selected to Best Lawyers in America – New York, NY and Washington, DC, 1989-1992

## PROFESSIONAL AFFILIATIONS
- New Jersey Institute of Technology – Adjunct Faculty Member
- "Distinguished Neutral" – International Institute for Conflict Prevention & Resolution

## PRESENTATIONS AND PUBLICATIONS
- July 18, 2017:  Featured presenter at "Ethics of Attorney Fee Disputes" audio webinar – sponsored by the National Business Institute
- September 21, 2016:  Featured presenter at "Best Practices & Lessons Learned for In-House Counsel on Unnecessary Legal Spend," webinar – sponsored by the Practising Law Institute
- September 16, 2016:  Featured presenter at "Legal Fees and the Discovery Process" in Whippany, New Jersey – sponsored by the Association of Corporate Counsel NJ Chapter
- April 19, 2016:  Featured presenter at "Ethics and the 'Reasonable' Legal Fee" webinar – sponsored by the Practising Law Institute
- December 1, 2015:  Featured presenter at "Ethics Behind the Reasonable Legal Fee" in Basking Ridge, New Jersey – sponsored by the Association of Corporate Counsel New Jersey Chapter
- September 18, 2015:  Featured presenter at "Litigating Fee Disputes: Keeping it Reasonable" in Hanover, New Jersey – sponsored by the Association of Corporate Counsel New Jersey Chapter
- March and June 2015:  Presenter of "Best Practices & Lessons Learned for In-House Counsel on Unnecessary Legal Spend," a CLE sponsored by the Association of Corporate Counsel New Jersey Chapter

- October 2013: Featured speaker at the NALFA Attorney Fee Conference in San Francisco, California
- April 2013: Presenter of two legal spend webinars (Bill Review/Litigation Budgeting Programs) with Deloitte
- June 2010: Featured speaker at the Second Annual Los Angeles Attorney Fee Conference: "It Pays To Be Reasonable" at Southwestern Law School
- Environmental Law and Real Estate Handbook
- New York Environmental Law Handbook

# EXHIBIT B

**Testifying History of Steven A. Tasher**
**(Chief Executive Officer of Wyatt Partners)**
**Current as of August 1, 2017**

Engagements as Testifying Expert Witness at Trials and/or Depositions

1. *Seagate Technology LLC, Seagate Technology International, and Seagate Singapore International Headquarters PTE, LTD. v. National Union Fire Insurance Company of Pittsburgh, PA and Insurance Company of the State of Pennsylvania*, Case No. 09-04120 CV (United States District Court for the Northern District of California) (deposition taken).

2. *First Horizon National Corporation, et al., v. Certain Underwriters at Lloyds, et al.*, Civil Action No.: 2-11-cv-02608 (United States District Court for the Western District of Tennessee: Memphis Division) (deposition taken).

3. *In the Matter of the Arbitration Act of 1996 and In the Matter of an Arbitration Between GATX Rail Austria GmbH and Liberty Mutual Insurance Europe Limited* (arbitration hearing testimony provided on November 18, 2015).

4. *Diana Gladstone v. Robert Hacker*, Civil Action no. GD12-24308 (in the Court of Common Pleas, Allegheny County, Pennsylvania) (jury trial testimony provided on January 19, 2016).

5. *Joseph P. Nacchio, et al. v. Herbert J. Stern et al.*, Docket No. ESX-L-2825-11 (Superior Court of New Jersey, Law Division, Essex County) (deposition taken).

6. *IVM Corporation v. Zuellig Group et al.*, Civil Action No.: 2-13-cv-3902 (United States District Court for the District of New Jersey) (deposition taken).

7. *Lee David Auerbach, P.C., v. Richard DelGatto*, Index No. 69908/2015 (Supreme Court of the State of New York, Westchester County) (court hearing testimony provided).

8. *Fox Paine & Company, LLC and Saul A. Fox v. Houston Casualty Company, A Professional Indemnity Agency, Inc.*, Index No. 52607/2014 (Supreme Court of the State of New York, Westchester County) (deposition taken).

9. *Quinn Emanuel Urquhart & Sullivan, LLP v. Victoria Brooks, Andrew Brooks, and Elizabeth Brooks*, Case No.: 1425019922 (JAMS New York, JAMS Arbitration) (arbitration hearing testimony provided on May 23, 2017).