UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------x
SAFECO INSURANCE COMPANY OF AMERICA,

Plaintiff,

- against -

M.E.S., INC., M.C.E.S., INC., HIRANI ENGINEERING & LAND SURVEYING, P.C., HIRANI/MES, JV, GEORGE MAKHOUL, JITENDRA S. HIRANI, and SARITA HIRANI,

Defendants.
-------------------------------------------------------x

**MEMORANDUM & ORDER**
09-CV-3312 (PKC) (VMS)

PAMELA K. CHEN, United States District Judge:

Plaintiff Safeco Insurance Company of America ("Safeco") seeks to recover its legal fees and costs related to performance and payment bonds that Safeco issued for three construction projects with the United States Army Corps of Engineers (the "Corps") in New Jersey: (1) the Pyrotechnics Research Technology Facility ("Pyro") project, undertaken by Defendant M.E.S., Inc. ("MES") and M.C.E.S., Inc. ("MCES"), of which Defendant George Makhoul is the President, sole officer, and shareholder ("Makhoul") (collectively, the "MES Defendants"); (2) the Explosives Research and Development Loading Facility ("ERDLF") project, undertaken by the MES Defendants; and (3) the High Energy Propellant Formulation Facility ("HEPFF") project, undertaken by the MES Defendants and Defendant Hirani Engineering & Land Surveying, P.C. ("Hirani"), which is owned by Defendants Jitendra Hirani and Sarita Hirani, as well as a joint venture, Defendant Hirani/MES, JV ("Hirani/MES") (collectively the "Hirani Defendants")[1].

[1] The MES Defendants and Hirani Defendants will be referred to collectively as "Defendants".

Safeco's attorneys' fee application[2] seeks a judgment against the MES Defendants in the amount of $5,570,500.62. Of this amount, Safeco seeks to hold the Hirani Defendants jointly and severally liable with the MES Defendants for $4,352,639.56.[3]

Safeco's attorneys are: (1) Watt, Tieder, Hoffar & Fitzgerald, LLP ("Watt Tieder"), which seeks $5,222,213.67; (2) Farber Brocks & Zane LLP ("Farber Brocks"), which seeks $255,710.59; and (3) Torre, Lentz, Gamell, Gary & Rittmaster, LLP ("Torre Lentz"), which seeks $92,683.36. (Safeco Fee App., Dkt. 503, at 6.)[4]

Defendants contest the amount of fees sought by Safeco. Makhoul contends that Safeco should not be awarded any fees and expenses, or, alternatively, that Safeco's claim for legal fees and expenses should be reduced by $2,137,575.92 to a total of $3,433,031.70.[5] The Hirani

[2] The Court permitted Safeco to file its Fee Application under seal because it discusses specific legal invoices. (*See* ECF Entry 10/5/17). Since the Court does not discuss specific legal invoices in this Order, the Court is not filing the Order under seal.

[3] In its reply, Safeco made two downward adjustments to the amount originally sought in its fee application. Safeco requested that the MES Defendants pay $107 less than the originally requested fee of $5,570,607.62 and that the Hirani Defendants pay $65,186.31 less than the originally requested fee of $4,417,932.87. (Safeco Reply, Dkt. 510, at 52.) As a result, Safeco seeks entry of a judgment awarding its attorneys' fees and costs against the MES Defendants for $5,570,500.62; and awarding its attorneys' fees and costs against the Hirani Defendants, jointly and severally liable with the MES Defendants, for $4,352,639.56. Considering that Safeco does not break out these costs for each individual Matter, the Court does not do so either and utilizes the original amounts requested by Safeco for the purposes of its analysis.

[4] Page numbers refer to the pagination generated by the CM/ECF system, and not the document's internal pagination.

[5] The MES Defendants' original attorney, Geoffrey Johnson, Esq., withdrew in April 2017. (*See* ECF Entry 4/3/17.) However, at the hearing on attorneys' fees and damages, MES, but not Makhoul, was represented by a new attorney, Rachel Schulman, Esq. (Dkt. 530 (Notice of Appearance of Rachel Schulman, Esq. on behalf of MES).) Since Mr. Johnson's withdrawal, Makhoul has represented himself and did so at the hearing. As an unrepresented corporate entity, MCES defaulted as of April 3, 2017. Given the late and limited appearance of Ms. Schulman in this case, it is unclear whether MES shares Makhoul's position regarding the elimination or reduction of Safeco's attorneys' fees.

Defendants similarly argue that Safeco's claim for legal fees and expenses as to them should be reduced by $3,299,453.92 to a total of $1,118,478.95.

For the reasons set forth below, the Court finds that the MES and Hirani Defendants are liable for the full amount sought by Safeco. As a result, the Court finds that the MES Defendants are liable for Safeco's attorneys' fees and costs in the amount of $5,570,500.62 and that the MES Defendants and the Hirani Defendants are jointly and severally liable for $4,352,639.56 of that amount.

## I. Facts and the Course of Litigation

### A. Relevant Facts

In July 2009, Safeco sought to recover losses arising from its issuance of performance and payment bonds required to secure three government contracts, including two that the MES Defendants entered into, and one that the Hirani/MES joint venture entered into, with the Corps (collectively, the "bonded projects"). Safeco issued performance and payment bonds in the amounts of $10,628,832.00 for the Pyro project, $8,253,975.00 for the ERDLF project, and $16,549,000.00 for the HEPFF project. (Pl. 56.1 Statement, Dkt. 410-1, at ¶¶ 30-33.) As consideration and inducement for Safeco to issue the bonds, Defendants, as indemnitors, executed one or both of two virtually identical Indemnity Agreements (collectively "the Agreements"). Defendants (i) agreed to fully indemnify Safeco for all loss and expense, of any kind or nature whatsoever, incurred in connection with the bonds; and (ii) agreed to a number of additional terms designed to protect Safeco's interests and to insulate it from loss. (*Id.* at ¶¶ 8-29.)

Specifically, the Agreements provide that Defendants agree to pay to Surety "upon demand . . . [a]ll loss, costs and expenses of whatsoever kind and nature, including court costs, reasonable attorney fees . . . consultant fees, investigative costs and any other losses, costs or expenses

incurred by Surety by reason of having executed any Bond, or incurred by it on account of any Default under this agreement by any of the [MES or Hirani]," as well as, "interest on all disbursements made by Surety in connection with such loss, costs and expenses . . . at the maximum rate permitted by law calculated from the date of each disbursement" and "[a]n amount sufficient to discharge any claim made against Surety on any Bond," either to "pay such claim or [to] be held by Surety as collateral security against loss on any bond." (*Id.* at ¶ 16.)

The Agreements were intended to cover Safeco's losses and expenses in the event of a default—including reasonable attorneys' fees—arising out of the investigation of, defense against, and payment of claims for the bonded projects. The Agreements enabled Safeco to "incur such expenses, including reasonable attorneys' fees, as deemed necessary or advisable in the investigation, defense and payment of such claims." (*Id.*) Notably, the Agreements stated, "[a]n itemized statement of loss and expense incurred by [Safeco], sworn to by an officer of [Safeco], shall be prima facie evidence of the fact and extent of the liability of [MES and Hirani] to [Safeco] in any claim or suit by [Safeco] against [MES and Hirani]." (*Id.*)

The Pyro, ERDLF, and HEPFF projects all failed in 2008. On March 5, 2008, the Corps terminated the Pyro contract for default, and 12 days later, on March 17, 2008, the Corps made a bond demand on Safeco to complete the remaining work on the Pyro contract. (*Id.* at ¶¶ 36–37.) The Corps terminated the HEPFF contract on November 4, 2008 for default and made a performance bond demand on Safeco to complete the project. (*Id.* at ¶ 39.) On December 22, 2008, the Corps terminated the ERDLF contract for default and made a performance bond demand to complete the ERDLF contract. (*Id.* at ¶ 41.)

Safeco retained outside counsel, Watt Tieder, to provide legal advice and assistance to Safeco in responding to the Pyro, ERDLF, and HEPFF bond demands and to provide legal services

in connection with the defaults and Safeco's completion of the contracts. (*Id.* at ¶¶ 45, 51–52, 56–58.) Highly contentious litigation involving Safeco and Defendants ensued. During the litigation, Farber Brocks served as local counsel for Safeco in the indemnity action against Defendants. Torre Lentz served as counsel for Safeco, who was a third-party defendant in the matter of *M.E.S., Inc. v. M.J. Favorito Electric, Inc., et al.*, No. 1:08-CV-183 (JG) (JMA) (E.D.N.Y.) (the "*M.J. Favorito* Action").

**B. Litigation History**

1. Safeco v. MES, et al., 09-CV-3312

On July 30, 2009, Safeco filed this action, alleging various claims for relief, including breach of contract and indemnification as to both the MES and Hirani Defendants. (Dkt. 1.) On March 24, 2010, Safeco filed a motion for partial summary judgment, arguing that Defendants had breached the parties' indemnity agreements and seeking to enforce Safeco's alleged rights to collateral security, including assignment of Defendants' affirmative claims against third parties. (Dkt. 64.) On May 19, 2010, the Honorable Allyne Ross granted that motion in part and denied it in part. (Dkt. 80.)

The MES Defendants appealed Judge Ross's May 19, 2010 summary judgment order to the U.S. Court of Appeals for the Second Circuit. (Dkt. 84.) The appeal was ultimately dismissed for lack of jurisdiction (Dkt. 101), but while the appeal was pending, the MES Defendants sought reconsideration of the May 19, 2010 order, (Dkt. 91). On October 4, 2010, Judge Ross issued an order on the reconsideration motion, as well as on Safeco's motion renewing its collateral security demand in which Safeco sought an order establishing the amount of the collateral, setting a payment deadline, and providing for a formal assignment of Defendants' claims against third parties in the event Defendants failed to post collateral by the set deadline. (Dkt. 107.) Judge Ross

directed Safeco to provide the Court with the demand for collateral security served on Defendants seeking an amount of collateral security and subtract from that demand any claims that had already been paid, and denied Safeco's motion for a formal assignment of Defendants' affirmative claims. (*Id.* at 11.)

Safeco then filed a renewed demand for collateral, which Judge Ross addressed in an order issued on November 22, 2010. Judge Ross ordered that Defendants provide Safeco with collateral by December 1, 2010. (Dkt. 121.) The MES Defendants sought reconsideration of that order, a request in which the Hirani Defendants joined. Judge Ross denied that request. (Dkt. 125.)

Protracted litigation followed over Defendants' failure to pay any collateral security and their failure to provide all required discovery. On July 23, 2014, the Court adopted the Report and Recommendation of the Honorable Vera M. Scanlon recommending that the Court hold Defendants in civil contempt for failing to pay the Court-ordered collateral security and for failing to meet their obligations to produce relevant books and records regarding their finances.

On April 17, 2016, the parties filed cross-summary judgment motions. The Court held oral argument on the motions on July 11, 2016, and requested supplemental filings from the parties as to the extent of Safeco's loss. On September 2, 2016, Safeco submitted supplemental briefing, (Dkt. 438), and on September 30, 2016, Defendants filed a response, (Dkt. 441).

On March 30, 2017, the Court found that Safeco was entitled to summary judgment on liability and that Defendants must indemnify Safeco for its attorneys' fees and costs arising from the bonds issued for the Pyro, ERDLF and HEPFF projects. (Dkt. 442.) On October 6, 2017, Safeco filed its attorneys' fees application, which included an itemized statement of the fees and costs Safeco had incurred, contemporaneously created time records—specifying for each attorney the date, hours expended, and nature of the work done—and support for the reasonableness of the

hourly rate sought and the hours expended. (Dkt. 503.) Defendants filed responses challenging Safeco's fee application. (Dkts. 506, 508.) The Court held a two-day hearing in January 2018, regarding Safeco's attorneys' fees application, as well as certain damage amounts challenged by Makhoul. The Court also allowed Makhoul to file a supplemental affidavit following the hearing, which he did on January 12, 2018. (Dkt. 531.) Safeco responded on January 18, 2018. (Dkt. 533.)

2. MES v. Safeco, et al., 10-CV-2798 ("MES Action")

On August 24, 2009, a little over a month after this action was filed, the MES Defendants filed a lawsuit in federal district court in New Jersey against Safeco, the MES/Hirani JV, S.A. Comunale Co,, Inc. ("Comunale"), one of MES's subcontractors on the HEPFF project, and Liberty Mutual Insurance Company, which had provided a surety bond relating to Comunale's work on the HEPFF project. The case was transferred to this Court on June 18, 2010. (*M.E.S., Inc. v. Safeco Ins. Co. of Am., et al.*, No. 10-CV-2798, Dkt. 54.) MES eventually filed a Second Amended Complaint—the operative complaint in that action—that dropped the MES/Hirani JV as a defendant and added three Safeco representatives, Caryn Mohan-Maxfield, David Pikulin, and Ron Goetsch, as defendants. (MES Action, Dkt. 111 (filed 1/7/14).) In the MES Action, MES alleged an array of claims, including bad faith, tortious interference with contract, breach of contract, tortious interference with prospective economic advantage, fraudulent misrepresentation and concealment, and civil conspiracy, all in connection with the three bonded projects. (*Id.*) The claims in the MES Action overlapped substantially with the defense in this action. On March 30, 2017, the Court granted Safeco's motion for summary judgment in the MES Action in its entirety. (MES Action, Dkt. 227.)[6]

[6] Although not included in Safeco's fee application, the Court notes that Watt Tieder incurred its own attorneys' fees and expenses in defending itself in yet another lawsuit brought by the MES Defendants in connection with the bonded projects; in that one, the MES Defendants

### C. Plaintiff's Fee Application

Safeco's fee application seeks a judgment against the MES Defendants in the amount of $5,570,500.62 (adjusted downward from $5,570,607.62) in attorneys' fees and costs, and seeks to have the Hirani Defendants held jointly and severally for $4,352,639.56 (adjusted downward from $4,417,932.87) of the total amount. Safeco seeks attorneys' fees for work performed by three law firms: Watt Tieder, Farber Brocks, and Torre Lentz.

The MES Defendants[7] contend that Safeco should be awarded none of these fees and expenses, nor any of Safeco's other, non-legal damages. Alternatively, relying upon the expert report of Steven Tasher, they assert that Safeco's total claim for legal fees and expenses should be reduced by $2,837,605.92. (*See* Expert Report of Steven Tasher ("Tasher Report"), Dkt. 504-2, at 29-30.) The Hirani Defendants, relying on their expert, Laura Johnson, contend that the legal fees and expenses Safeco is seeking as to them should be reduced by $3,299,453.92. (*See* Report of Expert Laura Johnson, ("Johnson Report"), Dkt. 504-1, at 23.)

With respect to Watt Tieder's fees—which were billed to, and paid by, Safeco—the firm has broken them down into eight separate "matters" and amounts, for purposes of its fee application:

Matter One: $282,757.50 relating to the Pyro bond;

alleged that Watt Tieder had breached a duty of representation as to the MES Defendants in the negotiations with the Corps over the defaulted projects. (MES Action, Dkt. 111.) The Court granted summary judgment in favor of Watt Tieder in that matter on March 30, 2017. (Safeco Action, Dkt. 442.)

[7] At the time Defendants' filed their responses to Safeco's Fee Application, Makhoul purported to represent himself *and* the MES corporate Defendants, even though, as a non-attorney, he could not do so. *Jones v. Niagara Frontier Transp. Auth.*, 722 F.2d 20, 22 (2d Cir. 1983) ("it is settled law that a corporation cannot appear other than by its attorney") (citing *Shapiro, Bernstein & Co. v. Continental Record Co.*, 386 F.2d 426, 427 (2d Cir. 1967)). However, because Ms. Schulman, who later appeared on behalf of the MES corporate Defendants, essentially adopted Makhoul's positions, the Court attributes Makhoul's arguments to the MES Defendants as a whole.

Matter Two: $315,748.50 relating to the HEPFF bond;

Matter Three: $241,341.00 relating to the ERDLF bond;

Matter Four: $3,773,553.50 relating to the litigation arising out of the three bonded projects, including the instant lawsuit and the MES Action;

Matter Five: $34,230 in connection with a litigation against a subcontractor, Power With Prestige, in the District of New Jersey, relating to the Pyro and ERDLF projects;

Matter Six: $277,216 in connection with Safeco's development and pursuit of the Indemnitor's assigned claims;

Matter Seven: $255,968.50 in connection with Safeco's claims against the Corps; and

Matter Eight: $36,697.50, in connection with defending Safeco's corporate executives in the MES Action[8].

Safeco also seeks $318,254.67 related to Watt Tieder's out-of-pocket expenses and costs.

Lastly, as summarized above, Safeco seeks $255,710.59 for fees it paid to its local counsel, Farber Brocks, and $92,683.36 paid to the firm Torre Lentz, which served as counsel for Safeco when it was a third-party defendant in the *M.J. Favorito* Action, a dispute between MES and one of its subcontractors.

**D. Defendants' Objections**

Defendants have lodged numerous objections to Safeco's fee application.[9] Both the MES and Hirani Defendants argue that the attorneys' fees are excessive in terms of the number of hours expended and that Safeco's Fee Application failed to provide a clear articulation and allocation of

[8] The costs included in Matter Eight are separate from those included in Matter Four, which also reflects fees and costs Safeco incurred in connection with the MES Action.

[9] As discussed *infra*, Defendants do not contest the reasonableness of partner billing rates for Watt Tieder, Farber Brocks, and Torre Lentz, or the fees that Safeco's attorneys have already written off for a portion of fully redacted billing entries, totaling $63,524.

the amount of fees being sought. (Hirani Opposition to Safeco's Fee Application ("Hirani Opp'n"), Dkt. 506, at 6-7; MES Opposition to Safeco's Fee Application ("MES Opp'n"), Dkt. 508, at 6, 24.) The Hirani Defendants further argue that Safeco should not hold them jointly and severally liable for nearly all of the fees and costs associated with Safeco's pursuit of this litigation and its defense of the MES Action against Safeco. (Hirani Opp'n, at 6-7.) The MES Defendants similarly argue that Watt Tieder has arbitrarily allocated fees between the MES and Hirani Defendants without supporting documentation. (MES Opp'n, at 24.) The MES Defendants further argue that Watt Tieder has failed to demonstrate that it was contractually entitled to any attorneys' fees and that there are outstanding construction costs that should be used to offset any award of attorneys' fees. (*Id.* at 10.)

The MES and Hirani Defendants both argue that Farber Brocks is not entitled to fees because the firm has played almost no role in the litigation and engaged only in procedural, repetitive, or duplicative tasks. The Hirani Defendants note that "Farber Brocks has been little more than a spectator in the Actions" and has not performed substantive work of any kind. (Hirani Opp'n, at 7.) The MES Defendants also contest Torre Lentz's fees on the grounds that they are excessive and that this Court has no jurisdiction to order fees on Torre Lentz's behalf. (MES Opp'n, at 21-22.)

The MES and Hirani Defendants both hired experts to opine on the reasonableness of Safeco's legal fees. The Hirani Defendants hired Laura Johnson, the lead attorney at Sterling Analytics Group, who reviewed each of Watt Tieder's over 10,000 billing entries and categorized them according to deficiencies. (Transcript of Hearing on Attorney's Fees on January 4 and 5, 2018 ("Hr'g. Tr."), at 493:25 (stating that she reviewed "each and every line of each and every bill").) Johnson opined that Safeco's application was deficient on multiple grounds, including:

vague billing entries; block-billing[10]; excessive clerical tasks; attorneys who were overqualified for the task at hand; clerical tasks; excessive overhead expenses; multiple attendance, *i.e.*, too many attorneys at one hearing; overstaffing; billing for getting up to speed; duplicate billing entries; billing entries for non-HEPFF related claims; too many redactions; and non-party fees and costs. (*See* Dkts. 505-3-11.) Johnson did not contest the partner rates in Safeco's fee application, but did note that some of the rates for associates were "slightly higher" than prevailing market rates. (Johnson Report, at 22.) Based on Johnson's analysis, the Hirani Defendants contend that the portion of Safeco's total claim for legal fees and expenses charged against Hirani should be reduced by $3,299,453.92.

The MES Defendants hired Steven Tasher, founder of Wyatt Partners, who conducted a review of Safeco's bills, but did not review each of the over 10,000 entries. Tasher opined that Safeco has failed to meet its burden to demonstrate the reasonableness of those fees/expenses that have been redacted, and has also failed to comply with this Court's directive to provide documentation of the hours incurred and nature of the work performed by each attorney. (Tasher Report, at 14.) Tasher more specifically opined that Watt Tieder's billing practices were unreasonable, including top-heavy administration of the workload, billing for excessive clerical and administrative work, having too many ancillary billers, block-billing, and billing for other undocumented expenses. (*Id.* at 19-24.) Tasher noted that there were "thousands" of block-billed entries included in the fee application. (Hr'g. Tr. at 452:8-21). Tasher also opined that Watt Tieder could have pushed more of the work down from partners to junior associates in order to save Safeco money on attorneys' fees, stating "if [Safeco] had such experienced lawyers at a lower

---

[10] Block-billing is the practice "of aggregating multiple tasks into one billing entry". *Molefi v. Oppenheimer Trust*, No. 03-CV-5631, 2007 WL 538547, at *7 (E.D.N.Y. Feb. 15, 2007).

rate, that's one of the things Mr. O'Donnell[11] could have said[,] [']why don't you use some of these lower-priced people and it could have saved me[']" (*Id.* at 454:1-454:10.) Tasher also explained that Farber Brocks failed to show what substantive role it played as counsel and failed to demonstrate that its billing entries were not duplicative or overlapping. (Tasher Report, at 25-26.) Similarly, Tasher criticized Torre Lentz for not providing a "specific and precise" articulation of the rationale in support of its entitlement to fees. (*Id.* at 26.) Tasher concluded that Safeco's total claim for legal fees and expenses should be reduced by 2,837,605.92. (*Id*. at 29-30.)

**E. January 4-5, 2018 Hearing**

During the two-day hearing held by the Court on Safeco's fee application and Makhoul's challenge to Safeco's damages claim, the parties presented the testimony of Watt Tieder attorneys Vivan Katsontonis and Christopher Harris, Safeco Senior Surety Counsel O'Donnell, defense experts Johnson and Tasher, and Defendant Makhoul. The parties also introduced voluminous documentary evidence.

## II. Discussion

### A. Legal Standards

In adjudicating a motion for attorneys' fees, both the Second Circuit and the Supreme Court have held that "the lodestar—the product of a reasonable hourly rate and the reasonable number of hours required by the case—creates a 'presumptively reasonable fee.'" *Millea v. Metro–North R.R. Co.*, 658 F.3d 154, 166 (2d Cir. 2011) (quoting *Arbor Hill Concerned Citizens Neighborhood Ass'n v. Cnty. of Albany*, 522 F.3d 182, 183 (2d Cir. 2007)). The Court should determine the

[11] John O'Donnell is Safeco's Senior Surety Counsel, who oversaw, managed, and approved the billing for the work performed by Watt Tieder and other outside counsel relating to the bonded projects.

"presumptively reasonable fee" by looking to "what a reasonable paying client would be willing to pay." *Arbor Hill*, 522 F.3d at 183–84.

"[W]hether the calculation is referred to as the lodestar or the presumptively reasonable fee, courts will take into account case-specific factors to help determine the reasonableness of the hourly rates and the number of hours expended." *Pinzon v. Paul Lent Mechanical Sys.*, No. 11-CV-3384, 2012 WL 4174725, at *5 (E.D.N.Y. Aug. 21, 2012), *adopted by* 2012 WL 4174410 (E.D.N.Y. Sept. 19, 2012). These factors include:

> [T]he complexity and difficulty of the case, the available expertise and capacity of the client's other counsel (if any), the resources required to prosecute the case effectively (taking account of the resources being marshaled on the other side but not endorsing scorched earth tactics), the timing demands of the case, whether an attorney might have an interest (independent of that of his client) in achieving the ends of the litigation or might initiate the representation himself, whether an attorney might have initially acted pro bono (such that a client might be aware that the attorney expected low or non-existent remuneration), and other returns (such as reputation, etc.) that an attorney might expect from the representation.

*Arbor Hill*, 522 F.3d at 184. "The party seeking reimbursement of attorneys' fees must demonstrate the reasonableness and necessity of hours spent and rates charged." *Finkel v. Omega Comm'n Svcs., Inc.*, 543 F. Supp. 2d 156, 164 (E.D.N.Y. 2008) (citation omitted).

A district court should generally use the prevailing hourly rates in the district where it sits. *See Simmons v. N.Y. City Transit Auth.*, 575 F.3d 170, 173 (2d. Cir. 2009). Prevailing rates for experienced attorneys in the Eastern District of New York range from approximately $300 to $400 per hour. *See Am. Fire & Cas. Co. v. Scott Elec. Servs., LLC*, No. 15-CV-3111, 2017 WL 395207, at *2 (E.D.N.Y. Jan. 9, 2017), *report and recommendation adopted*, 2017 WL 374728 (E.D.N.Y. Jan. 25, 2017). Some judges "have recognized slightly higher ranges in this district of $300–$450 per hour for partners, $200–$300 per hour for senior associates, and $100–$200 per hour for junior

associates." *Small v. New York City Transit Auth.*, No. CV 2003-2139, 2014 WL 1236619, at *5 (E.D.N.Y. Mar. 25, 2014) (citation omitted).

To determine whether the number of hours spent by counsel was reasonable, the Court must "use [its] experience with the case, as well as [its] experience with the practice of law, to assess the reasonableness of the hours spent . . . in a given case." *Fox Indus., Inc. v. Gurovich*, No. 03-CV-5166, 2005 WL 2305002, at *2 (E.D.N.Y. Sept. 21, 2005) (quotation omitted). A court should "exclude hours that were 'excessive, redundant, or otherwise unnecessary' to the litigation" *Cho v. Koam Medical Servs. P.C.*, 524 F. Supp. 2d 202, 209 (E.D.N.Y. 2007) (citation omitted). Likewise, where counsel relies on vague and/or excessive entries or block-billing practices that make it difficult for a court to assess reasonableness, an across-the-board fee reduction can be justified. *Anderson v. Cnty. of Suffolk*, No. 09-CV-1913, 2016 WL 1444594, at *6 (E.D.N.Y. Apr. 11, 2016). The party seeking an award of attorneys' fees bears the burden to document "the hours reasonably spent by counsel, and thus must support its request by providing contemporaneous time records reflecting, for each attorney and legal assistant, the date, the hours expended, and the nature of the work done." *Cho*, 524 F. Supp. 2d at 209 (internal citations and quotations omitted).

When reviewing the overall reasonableness of a fee application, "a district court is not required to 'set forth item-by-item findings concerning what may be countless objections to individual billing items[.]'" *Reiter v. Metro. Transp. Auth. of State of N.Y.*, No. 01-CV-2762G, 2007 WL 2775144, at *13 (S.D.N.Y. Sept. 25, 2007).[12] Rather, if upon review of the

[12] The Court previously noted at the attorneys' fees hearing that it was not going to seek the disclosure of any of Safeco's redacted billing records to view *in camera*. (Hr'g. Tr. 7:25-8:16) ("I have a very good sense of what the issues are that have been briefed throughout the last five or four-and-a-half years of this case, so I don't need to see that level of detail."). Given that the Second Circuit has held that a reviewing Court need not review every line of every entry in making a determination on attorneys' fees, *Lunday v. City of Albany*, 42 F.3d 131, 134 (2d Cir. 1994), the Court declines to review Safeco's unredacted entries.

contemporaneous time records the court "determines that the number of hours expended was excessive, redundant or otherwise unnecessary, the court [in its discretion] may . . . account for such over-billing in an across-the-board percentage deduction." *Manzo v. Sovereign Motor Cars, Ltd.*, No. 08-CV-1229, 2010 WL 1930237, at *8 (E.D.N.Y. May 11, 2010).

**B. The Agreements Require Payment of Reasonable Attorneys' Fees**

Before addressing the reasonableness of Safeco's specific fee requests, the Court notes that the Agreements plainly entitle Safeco to reasonable attorneys' fees, including those incurred in enforcing the Agreements. (Dkt. 64-5 at 2, Dkt. 64-6 at 2 (providing that the MES and Hirani Defendants "agree to pay to Surety upon demand . . . [a]ll loss, costs and expenses of whatsoever kind and nature, including court costs, reasonable attorney fees . . . , consultant fees, investigative costs and any other losses, costs or expenses incurred by [Safeco] by reason of having executed any Bond, or incurred by it on account of any Default under this agreement by any of the [MES or Hirani Defendants]").[13]

---

[13] Judge Ross also held in her November 22, 2010 order that Safeco was entitled to collateral security from the MES Defendants for its projected legal and consulting fees because the provision in the Agreements entitling Safeco to collateral security was "sufficient to cover all exposure" under the bonds, and reaffirmed her previous order holding that "the term 'exposure' . . . unambiguously refers to the risk of loss or future loss faced by Safeco." (Dkt. 121 at 25.) Similarly, the Second Circuit, in affirming Judge Ross's orders, "conclude[d] that the term 'exposure,' as used in the [A]greements, [was] sufficiently broad to include attorneys' fees", and thus held that Judge Ross had not abused her discretion in including attorneys' fees in the collateral security award. *Safeco Ins. Co. of Am. v. Hirani/MES, JV*, 480 Fed. App'x 606, 609 (2d Cir. 2012) (summary order).

Other courts have found that attorneys' fees are covered by similar language in indemnity agreements. In *First Nat'l Ins. Co. Am. v. Joseph R. Wunderlich Inc.*, 358 F. Supp. 2d 44 (N.D.N.Y. 2004), the indemnification agreement issued by an affiliate of Safeco contained a very similar clause stating that Defendants would pay the surety "[a]ll loss, costs and expenses . . . including . . . reasonable attorney fees. . . ." *Id.* at 48. The court in *First Nat'l Ins. Co. Am.* held that "there does not exist an issue of fact that the Plaintiff cannot collect reasonable attorney fees . . . under the Agreement", and explained that "[t]hese types of costs are expected when a surety exercises its exclusive right to seek indemnification." *Id.* at 57. The court awarded the surety "all

Under the terms of the Agreements, Safeco's itemized statements of loss meet its prima facie burden of establishing its entitlement to attorneys' fees and costs. The Court must now determine whether the fees requested by Safeco are reasonable. *General Elec. Co. v. Compagnie Euralair, S.A.*, No. 96-CV-0884, 1997 WL 397627, at *4 (S.D.N.Y. July 3, 1997) ("[Plaintiff], as the fee applicant, bears the burden of documenting the hours reasonably spent by counsel, and the reasonableness of the hourly rates claimed.")

**C. Reasonableness of Attorneys' Fees Claimed by Safeco**

1. Billing Rates

The billing rates applied by Watt Tieder in Safeco's fee application are as follows:

| **Title** | **Rate** |
|---|---:|
| Senior Partner | $315 |
| Partner | $315 |
| Counsel | $300 |
| Associates 9th Year | $300 |
| Associates 8th Year | $300 |
| Associates 7th Year | $300 |
| Associates 6th Year | $300 |
| Associates 5th Year | $300 |
| Associates 4th Year | $270 |
| Associates 3rd Year | $270 |
| Associates 2nd Year | $270 |
| Associates 1st Year | $270 |
| Law Clerks | $185 |

---

of the attorney fees [sic], including the fees, to prepare, submit, and defend this Motion." *Id. See also Berkley Regional Ins. Co. v. Weir Bros. Inc.*, No. 13-CV-3227(CM)(FM), 2013 WL 6020785, at *7, 12 (S.D.N.Y. Nov. 6, 2013) (holding that indemnity agreement "plainly cover[ed] [plaintiff surety's] attorneys' fees" where agreement stated that defendants would indemnify surety "from and against any and all liability arising from any cause of action, claim, cost, damage, debt, demand, expenditure, liability, loss, payment, obligation, or penalty of any kind whatsoever, including without limitation, interest, costs, court costs, costs to compromise or settle any claim, expert fees, investigative costs and the fees and expenses of attorneys . . .").

| Paralegals | $180 |
|---|---|
| Project Assistants | $120 |

The rates charged by Farber Brocks are $275 per hour for named partners, like William Brocks and Braden Farber, $225 for associates, and $75 for paralegals. (Safeco Fee App., at 16.) Torre Lentz charged $250 per hour for partners and of-counsel attorneys, $180-$210 for associates, and $115 for paralegals. (*Id.* at 17.)

Defendants do not dispute the rates charged by Watt Tieder, Farber Brocks, or Torre Lentz in Safeco's fee application. The Court finds that these rates are appropriate and in line with prevailing rates in this district. *Small*, 2014 WL 1236619, at *5 (recognizing rates of $200-$300 for senior associates and $300-$450 for partners). Although the rates charged by the Safeco law firms for junior associates are slightly more than the commonly recognized rate of $100-$200, the Court nonetheless finds the billing rates reasonable.

2. Billed Hours

In seeking reimbursement of attorneys' fees, Safeco must demonstrate that the number of hours its attorneys billed was reasonable. *Finkel*, 543 F. Supp. 2d at 164.

The parties tenaciously litigated their disputes in this and multiple related matters for over eight years. Much of the litigation was driven by Defendants, including a motion for reconsideration (Dkt. 122), appeals to the Second Circuit (Dkts. 134, 135, 147), a motion for stay of enforcement of the November 2010 Order pending the appeal (Dkts. 127, 128), motions for reconsideration on the grounds that Defendants allegedly could not pay the amount of the appeal security (Dkt. 140), motions to compel the production of documents (Dkts. 175, 202), and multiple motions for contempt and sanctions against Defendants (Dkts. 241, 242, 325). Safeco was also required to litigate a motion over the restraint and monitoring of the MES and Hirani Defendants' respective assets to enforce the terms of the Court's numerous orders. (Dkts. 313, 314.) Indeed,

both the MES and Hirani Defendants were held in willful contempt of Court. (Dkt. 314, at 14 ("Based on their actions, the court questions whether [the] Hirani defendants take their obligations to this court seriously.").) In its order granting Safeco's motion for summary judgment, the Court noted that it was "deeply troubled" by the MES Defendants' practice of making serious allegations "without proper evidentiary support" and further stated, "[w]ere the Court not finding that the MES Defendants are required to indemnify Safeco for its attorneys' fees, including those spent defending against unsupported and misleading allegations, the Court would consider imposing additional sanctions." (Dkt. 442, at 54 n. 31.)

During the January 2018 hearing, the Court repeatedly heard testimony that this litigation was "extraordinary" in scope and aggressiveness. Safeco Senior Surety Counsel O'Donnell, who handles 100-150 claims matters at any given time (Hr'g. Tr. at 205:8-205:11), stated that he found this litigation "extraordinary," due to the "length of the indemnity litigation, which has been pending since [approximately] 2009 . . . ; the amount of work that has had to go into this case; the numerous orders that have been entered that haven't been complied with; the extensive briefing, rebriefing, sometimes two, three, four times arguing and rearguing points; [and] the number of times in which we have had to make submissions", (*id.* at 206:5-206:20). Similarly, Watt Tieder partner Vivian Katsantonis noted that in her career, she has never been involved in a case that was as "contentious" and "involved," and that "dragged on the way this did." (*Id.* at 259:18-260:4.) She explained, "[t]he motions practice, the [defendant's] failure to adhere to any orders, the relitigating every issue 10 times over, you know, it was extraordinary."[14] (*Id.* at 261:7-261:9.)

[14] Katsantonis further explained that Watt Tieder had to do the same litigation work pertaining to the MES and Hirani Defendants – researching choice of law, drafting summary judgment motions, etc. – and that that was a major reason why the bills were consolidated and applied to all Defendants for the HEPFF project. (Hr'g. Tr. 254:3-255:10.)

The protracted litigation history relating to the three bonded projects—including two separate lawsuits, one of which was initiated by the MES Defendants—is a key factor in the Court's assessment of the reasonableness of the approximately five million dollars being claimed by Safeco in attorneys' fees. Another factor the Court has considered is that, despite the extraordinarily protracted nature of the litigation and the massive amounts of billing records generated as a result, Safeco has not even requested attorneys' fees or costs in connection with the preparation of its fee application, even though this Circuit permits it to do so. *See Baird v. Boies, Schiller & Flexner LLP*, 219 F. Supp. 2d 510, 525 (S.D.N.Y.2002) ("[T]he fee application is a necessary part of the award of attorneys' fees.") (internal quotation marks and citation omitted). Watt Tieder has also made discretionary adjustments to reduce its total fee request by $115,951.97, by lowering the rates of paralegals and project assistants. (Safeco Fee App., at 6, 13-14.) Farber Brocks similarly reduced its fees by $3,248.00. (*Id.* at 6.)

As previously discussed, for purposes of its fee application, Safeco has parsed over 10,000 billing entries and categorized them into eight "matters". The Court addresses each of these billing matters in turn.

3. <u>Matters One, Two, and Three: Pyro Bond Demand (MES Only), HEPFF Bond Demand (MES and Hirani Defendants), and ERDLF Bond Demand (MES Only)</u>

*a) The Pyro Project (MES Defendants Only)*[15]

On March 5, 2008, the Corps terminated MES on the Pyro Project and shortly thereafter made a performance bond demand against Safeco. Safeco retained Watt Tieder to provide advice and assistance in responding to the Pyro bond demand and "to protect and preserve Safeco's rights

[15] References to "(MES Defendants Only)" indicate that Safeco is not seeking to hold the Hirani Defendants jointly and severally liable for these fees.

as against both the Corps and the MES Indemnitors." (*Id.* at 21.) Watt Tieder evaluated project records, analyzed alternative takeover proposals and options, prepared multiple drafts of the Takeover Agreement, negotiated Perini's completion contract, and investigated possible claims against the Corps, among other tasks. (*Id.* at 21-22.) Watt Tieder expended 1001.5 hours in legal services with respect to the Pyro matter, with total billings of $282,757.50, and seeks this amount from MES. (*Id.* at 22.)

*b) The HEPFF Project (MES and Hirani Defendants)*

On November 4, 2008, the Corps terminated MES and Hirani on the HEPFF project and, on the same day, made a demand on Safeco's performance bond. In response, Watt Tieder unsuccessfully attempted to negotiate a Memorandum of Understanding between Safeco, the Corps, MES, and Hirani. Watt Tieder also evaluated project records, negotiated takeover agreements, hired experts on project completion, and negotiated ratification agreements. (*Id.* at 23.) Watt Tieder expended 977.2 hours in legal services with respect to the HEPFF matter with total billings of $315,748.50, and seeks this amount from MES and Hirani Defendants. (*Id.)*

*c) The ERDLF Project (MES Defendants Only)*

On December 22, 2008, the Corps terminated MES on the ERDLF project and on the same day made a demand on Safeco's performance bond. Watt Tieder analyzed the grounds for the default, reviewed and produced documents, and negotiated a settlement with the Corps. (*Id.* at 24-25.). Watt Tieder prepared a report to Safeco detailing its bond defenses, the risks of nonperformance, and recommendations for an overall strategy in response to MES's default. Watt Tieder expended 848.2 hours in legal services with respect to the ERDLF matter, with total billings of $241,341, and seeks this amount from MES. (*Id.* at 25.)

*d) Safeco's Fee Request for the Bonded Projects*

The Hirani Defendants argue that they should have to pay significantly fewer fees in Matter Two (relating to the HEPFF project), because Safeco did not itemize its fees, so as to permit the segregation of fees generated solely in connection with the HEPFF project from those generated by the Pyro and ERDLF projects—an argument they repeat throughout their response to the fee application. (*See, e.g.*, Hirani Opp'n, at 12 ("If Watt Tieder could figure out which specific charges related to the HEPFF Project, those figures would have been provided in the Fee Application.").) For their part, the MES Defendants argue that Safeco "made no specific and precise articulation" to show that its fees relating to the bonded projects were reasonable. (MES Opp'n, at 10.) The Court rejects these arguments for two reasons.

First, in Matters One, Two, and Three, Safeco does exactly what the Hirani Defendants accuses Safeco of *not* doing, *i.e.*, breaking down the fees by project and only assessing those fees generated in connection with the HEPFF project (Matter Two) to the Hirani Defendants. Indeed, Watt Tieder made a good faith effort to open new matter numbers to segregate the HEPFF billings, which pertained to both Hirani and MES, from those on the Pyro and ERDLF projects, which pertained only to MES.[16]

Second, the fees Safeco seeks relating to the termination of the Hirani Defendants on the HEPFF project and MES on all three projects, as well as the resulting performance bond demands on Safeco, are reasonable. At the January 2018 hearing, Ms. Katsantonis testified that most of these fees had to do "specifically related to the default terminations of those contracts" of these multiple-million-dollar projects. (Hr'g. Tr, at 241:6-241:17.) Watt Tieder performed an extensive

[16] In this regard, the Court notes that Watt Tieder reallocated fees overall by project *post hoc*, reducing the amount owed by the Hirani Defendants from $7 million to $3.7 million. (Hr'g. Tr, at 38:6-13; 163:5-16.)

array of services for Safeco in connection with the terminations, including negotiating agreements between Safeco and the Corps, hiring consultants, developing alternative takeover options, and preparing for litigation. (*See* Safeco App., at 21-25.) Given the scope, complexity, and time pressures of the work necessitated by the defaults on each of the three performance bonds, the Court does not find that the amounts billed by Watt Tieder for these services are unreasonable. *See Reiter*, 2007 WL 2775144, at *13 (court need not "set forth item-by-item findings concerning what may be countless objections to individual billing items").

4. Matter Four: Indemnity Litigation (MES and Hirani Defendants)

As explained by Safeco in its fee application and at the hearing, and as reflected in the billing records provided to the Court, the "overwhelming majority" of legal fees and costs in Safeco's fee application relate to Matter Four—the indemnity litigation. (Safeco Fee App., at 26.) Watt Tieder billed Safeco a total of $3,460,000 for services provided under Matter Four, which contained over 7,000 invoices. In total, Watt Tieder invoiced 13,048.30 hours of attorney, paralegal, and project assistant time, over the course of more than eight years, in connection with these litigation services.

At the January 2018 hearing, MES Defendants' expert Steven Tasher testified that Safeco's surety counsel, John O'Donnell, could have taken "a number of measures" to deal with escalating fees resulting from the contentious litigation, but did not do so. (Hr'g. Tr. at 440:9-440:15.) Tasher explained that although his ability to assess the invoices was "compromised" because of redactions (*Id.* at 449:9-14), he was still able to identify significant problems, including vague billing, block-billing, top heavy administration, and other unnecessary expenses. (*Id.* at 450:9-453:8.) Similarly, Hirani Defendants' expert Laura Johnson identified a number of billing categories that she deemed problematic, including vague entries and block-billing. She testified that Watt Tieders' block-

billing mixes "potentially not billable" entries with billable ones. (*Id.* at 508:3-508:10.) Johnson also opined that the billing descriptions were vague and that they unfairly lumped Hirani in with MES, noting that there was no reduction to "matter four by Watt, Tieder for non-HEPFF related work, even though there were specific entries within those bills that mentioned other projects, and entries that also made no mentions to HEPFF." (*Id.* at 523:20-523:24.) Johnson concluded that the lack of segregation between projects should result in a fee reduction because Watt Tieder "was aware at the outset that this was an indemnity lawsuit and that they would be seeking legal fees from two separate parties on three projects, two separate indemnity agreements . . . knowing that down the line they were going to be seeking legal fees from separate parties. So here . . . that wasn't done." (*Id.* at 524:13-524:25.)

In response, Safeco makes three primary arguments. First, Safeco maintains that the large amount of attorneys' fees was the direct result of the extraordinarily protracted nature of the indemnity litigation. Safeco states that this indemnity action, "over its eight-year history involved two separate lawsuits, before two different federal district courts, no less than four separate appellate actions before the Second Circuit, and over 1,200 docket entries, including numerous dispositive motions, contempt proceedings and evidentiary hearings." (Safeco Reply, Dkt. 510, at 41.)

Second, Safeco argues that nearly all of the issues litigated as part of the indemnity lawsuits were common to the three bonded projects, such that, even if there had only been litigation over the HEPFF project, the same work would have been necessary. (Hr'g. Tr. at 244:12-244:17.) And because both MES and Hirani are responsible under the Agreements for all expenses, including attorneys' fees, arising out of the issuance of the performance bond, if an indemnity-related issue was, or would had to have been litigated, in connection with the HEPFF bond, both the MES and

Hirani Defendants are equally and fully responsible for the fees incurred in connection with litigating all of those issues. Relatedly, Safeco argues that because the MES Action challenged Safeco's execution of the three performance bonds, including the one for HEPFF project, and mirrored the defense in this action, the work that Watt Tieder performed in defending the MES Action was indistinguishable from the work it performed in pursuing the instant action.

Third, Safeco argues that the HEPFF project, which involved both MES and Hirani, was the "largest, most disputed and most costly to Safeco of the three Projects." (Safeco Reply, at 19.) MES and Hirani Defendants each had separate counsel and "submitted separate pleadings, motions, arguments, appeals and discovery requests and responses." (*Id.* at 20.) Watt Tieder was required to respond to all of these motions, as well as "defend[] two sets of counterclaims/affirmative defenses, respond[] to two sets of document requests, tak[e] depositions of representatives of two joint venture partners, and litigat[e] two separate summary judgment motions." (*Id.*). Safeco argues that, as a result, it was unable to distinguish its billing practices to reflect time spent dealing with specific Defendants or projects. At the January 2018 hearing, Ms. Katsantonis testified: "If you actually look at the billings, there was much work that you couldn't segregate. . . . If I was preparing a motion to dismiss those claims, you can't segregate it into each. But if I was doing the affidavit of Ron Getsch or preparing an affidavit for Dave Pikulin, then you could segregate those costs. So, to the best of our abilities, we tried to do that." (Hr'g. Tr. at 244:12-244:17.)

As a general matter, the Court finds that the fees requested by Safeco are reasonable for the three reasons it articulates. First, the indemnity litigation was long and extraordinarily contentious, spanning over eight years. The docket entries in this action alone number over 1,200. Second, as to the Hirani Defendants, the Court agrees with Safeco that due to the identity of issues

being litigated in this case and the MES Action, it was reasonable for Safeco's counsel not to separate the fees as to the MES and Hirani Defendants or as to the different projects for work it performed on issues common to both cases. The Court also finds that Safeco's counsel made a good faith effort to segregate fees that were not common to the two cases. Third, the HEPFF project was the largest of the three projects and its failure spurred an enormous amount of litigation, much of it driven by Defendants' litigation strategy and repeated non-compliance with court orders, which, *inter alia*, resulted in findings of contempt and the imposition of sanctions.

In addition, the Court rejects the defense experts' conclusions that a fee reduction is warranted based on the allegedly deficient billing practices of Safeco's counsel, such as vague entries, billing for simple clerical tasks, general overstaffing, duplicative billing, and block-billing, or on Safeco's alleged failure to contain its litigation expenses. To the extent Safeco's counsel's fee records were not perfectly maintained, the Court does not find that the deficient entries were excessive or that they impair the Court's ability to assess the reasonableness of the fees and hours billed by Safeco's counsel, especially given the Court's extensive familiarity with the indemnity litigation. *See Reiter*, 2007 WL 2775144, at *13 ("[A] district court is not required to set forth item-by-item findings concerning what may be countless objections to individual billing items[.]"); *Molefi*, 2007 WL 538547, at *7 (noting that, as a general rule, block-billing is "not prohibited").

Indeed, this is a case where the defense's approach of poring over 10,000 billing entries to identify inconsequential instances of deficient record-keeping, and pointing out Safeco's less than ideal outside counsel management practices, misses the proverbial forest for the trees.[17] (*See e.g.*,

[17] The Court notes that Laura Johnson has spent her entire career reviewing legal billing, but has not handled a case of this magnitude as a trial lawyer. (Hr'g. Tr. 528:14-529:23.) The Court, therefore, finds that Johnson lacks a sufficient base of knowledge, experience, or expertise

Johnson Report, at 3.) ("The block billing entries obscure the time spent on each discrete task making it impossible to determine if the time spent was reasonable. I recommend that these entries be reduced by 20%.").) In sum and for the reasons discussed in sections (a)-(i) below, the Court finds that the approximately three million dollars in attorneys' fees sought by Safeco in connection with the exceedingly prolonged and contentious multi-million-dollar indemnity litigation—fueled in large measure by Defendants' tactics and recalcitrance—are reasonable.

In its fee application, Safeco itemizes its indemnity litigation fees by nine subcategories, which the Court discusses individually in sections (a) through (i) below.

*a) Complaint-Related Services*

Safeco states that Watt Tieder billed $40,000 for time spent drafting the complaint, as well as reviewing contractual agreements, project correspondence, and possible litigation strategies. Moreover, Watt Tieder prepared for Defendants to sue, which Defendants had been "threatening" to do for more than a year before Safeco initiated the lawsuit. (Safeco Reply, at 43.) Defendants argue that "there is no discernible reason" why a complaint in a "straightforward indemnity action" should have taken over 130 hours to prepare. (*See, e.g.,* Hirani Opp'n, at 16.) Yet the Court observes that Defendants do not seem to appreciate that when a complaint is filed, attorneys have more to do than drafting. The complicated and time-consuming litigation that ensued was much more than a straight-forward indemnity action. As previously discussed, it involved suing over the execution of performance bonds for three separate multi-million-dollar construction projects. In its fee application and at the hearing, Safeco offered a detailed description of the work performed by Watt Tieder in preparation for filing the lawsuit, which went beyond simply drafting

---

with respect to the amount of time reasonably required to carry out certain functions arising in complex litigation, such as preparing and drafting complicated motions, hearings, or oral argument.

the complaint. (Safeco Fee App., at 27-28.) The Court finds that the $40,000 in complaint-related fees sought by Safeco is reasonable.

*b) Summary Judgment Motion Regarding Collateral Security*

Safeco incurred fees of approximately $100,000, for 345 hours billed, in connection with its summary judgment motion regarding the requirement that Defendants post collateral security. Safeco justified its fees by explaining that the litigation involved "two sets of extremely litigious defendants." (Safeco Reply, at 43.) Safeco alleged that summary judgment involved multiple rounds of pre-motion and full motion briefings. (*Id.*) Defendants argue that these briefings "involved no complex issues" and the subject matter "was right in Watt Tieder's wheelhouse." (Hirani Opp'n, at 17.) The Court finds that Defendants over-simplify the amount of work that Watt Tieder put into their summary judgment briefing. As recognized throughout this Order, this litigation was hotly contested and lasted more than eight years. Safeco filed a motion for partial summary judgment, which Judge Ross granted in a twenty-nine page order (*see* Dkt. 80), and then filed a collateral security motion for summary judgment to further brief the amount of collateral that Defendants should be required to post. (Safeco Fee App., at 28.) This briefing involved responding to Defendants' pre-motion letters, researching and drafting the motions for summary judgment, compiling affidavits and exhibits, replying to oppositions, and responding to requests for oral argument. (*Id.*) These motions and their related submissions totaled hundreds of pages (*See e.g.*, Dkt. 64.) The Court finds Safeco's fee reasonable.

*c) Enforcement of Collateral Security Orders*

Safeco incurred $1,490,000 in fees related to its attempts to enforce the Court's collateral security orders. Safeco argues that obtaining Defendants' compliance with their Court-ordered obligation to provide collateral security was difficult and drove up litigation costs: "Defendants

could have easily avoided all of the costs in this category simply by complying with the Court's orders back in 2010." (Safeco Reply, at 44.) Instead, an additional seven years of litigation ensued after Defendants were ordered, but refused, to post collateral security, during which time Watt Tieder was required to continuously pursue Safeco for its collateral security. Defendants counter that this fee is excessive because Watt Tieder was dealing with matters with which it had no experience, and that this lack of experience merits a fee reduction. (*See* Hirani Opp'n, at 18.)

The Court notes that all of the fees in this category were driven by Defendants' decisions and actions. Defendants have made hundreds of filings with this Court and others, including counter-claims, motions for reconsideration, and appeals, all relating to the requirement that they post collateral security as ordered by Judge Ross in 2010. At the same time, Defendants have not paid *any* money, to date, to satisfy their obligation to provide collateral, despite numerous court orders requiring them to do so. Safeco incurred substantial legal fees in enforcing the collateral security orders, including Defendants' continuous refusal to comply with Court-ordered obligations. In cases like these, courts have found large fees reasonable where one party refuses to comply with court orders. *See Telenor Mobile Comm's. AS v. Storm LLC*, No. 07-CV-6929, 2009 WL 585968 at *1 (S.D.N.Y. Mar. 9, 2009) (granting a fee application for $2,487,853.24 incurred from litigation involving a contempt proceeding and noting defendant's "determined effort . . . to frustrate their contractual obligations to [plaintiff] by willful noncompliance"). The Court agrees with Safeco that "Defendants' continuing contumacy, alone, caused such fees." (Safeco Reply, at 44.)

In its fee application, Safeco breaks down the fees it incurred relating to enforcement of the collateral security against Defendants into five sub-categories. The Court discusses these sub-categories individually.

Appeals to Second Circuit: Safeco incurred approximately $300,000 in fees related to two separate appeals filed by Defendants. Defendants' first appeal, *Safeco Insurance Co. v. M.E.S. Inc.*, No. 10-2269, challenged Judge Ross's May 19, 2010 order granting Safeco's right to collateral security. (Dkt. 80, at 29.) A second appeal relating to Safeco's collateral security, *Safeco Insurance Co. v. M.E.S. Inc.*, No. 10-5203, followed the Court's determination of the collateral security amount. Defendants appealed Judge Ross's November 22, 2010 Order finding that Safeco was entitled to $6,614,634.41 in collateral security from the MES Defendants and $4,960,067.44 in collateral security from the Hirani Defendants. (Dkt. 121.) While Defendants' first appeal was dismissed on jurisdictional grounds, their second one required extensive briefing on the merits. (Safeco Fee App., at 30.) Defendants then sought reconsideration of the Circuit's denial of the second appeal, which was, in turn, denied. In addition to briefing-related fees, Safeco requests fees for several status conferences during the pendency of the appeal. (*Id.* at 31.)

The Hirani Defendants contend that the appeals were not complex in nature and that Watt Tieder's fees are, therefore, excessive. (Hirani Opp'n, at 19.) The Court disagrees, and finds that the fees billed by Watt Tieder to litigate the two appeals are not excessive when compared to other awards in this Circuit for fees incurred on appeal. *See, e.g., Litton Systems, Inc. v. American Tel. & Tel. Co.*, 613 F.Supp. 824, 833 (S.D.N.Y. 1985) (approving $1,496,564 in fees reasonably incurred on appeal in a civil case with partners' rates of $125–$220, associates' rates of $75–$115, and paralegals' rates of $18 to $59). In both appeals, Safeco reviewed and analyzed the Defendants' grounds for appeals, researched issues related to Safeco's defense, drafted the appellate briefs, and participated in status conferences during the appeal process. In *Safeco Insurance Co. v. M.E.S. Inc.*, No. 10-2269, Safeco filed numerous motions, including a motion to dismiss Defendant MES's appeal for lack of appellate jurisdiction; Safeco eventually prevailed on

this motion and the Second Circuit dismissed the case. Similarly, in *Safeco Insurance Co. v. M.E.S. Inc.*, No. 10-5203, Safeco filed multiple briefs and won their appeal. The Second Circuit also denied MES's request for rehearing and rehearing *en banc*. Indeed, if anything, the appeal-related fees being claimed by Safeco seem relatively low, given the complexity of the factual record and legal issues.

Collateral Security Discovery & Contempt: Safeco incurred approximately $790,000 in fees related to collateral security discovery and contempt motions. Safeco explains that the fees were driven entirely by Defendants' actions, including their refusal to post collateral security as ordered by Judge Ross in November 22, 2010 and their efforts to conceal, shield, and dissipate assets that should have been used to post the court-ordered security. (Safeco Fee App., at 34.) The Hirani Defendants argue that this fee request is excessive because "Watt Tieder billed more than twice the dollar amount and at least quadruple the number of hours that competent firms spend on the entirety of litigations that go to trial." (Hirani Opp'n, at 20.) In support of this argument, the Hirani Defendants assert that Watt Tieder "clearly lacked experience" and "had no apparent background" in debt collection or creditors' rights, and that this lack of expertise resulted in unnecessary and excessive work and fees. (*Id.* at 20.) The Court strongly disagrees for two reasons.

First, the Hirani Defendants submit no evidence to support their assertion that Watt Tieder, a firm with over fifty lawyers and offices in multiple cities, lacked the necessary expertise in debt collection, especially in the context of enforcing a collateral security order. For example, they do not identify any tasks that Watt Tieder could have performed more efficiently or in less time as a result of its purported inexperience.

Second, the Hirani Defendants completely ignore Defendants' role in ratcheting up the fees that were necessarily incurred to enforce the collateral security and address Defendants' non-compliance. This was not a run-of-the-mill debt collection action; rather, Defendants turned it into a seven-year cat-and-mouse pursuit, with Defendants thwarting Safeco's efforts to compel Defendants' compliance with court orders at every turn through vexatious litigation. That this endeavor took seven years and hundreds of thousands of dollars is not due to Watt Tieder's lack of experience, but to Defendants' contumacious refusal to obey lawful court orders. (*See, e.g.*, Report and Recommendation re Motion for Contempt Sanctions Against MES Defendants, Dkt. 313; Report and Recommendation re Motion for Contempt Sanctions Against Hirani Defendants, Dkt. 314; Minute Order from 7/23/14, Dkt. 321 (adopting Magistrate Judge Scanlon's R&R finding MES and Hirani Defendants in contempt and discussing their non-compliance)). Had Defendants complied with any of their obligations to post collateral security, Safeco would not have incurred any of the fees that Defendants now complain about.

The Court, therefore, finds that the fees claimed by Safeco in connection with collateral security discovery and contempt motions are reasonable.

<u>Post-Contempt Hearing Briefing</u>: Safeco incurred approximately $50,000 in fees related to the post-contempt hearing briefing. Safeco explains that these fees were incurred in response to the Court seeking briefing on the supplemental materials submitted by Defendants and the scope of sanctions against Defendants. (Safeco Fee App., at 34-35.) The Hirani Defendants object to these fees, arguing that Watt Tieder billed an excessive amount for "four (4) legal briefs (dual initial briefs and replies) that, in large part, simply regurgitated arguments that had been made to Magistrate Judge Scanlon when the contempt motions were first filed." (Hirani Opp'n, at 21.) The Court again notes that the only reason the parties had to file contempt motions was because

Defendants flouted their responsibility to pay collateral security. Furthermore, a comparison of Safeco's initial filings to Judge Scanlon and the subsequent briefs and replies demonstrates that Watt Tieder did more than "regurgitate" its original arguments. (*Compare* Dkts. 327, 328 to Dkts. 333, 334.) The Court, therefore, finds the fees incurred by Safeco in connection with post-contempt hearing briefing are reasonable.

Continued Efforts to Enforce Court's Orders: Safeco incurred $75,000 in fees relating to its continued efforts to enforce the Court's orders. Safeco explains that these fees resulted from the need to investigate Defendants' compliance with the collateral security orders, including "potentially improper or fraudulent transfers of their assets." (Safeco Fee App., at 35.) Defendants argue that this category is "duplicative of the very same document review purportedly undertaken by Watt Tieder in connection with the contempt proceedings." (Hirani Opp'n, at 21.) The Court disagrees. Investigation and litigation over Defendants' efforts to conceal or dissipate assets that should be, or should have been, used toward obtaining collateral security constituted a discreet subset of work performed by Watt Tieder. (*See, e.g.*, Dkt. 465, at 4) (noting that "in addition to the monthly loans from his mother, Makhoul has been receiving near-monthly deposits of between $2,500 to $6,000 since August 2016 from an account purportedly held by Makhoul's brother, but as to which Makhoul appears to have an interest").) Following the Court's contempt rulings and again after the Court's restraint of Defendants' assets, Safeco was forced to litigate further over Defendants excessive personal expenditures and dissipation of funds that they should have been using to pay collateral. (*See, e.g.*, Dkts. 470, 471, 472, ECF Entry 7/11/2017, ECF Entry 7/13/2017.) The Court, therefore, finds that the fees incurred by Safeco in connection with its continuing efforts to enforce the rulings of this Court are reasonable.

Third Party Discovery Efforts (MES Defendants Only): Safeco incurred $275,000 in fees relating to third-party discovery efforts in litigating against MES. Safeco notes that it was necessary to depose third parties, including the indemnitors of the Defendants. Safeco stated that it sought discovery from individuals and limited liability companies related to at least eleven MES Indemnitors, including but not limited to: Anthony Dalleggio; Lea Dalleggio; Johnny Makhoul; Fidelity Seal, LLC; Cherry Hill Acquisitions, LLC; Defined Alliance, LLC; Mark Zawinsy; Marta Zawinsy; Bernard Khadra; Lew Saling, Jr.; and Largime Duka. (Safeco Fee App., at 36.) MES, in response, sought its own discovery, and filed multiple motions to compel. Despite MES's own role in driving up litigation costs, the MES Defendants argue that these fees are excessive. The Court rejects this argument, finding instead that, as Safeco argues, Defendants created a "long and protracted battle." (*Id.*) Defendants fought Watt Tieder at every turn, refusing to produce documents and forcing Watt Tieder to prepare for hearings on motions for sanctions. (*Id.* at 36-37.) Seemingly simple questions of discovery became complicated and expensive endeavors requiring many hours of motions practice. The Court, therefore, finds that the fees incurred by Safeco in connection with third-party discovery relating to the MES Defendants' indemnitors are reasonable.

*d) Response to Defendants' Bad Faith Allegations*

As part of the indemnity litigation, Matter Four, Safeco requests $460,000 in attorneys' fees relating to its responses to Defendants' allegations of bad faith by Safeco in connection with the Agreements. The Hirani Defendants contend that Watt Tieder billed far too much in this sub-category. (Hirani Opp'n, at 22-23.) However, the fees in this sub-category are well-documented in Safeco's Fee Application and show work in connection with nearly sixty separate pleadings, as well as conferences, hearings, research issues, dispositive motions, and other legal services, all

relating to responding to Defendants' $43-million bad faith claim. (Safeco Fee App., at 37-39.) Based on the detailed billing records and affidavits regarding these fees, the Court finds them to be reasonable. *See Reiter*, 2007 WL 2775144, at *13.

*e) General Discovery Efforts*

As part of the indemnity litigation, Safeco also requests $960,000 for 3,048 hours spent on general discovery in this case. Defendants oppose this request, noting that "[e]ven in cases far more complex than this, the time spent on discovery is often far less than what is alleged here." (Hirani Opp'n, at 23-24.) However, as discussed, this case was litigated over the course of eight years, involved the contentious execution of multi-million dollar performance bonds, and required an enormous amount of discovery. Safeco issued interrogatories and document requests to each of the Defendants, took or defended over a dozen depositions, responded to interrogatories and document requests, and responded to pre-motion letters. (Safeco Fee App., at 40.) Most of this discovery focused on the investigations of Defendants' allegations of bad faith and preserving privilege for Safeco's non-testifying experts, Cashin, Spinelli, and Ferretti LLC and Perini Corporation. (*Id.*) Safeco reviewed and analyzed documents from both experts and prepared non-privileged documents for production. (*Id.*) The final privilege logs contained a total of 1,103 privilege entries, each of which had to be supported by an affidavit from a Safeco executive explaining why the material was privileged.[18] (*Id.*)

The Court finds that the hours and fees sought by Safeco for this extensive amount of general discovery are reasonable. *Rand-Whitney Containerboard v. Town of Montville*, No. 3:96-

[18] To the extent that the Hirani Defendants argue that Safeco's discovery review and privilege log preparation involved unnecessarily duplicative work by Watt Tieder partners and associates, the Court disagrees. These tasks inherently require layers of review, especially where the partners are the ones primarily communicating with the Court. The Court further notes that much of the discovery related tasks stemmed from the HEPFF project.

CV-412, 2006 WL 2839236 at *2, 28 (D.Conn. Sept. 5, 2006) (approving attorneys' fees of $2,668,690 from litigation lasting over ten years and involving "voluminous" discovery).

*f) Cross-Motions for Summary Judgment*

As part of the indemnity litigation, Safeco requests $300,000 for its work on cross-motions for summary judgment.[19] Defendants state that the amount of time spent on these motions is "absolutely unheard of in this Circuit." (Hirani Opp'n, at 24.) Yet, even Defendants admit that these were substantive motions addressing complex issues. (*Id.*) Safeco notes that it spent time on numerous tasks, including writing and responding to pre-motion letters, drafting Safeco's motion for summary judgment and compiling supporting exhibits, researching and responding to the Hirani Defendants' and MES Defendants' motions and statements of fact, and filing necessary replies. Safeco notes that at summary judgment, Defendants "submitted two sets of lengthy initial briefings, accompanied by hundreds of pages of affidavits and approximately 300 documentary exhibits." (Safeco Reply, at 47 (citing Dkt. Nos. 399, 422, 424, 425).) Defendants also raised new factual issues in the cross-summary judgment briefing, which necessitated even more briefing. (*Id.* at 47.) The time and effort required to address all of these papers was significant. Furthermore, these motions formed the core of the liability finding in this matter. The Court's decision on the parties' cross-motions was 76 pages in length. (*See* Dkt. 442.)

The Court, therefore, finds that the fees sought in this sub-category are reasonable.

[19] These cross-summary judgment motions were different from, and came after, Safeco's summary judgment motion relating to collateral security, discussed *supra*, filed before Judge Ross in 2010. These cross-summary judgment motions, which were filed in April 2016, related to Safeco's entitlement to damages under the Agreements.

*g) General Case Management and Strategy*

Safeco requests $60,000 in attorneys' fees that related to status conferences, *pro hac vice* motions, and other miscellaneous matters. Defendants argue that these fees should be written off because they amount to nothing more than "amorphous internal correspondence and conferences." (Hirani Opp'n, at 24-25.) However, the Court finds that during the eight-plus years of litigation in this case, Watt Tieder undoubtedly worked on miscellaneous matters that did not easily fit into the other categories. Tasks like preparing for and attending status conferences and filing *pro hac vice* motions are necessary during litigation. The Court finds that these fees to be justified and reasonable.

*h) Settlement Efforts*

Safeco requests $35,000 for previous efforts to settle the case. Safeco notes that Defendants' "obligation to indemnify Safeco for all loss incurred does not distinguish between successful and unsuccessful efforts." (Safeco Reply, at 48.) Defendants argue that the settlement hours are excessive, even allowing for a one-day mediation to settle part of the case. (Hirani Opp'n, at 25.) The Hirani Defendants argue that partners billed too many hours, noting that "Watt Tieder is claiming to have spent the billing equivalent of about 111 partner hours attempting to settle this case." (*Id.*) MES Defendants' expert Steven Tasher also argues that Watt Tieder engaged in "task-inappropriate work performed by partners that should have been delegated to lower-billing attorneys," which resulted in a "top-heavy administration of the workload." (Tasher Report, at 17.) Tasher claimed that 77% of Watt Tieder's total fees were performed by senior attorneys, *i.e.*, fifth year associates to senior partners. (*Id.* at 28.) The Court does not agree that Watt Tieder used its partners to do associate-level work, especially as it relates to settlement. Indeed, settlement is one area where the work of associates is no substitute for the experience and

knowledge of the partners. Furthermore, the Court finds that the expenditure of 111 partner hours, in total, to attempt to reach settlement in a multimillion dollar litigation involving three separate large-scale construction projects was reasonable. Safeco got good value from its attorneys given the long history of this case and the partners' artificially suppressed hourly rate.

The Court, therefore, finds that the fees being claimed in connection with settlement efforts are reasonable.

*i) Damages Hearing Preparation in April 2017*

Safeco incurred $15,000 in fees in preparing for the damages hearing in April 2017. (Safeco Fee App., at 44.) The Hirani Defendants "do not find such fees to be unreasonable in amount." (Hirani Opp'n, at 25.) The Court agrees and finds these fees reasonable.

5. <u>Matter Five: Power with Prestige Sub-Contract (MES Defendants Only)</u>

Safeco requests $34,230 in fees relating to the Power with Prestige sub-contract. Sub-contractor Power with Prestige sought payment under Safeco's performance bond for the Pyro and ERDLF projects. The MES Defendants do not address the Power with Prestige Contract, or any of Matters Five through Eight, in their opposition papers.

Power with Prestige sued Safeco and MES seeking payment under Safeco's performance bond under both projects in the District of New Jersey. Safeco filed a motion to dismiss, which was granted with prejudice. (Safeco Fee App., at 45.) Watt Tieder spent 118.5 hours divided between partners and associates in briefing and arguing the motion. The Court finds the amount of time spent on this task and the resulting fees reasonable.

6. <u>Matter Six: Development and Pursuit of Indemnitors' Assigned Claims (MES and Hirani Defendants)</u>

Safeco requests $277,216 in fees relating to the development and pursuit of MES and Hirani's assigned claims from the bonded projects. Safeco explains that the MES and Hirani

Defendants raised dozens of claims against the Corps related to the three projects: "M.E.S. filed thirty-five appeals to the Armed Services Board of Contract Appeals ("ASBCA") relating to the Pyro Contract (the "Pyro Claims"); Hirani/MES filed nine appeals relating to the HEPFF contract; and MES filed twenty-two appeals to the ASBCA relating to the ERDLF Contract." (*Id.* at 45-46.) Ms. Katsantonis testified that she opened a new matter related to these claims, but had to hire outside consultants to help Watt Tieder "review and analyze these claims and determine what claims to recertify and include before the ASBCA." (Hr'g. Tr. 242:16-242:18.) Watt Tieder billed 536.5 hours of partner, associate, and consultant time for this Matter. The Hirani Defendants object to the fact that Safeco "did not contemporaneously break down its billings by Project for Matter Nos. 6 and 7." (Hirani Opp'n, at 12 n. 5.) However, given the number of claims and appeals that Safeco's counsel was required to handle and the overlapping nature of this work as between the three projects, the Court finds the requested fees, including the hiring of the consultant, to be reasonable.

7. Matter Seven: Development and Pursuit of Safeco's Claims against the Corps (MES and Hirani Defendants)

Safeco incurred $255,968.50 in fees relating to the development and pursuit of its claims against the Corps. Safeco reached a settlement with the Corps regarding Safeco's own claims and the numerous assigned claims relating to the Pyro and HEPFF projects. Safeco had two of its own claims against the Corps relating to the Pyro and HEPFF projects: one for $8,919,776.77 in excess completion costs for the HEPFF Project, and a claim in the amount of $2,143,049.98 in excess completion costs for the Pyro Project. (Safeco Fee App., at 46-47.) Ms. Katsantonis testified that the settlement resulted in a significant reduction in the indemnity owed by Defendants, some of which Defendants arguably were not entitled to. (Hr'g. Tr. 243:17-243:23 ("When we ended up settling with the Corps, it encompassed all of these claims, not MES or Hirani claims. They're our

claims as well. We've, nonetheless, in this lawsuit, credited them with every penny we received from the Corps. But it encompassed all of our claims.").) Watt Tieder spent 738.8 hours on settling the multitude of claims against the Corps. The Hirani Defendants again object to the fact that Safeco "did not contemporaneously break down its billings by Project for Matter Nos. 6 and 7." (Hirani Opp'n, at 12, n. 5.) However, as Safeco contends, its successful settlement of the matter saved *all* parties, including Defendants, substantial funds. Furthermore, there was undoubtedly overlap between the work done to settle claims from one project and the work done to settle the claims for the other two projects, such as preparing for and participating in meetings and telephone conferences with the Corps. The Court also finds that the number of hours and fees expended on these efforts was reasonable, especially given the result. Lastly, under the Agreements, Safeco is allowed to be compensated for what it took to complete the projects.

8. Matter Eight: Defense of Conspiracy and Bad Faith Claims against Safeco Executives (MES Defendants Only)

Safeco incurred $36,697.50 in fees in connection with the defense of conspiracy and bad faith claims against Safeco's corporate executives in the MES Action. The MES Defendants brought claims against David Pikulin, Caryn Mohan-Maxfield, and Ron Goetsch, alleging that these executives tricked MES into relying on Watt Tieder as personal counsel, and otherwise conspired to precipitate the Indemnitors' default termination on the bonded projects. (Safeco Fee App., at 48.) Safeco was successful in defending against these claims. (*Id.*) Safeco's counsel billed 117 hours for this work. The MES Defendants do not address these fees in its opposition papers. The Court finds that them to be reasonable.

9. Watt Tieder Out-of-Pocket Expenses (MES and Hirani Defendants)

Watt Tieder incurred $318,254.67 in out-of-pocket expenses, which were paid by Safeco, in connection with this litigation. According to Safeco's Fee Application, these expenses include

"(i) travel and lodging costs relating to hearings and depositions; (ii) costs in connection with court reporters and deposition transcripts; (iii) document production and e-discovery costs; (iv) costs in retaining experts (billed through Watt Tieder) to assist counsel with calculating damages and in evaluating potential Americans with Disabilities Act violations; and (v) other expenses incidental and necessary to counsel's representation of Safeco." (Safeco Fee App., at 50.) Hirani Defendants' expert Laura Johnson contests Watt Tieder's travel costs and billing for administrative tasks, such as photocopying and clerical work, which should not have been done by attorneys.[20] (Johnson Report, at 3-4.) The Court is not persuaded that the occasional billing by attorneys for administrative tasks renders the claimed expenses unreasonable. The Court, therefore, finds that Safeco is entitled to recover the full amount of its request for out-of-pocket expenses. *Reichman v. Bonsignore, Brignati & Mazzotta, P.C.*, 818 F.2d 278, 283 (2d Cir. 1987) (noting that courts typically award "those reasonable out-of-pocket expenses incurred by the attorney and which are normally charged fee-paying clients.").

10. Farber Brocks Counsel Fees (MES and Hirani Defendants)

Safeco requests $255,710.59 on behalf of its local counsel Farber Brocks. Safeco explains that Farber Brocks performed important services relating to the litigation between the parties that took place in the this Court, including providing guidance on local rules and practices, interfacing with the Court, and dealing with Defendants' attorneys and Makhoul, in his *pro se* capacity, who "often reached out directly to William Brocks, rather than Watt Tieder." (Safeco Reply, at 49.) The Hirani Defendants contest this fee, noting that Farber Brock attorneys "have essentially

[20] For example, Johnson recommends multiple reductions on the grounds of "clerical tasks" ($184 for Matter Two, $78,644.50 for Matter Four, $1,575 for Matter Six, and $5,050.50 for Matter Seven) and "attorney overqualified for task" ($4,797 for Matter Four and $544 for Matter Six). (Dkt. 505-11, at 3-5.)

functioned as paralegals or administrative assistants for *at least* the last 6-7 years of litigation in the Safeco and MES Actions" and have performed no substantive services. (Hirani Opp'n, at 26.) The MES Defendants similarly opposed Farber Brocks's fee, explaining that Farber Brocks did not show what role it played aside from reviewing documents and engaging in correspondence. The MES Defendants also argue that there are overlapping fees for the same tasks between Watt Tieder and Farber Brocks. (MES Opp'n, at 21-22.)

The Court disagrees with Defendants' characterization and minimization of Farber Brocks's role in the litigation. Farber Brocks played a key role as local counsel in a multi-million-dollar lawsuit for out-of-state counsel, who, while experts in surety, were unfamiliar with the judges and practices in this district. Farber Brocks's attorneys attended a number of proceedings, including at critical points in the litigation. At the January 2018 hearing, William Brocks testified, "I was always there to try to lend my expertise. We'd discuss whatever was being dealt with at the conference, whether it was contempt hearings that I attended, or something of that nature." (Hr'g. Tr. 237:2-237:7.) He was asked to give guidance and advice about local practice in the Eastern District, including knowledge about the different judges. (*Id.* at 237:16-237:19.) Furthermore, the significant amount of time spent by Farber Brocks on some tasks, as with the other fees Safeco incurred, was necessitated by Defendants' aggressive litigation posture, which resulted in unnecessarily protracted litigation. Farber Brocks served as local counsel for almost the entirety of this litigation and billed $255,710.59 as a result. The Court finds that the hours and fees billed by Farber Brocks are reasonable.

11. <u>Torre Lentz Counsel Fees (MES and Hirani Defendants)</u>

Safeco requests $92,683.36 on behalf of Torre Lentz, which served as counsel for Safeco when it was a third-party defendant in the *M.J. Favorito* Action. That case arose out of the HEPFF

project. Safeco was drawn into the litigation between MES, Hirani, and the subcontractor through third-party complaints and cross-claims. (Safeco Fee App., at 57-58.) The MES Defendants argue that the Court has no jurisdiction to allow Torre Lentz to collect in this case since the Court did not preside over the *M.J. Favorito* Action, which was filed in the District of New Jersey. (MES Opp'n, at 23.) The Court disagrees.

The Agreements provide that Defendants will pay reasonable legal fees in connection with all litigation matters relating to the bonded projects, and the Court in this action has found that Defendants are liable to Safeco for attorneys' fees under the Agreements for all such litigation. The Court also finds that the $92,683.36 billed by Torre Lentz representing Safeco in the *M.J. Favorito* Action are reasonable. Because both the MES and Hirani Defendants were involved with the HEPFF project, they are jointly and severally liable for the legal fees that resulted from the *M.J. Favorito* Action.

## III. Damages: Safeco's Construction Completion Costs

In the Court's decision granting summary judgment to Safeco on its indemnity claims, the Court left open one area for further fact-finding based on Defendant Makhoul's challenge to certain construction completion costs. (Dkt. 442, at 45 ("[T]he MES Defendants, in their supplemental briefing, have demonstrated some dispute about the exact amounts of Safeco's damages—which will need to be resolved at the upcoming evidentiary hearing on the amount of fees and costs to be awarded").) Makhoul, therefore, was permitted to submit supplemental briefing, and present argument and testify at the January 2018 hearing, about the disputed damages amounts. As set forth below, the Court does not find that Defendants are entitled to any reduction in the construction completion costs claimed by Safeco.

### A. Defendant Makhoul's Objections to Safeco's Damages Claim

Defendant Makhoul contests the amount of construction completion costs being claimed by Safeco pursuant to the Agreements. For the Pyro project, the MES Defendants point to Perini's "exorbitant and unreasonable charges" to complete the project. (Supplemental Affidavit of George Makhoul ("Makhoul Aff."), Dkt. 531, at 2.) For the HEPFF project, Makhoul cites Safeco's unwillingness to engage the lowest qualified bidder approved and recommended by the Corps to complete the project, along with "payments for certain subcontractors' payment bond claims." (*Id.* at 3-4.) For the ERDLF project, Makhoul argues that Safeco made unreasonable payments for subcontractors' payment bond claims and failed to credit MES for the value of all work that MES performed. According to Makhoul, Safeco also unfairly paid Watt Tieder for tasks that the law firm should not have performed, thereby "demonstrating further Safeco's unreasonable and inappropriate conduct." (*Id.* at 9.)

As to both the Pyro and HEPFF projects, Makhoul argues that Safeco incurred unreasonable construction costs attributable to the Corps's lack of funds (as opposed to MES's or Hirani/MES's deficient performance), along with unnecessary consultants to deal with the delays corresponding to the lack of funding. (*Id.* at 4-5.) Makhoul also cites Safeco's refusal to turn over subcontractors' documents that allegedly show excessive construction costs for the Pyro and HEPFF projects. (*Id.* at 6.) According to Makhoul, Safeco allegedly embarked on "an unreasonable expenditure spree after entering into disallowed and unreasonable takeover agreements to complete the Pyro and HEPFF projects." (*Id.* at 10.) Makhoul further argues that "Safeco incurred unreasonable cost [sic] that originated from its decision to voluntarily complete the two construction projects" even though "no valid Government contracts existed." (*Id.*) Makhoul maintains that Safeco profited from its completion efforts on the projects. (*Id.* at 8.)

Safeco counters that Makhoul's affidavit, which was submitted by the MES Defendants in support of these contentions, contains argumentative statements, "expert" opinions already ruled out by the court, speculation without foundation, and hearsay. (Safeco Response to Makhoul Affidavit ("Safeco Res."), Dkt. 533 at 1-2.) Safeco argues that Makhoul also seeks to "re-argue positions and evidence already submitted in opposition to Safeco's motion for summary judgment on entitlement[,]" which the Court has already resolved or rejected. (*Id.* at 2, 5 (noting that Makhoul makes "essentially the same arguments" that the Court already ruled would not be heard at the damages hearing).) Safeco argues that Makhoul ignores the fact that the Agreements required Safeco to complete the work under its defaulted contracts and that the Agreements authorized Safeco to determine the settlement amounts of payment bonds. Furthermore, Safeco contends that, although the Agreements required Safeco to use the lowest qualified bidder to complete the work under the defaulted contracts, they do not require Safeco to submit an itemized statement of loss "in the manner specified by MES." (*Id.* at 5.) Safeco also maintains that, despite Makhoul's insistence otherwise, Safeco has provided Defendants all of the necessary discovery material, including subcontractor files and change orders, as detailed in affidavits, summary judgment papers, and its fee application. (*Id.* at 8-9; *see, e.g.*, Dkt. No. 438.)

Putting aside Safeco's arguments about the validity of the affidavit, the Court finds that there are several problems with Makhoul's arguments on this topic. First, Makhoul makes arguments that even his co-Defendants do not share. At the January 2018 hearing, Ms. Katsantonis noted that Hirani did not contest "at all" the costs under the bonds "as far as the construction costs." (Hr'g. Tr., at 22:3-22:8.) Second, as Safeco argues, Makhoul is not entitled to contest the terms of the Agreements, which expressly give Safeco considerable latitude in making decisions about project management, construction completion, and legal expenditures, once a project is in default.

Third, Makhoul offers nothing more than conclusory statements about Safeco's completion costs being unauthorized or excessive. (*Id.* at 22:24-23:5 (Court noting that Makhoul presented no substantive discussion about construction costs "other than . . . just saying they shouldn't get any of it because it was all done in bad faith.").) Finally and perhaps most problematically, Makhoul makes many of the same arguments that he made on summary judgment, which the Court has already rejected. For example, Makhoul argues that Safeco unfairly realized a profit on the bonded projects—an argument that the Court dispensed with in its summary judgment decision. (S.J. Order, Dkt. 442, at 54 ("The MES Defendants argue that Safeco's bad faith in acting upon the bonds on the three construction projects at issue can be demonstrated through its alleged pursuit of profits on each of those contracts. . . . There is no evidence to support this otherwise specious accusation.").)

Accordingly, the Court finds that Makhoul has failed to show that any offset to the approximately $9 million in construction completion and related costs that Safeco incurred as a result of Defendants' defaults on the bonded projects is warranted.

**B. Amount of Safeco's Damages**

Safeco has not yet identified the aggregate amount of damages it is owed or seeking. In connection with summary judgment briefing, Safeco noted that it had sent letters to both MES and Hirani requesting $13,325,000 in collateral from the MES Defendants and $8,800,000 from the Hirani Defendants. (Safeco's 56.1, Dkt. 410-1, at ¶ 74). Safeco later stated in its 56.1 Statement that its "total unreimbursed out-of-pocket losses resulting from its having issued the Bonds exceed $14,000,000.00, of which not less than $11,000,000 is attributable to the HEPFF Bonds." (*Id.* at ¶ 85.) Safeco also noted that, of this amount, it expected a settlement payment of $6,015,000 from

the Corps that had not been paid as of the time it filed its 56.1 statement in February of 2016. (*Id*. at ¶ 85 n. 16.)

Accordingly, the Court directs Safeco to identify in writing, by July 3, 2018, the amount of damages that it is claiming under the surety agreements, including, but not limited to, a breakdown of specific amounts owed by Defendants, the MES Defendants, and the Hirani Defendants.

**CONCLUSION**

For the reasons stated herein, Safeco's fee application is granted in its entirety and Defendants' oppositions to the application are denied in their entirety. The Court finds that the MES Defendants are liable for $5,570,500.62 in attorneys' fees and costs, that the Hirani Defendants are jointly and severally liable for $4,352,639.56 of that amount, and that Defendants are not entitled to any offset against the construction completion and related costs established by Safeco in this matter. In light of Defendants' history of re-litigating every issue in this case, the Court cautions them against filing reconsideration motions that are not well-considered. All parties are warned that the filing of a reconsideration motion that the Court finds to be frivolous, *e.g.*, merely restating arguments already rejected by the Court, could result in the imposition of sanctions. *See Caisse Nationale de Credit Agricole–CNCA, N.Y. Branch v. Valcorp, Inc.*, 28 F.3d 259, 264 (2d Cir. 1994)) (affirming imposition of Rule 11 sanction for a frivolous reconsideration motion and stating that Rule 11 permits sanctions against a litigant who submits a motion that, evaluated "under an objective standard of reasonableness . . . [has] no chance of success and [makes] no reasonable argument to extend, modify or reverse the law as it stands."). Finally, the Court directs Safeco to identify, by July 3, 2018 the total amount of damages that it is owed under the surety

agreements, including amounts owed by Defendants, the MES Defendants, and the Hirani Defendants.

SO ORDERED.

*/s/ Pamela K. Chen*
Pamela K. Chen
United States District Judge

Dated: June 8, 2018
Brooklyn, New York